**Appendix 1: Unpublished Materials - Citations**

1. *Harris v. FOIA Unit DEA*, Civ. Action No. 3:06-cv-0176-R, 2006 WL 3342598 (N.D. Tex. Nov. 17, 2006).

2. *Cabrera v. U.S. Dep't of Justice*, Civ. Action No. 5:12-cv-108, 2012 WL 12903135 (E.D. Tex. Dec. 10, 2012).

3. *Ades v. United States*, 2022 WL 1198206 (5th Cir. Apr. 22, 2022).

4. *Porter v. Leavitt*, Civ. Action No. 22-76-BAJ-SDJ, 2023 WL 2705854 (M.D. La. Mar. 9, 203).

5. *Star v. Sec'y of Dep't of Homeland Security*, No. PE: 19-cv-053-DC, 2022 WL 3644188 (W.D. Tex. June 3, 3022).

6. *Brook v. Teti*, Civ. Action No. 15-2022 (RFH), 2023 WL 2072442 (D.D.C. Feb. 17, 2023).

7. *Slocum v. Sebring Capital Partners, LP*, C.A. No. 4:18-CV-029, 2018 WL 3470300 (E.D. Tex. June 27, 2018).

8. *Fidelis Diagnostics, Inc. v. SafeGuard Servs., LLC*, No. 4:10-cv-638, 2011 WL 5975787 (E.D. Tex. Nov. 4, 2011).

9. *Adam Brook, M.D., PH.D. v. Catherine Teti, et al*, No. 1:15-CV-02022; United States District Court for the District of Columbia ("DDC") Complaint.

Harris v. Freedom of Information Unit Drug Enforcement Admin., Not Reported in...
2006 WL 3342598

2006 WL 3342598
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas,
Dallas Division.

John HARRIS, Plaintiff,
v.
FREEDOM OF INFORMATION UNIT DRUG
ENFORCEMENT ADMINISTRATION, Defendant.

Civil Action No. 3:06-CV-0176-R.
|
Nov. 17, 2006.

**Attorneys and Law Firms**

John Harris, Forney, TX, pro se.

T.J. Johnson, U.S. Attorney's Office, Dallas, TX, for Defendant.

*ORDER ADOPTING THE FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE*

JERRY BUCHMEYER, District Judge.

**\*1** The Court has under consideration the Findings, Conclusions, and Recommendation of United States Magistrate Judge Paul D. Stickney. The District Court reviewed *de novo* the proposed Findings, Conclusions, and Recommendation. Finding no error, the Court adopts the Findings, Conclusions, and Recommendation of the United States Magistrate Judge.

**SO ORDERED** this 17th day of November, 2006.

PAUL D. STICKNEY, Magistrate Judge.

*FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE*

Plaintiff John Harris ("Plaintiff") filed a petition for writ of mandamus requesting that the Court require the Freedom of Information Unit of the Drug Enforcement Administration to provide information to him pursuant to a Freedom of Information Act ("FOIA") request he made September 28, 1999. The following motions are pending before the United States Magistrate Judge pursuant to an order of referral from the District Court:

1. Defendant's Objections to Summary Judgment Exhibits and Motion to Strike Plaintiff's Affidavits and Supplemental Documents, filed July 26, 2006;

Defendant's Motion for Summary Judgment, filed May 30, 2006; and

Plaintiff's Motion for Summary Judgment, filed April 13, 2006.

*Defendant's Objections to Summary Judgment Exhibits ("Exh.") and Motion to Strike Plaintiff's Affidavits and Supplemental Documents*

Defendant objects to the evidence Plaintiff submitted in support of his motion for summary judgments because it is neither properly authenticated nor admissible. (Def.'s Resp., filed May 15, 2006.) Defendant requests that the court strike the following summary judgment proof: Exh. "A" (September 26, 1999-unsigned letter purportedly authored by James Harris); Exh. "B" (unauthenticated receipt for certified mail); Exh. "C" (unauthenticated mail documents) and Exh. "D" (October 22, 1999 letter purportedly authored by Clarence W. Cash, Jr.). These documents are not properly authenticated and constitute hearsay. The Court finds that Defendant's objections should be sustained and that these exhibits should be stricken.

The Court will now consider "Defendant's Motion to Strike Plaintiff's Affidavits and Supplemental Documents," filed July 26, 2006. Plaintiff filed a response to the motion on August 29, 2006. In the response, Plaintiff withdrew his second affidavit in support of summary judgment. (Pl.'s

Harris v. Freedom of Information Unit Drug Enforcement Admin., Not Reported in...

2006 WL 3342598

Resp., 2.) Accordingly, Plaintiff's second affidavit will not be considered for any reason.

Defendant contends that the "Affidavit of Plaintiff John Harris in support of Motion for Summary Judgment," filed June 30, 2006, should be stricken. Defendant contends that Plaintiff's affidavit is inadmissible hearsay, that the affidavit contains inadmissible hearsay as defined by Federal Rule of Evidence 801, and that it is offered for the truth of the matters asserted. Defendant argues that the affidavit is not relevant evidence as defined by Federal Rule of Evidence 401 and thus, is inadmissible in accordance with Federal Rule of Evidence 402. Plaintiff responds that the affidavit refers to actions he filed in the United States District Court for the Eastern District of Arkansas in Little Rock, Arkansas, regarding grand jury records. The Court finds that the Affidavit of Plaintiff John Harris should be stricken in its entirety because it is not relevant and contains inadmissible hearsay. The affidavit is not competent summary judgment evidence in this proceeding.

**\*2** Defendant also requests the Court to strike the supplements to the record which Plaintiff filed on June 30, 2006, namely supplements to the record (A), (B), (C), and (D). Plaintiff claims that he offers these documents, not as proof that he filed an FOIA request in this case, but because he "simply wanted the Court to know that he had not yet received a positive or negative response to his request for grand jury records from the District Court in Arkansas which was filed in the U.S. Eastern District Court in Arkansas in May of 2006." (Resp., 2.) These unauthenticated documents allegedly from an unrelated case in another jurisdiction are not relevant and are inadmissible in accordance with Federal Rule of Evidence 402. Moreover, the documents are hearsay and contain inadmissible hearsay in accordance with Federal Rule of Evidence 802. Accordingly, Defendant's Motion to Strike Plaintiff's Affidavits and Supplemental Documents, filed July 26, 2006, should be granted.

### Defendant's Motion for Summary Judgment

### Standard of Review

### A. Standard for Summary Judgment

Summary judgment is appropriate when the pleadings and record evidence show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994). Only disputes about material facts will preclude the court's granting summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The burden is on the movant to prove that no genuine issue of material fact exists. *Latimer v. Smithkline & French Labs.,* 919 F.2d 301, 303 (5th Cir.1990). If the non-movant bears the burden of proof at trial, the summary judgment movant need not support his motion with evidence negating the non-movant's case. Rather, the movant may satisfy his burden by pointing to the absence of evidence to support the non-movant's case. *Little,* 37 F.3d at 1075. Once the movant meets his burden, the non-movant must show that summary judgement is not appropriate. *Little,* 37 F.3d at 1075 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)). "[A properly supported summary judgment motion] requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex,* 477 U.S. at 324. *See* Fed.R.Civ.P. 56(e). "This burden is not satisfied with 'some metaphysical doubt as to material facts,' ... by 'conclusory allegations,' ... by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). To determine whether a genuine issue exists for trial, the court must view all of the evidence in the light most favorable to the non-movant, and the evidence must be sufficient such that a reasonable jury could return a verdict for the non-movant. *Munoz v. Orr,* 200 F.3d 291, 302 (5th Cir.2000); *Anderson,* 477 U.S. at 248. The Court has no duty to search the record for triable issues. *Ragas v. Tennessee Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir.1998).

### B. Statement of Facts

**\*3** Taking the facts in the light most favorable to Plaintiff, the facts are as follows:

1. Plaintiff sent by certified mail a letter (FOIA request) to Freedom of Information Operations Unit ("SARO"),

Drug Enforcement Administration ("DEA"), 700 Army Navy Drive, Arlington, VA 22202, on September 28, 1999. Plaintiff received a receipt for certified mail dated October 1, 1999, signed by someone named "Horton," who remains unidentified. (First Amended Petition ("Pet."), ¶ 9.)

2. Plaintiff did not receive a response to his FOIA letter request. (Pet., ¶ 11.)

3. In October, 1999, Plaintiff's attorney wrote a letter inquiring about Plaintiff's FOIA request, but his attorney did not receive a response to his letter. (Pet., ¶ 11.)

4. Plaintiff did nothing more to follow up on his request until he filed this action. (Plaintiff's Brief in Support of Response ("Resp."), 2.)

5. Leila I. Wassom ("Wassom"), a DEA Paralegal Specialist, currently assigned to the Office of Chief Counsel, Administrative Law Section ("CCA"), DEA Headquarters, Washington, D.C., was assigned to the Freedom of Information and Records Management Section, DEA Headquarters from August 1991 to June 2005. (Wassom Declaration ("Decl").

5. Wassom searched the records maintained by SARO and determined that SARO has no record of receipt of a letter (FOIA request) from Plaintiff dated September 26, 1999.

6. SARO uses a computer based system to track Freedom of Information/Privacy Act ("FOI/PA") requests received by DEA. DEA enters into the FOIA database for each request received the name of requester, the assigned request number, the requester's date of birth and the requester's Social Security Number. Each request received is entered into the system once it is reviewed. Information about a request, including the DEA FOIA case number is retrieved by entering the name of the requester. The result will be a positive or negative response from the system. (Decl.)

7. When the response is positive, the system will list all DEA FOIA case numbers that relate to the requester in the "Matching Cases" box. If the case has been appealed to the Department of Justice, Office of

Information and Privacy, an "X" will appear by the "Appeal Opened" date box. (Decl.)

8. Wassom conducted a search of the EFOIA database by entering Plaintiff's first and last name, using the names "John Harris" and "Johnny Harris" in the designated name field. (Decl.)

9. Wassom received a negative response. No matching DEA FOIA cases numbers or matching requester names were displayed. (Decl., (Printouts of the search are attached to the Decl. as Exh. "A.")

## C. Conclusions of Law

The FOIA, 5 U.S.C. § 552, generally provides that any person has a right, enforceable in court, of access to federal agency records, except to the extent that such records, or portions thereof, are protected from disclosure. The merits of the request are not dependent upon the purpose for which the records are sought. *Reporters Committee for Freedom of the Press v. Dep't of Justice,* 489 U.S. 749, 771 (1989). The requester does not have to justify his or her request. *See North v. Walsh,* 881 F.2d 1088, 1096 (D.C.Cir.1989). Congress enacted the FOIA to facilitate public access to Government documents. *Dep't of State v. Ray,* 502 U.S. 164, 173, (1991). Nevertheless, FOIA requests must reasonably describe the records sought. *See* 5 U.S.C. § 552(a)(3)(A). Further, the requests must be made in accordance with the agency's regulations. *See* 5 U.S.C. § 552(a)(3)(B).

### 1. Exhaustion of Administrative Remedies

*\*4* The Act's provisions "do not expressly require that a claimant exhaust his administrative remedies prior to requesting judicial relief; however, they clearly imply that exhaustion is required." *Hedley v. United States,* 594 F.2d 1043, 1044 (5th Cir.1979). In such a case, the jurisprudential doctrine of exhaustion controls. *See McKart v. United States,* 395 U.S. 185, 193-94 (1969) (discussing "judicial application of the exhaustion doctrine in cases where the statutory requirement of exclusivity [of an agency's jurisdiction] is not so explicit"). The jurisprudential exhaustion doctrine is a "long settled rule of judicial

Harris v. Freedom of Information Unit Drug Enforcement Admin., Not Reported in...

2006 WL 3342598

administration [which mandates] that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 50-51 (1938). The doctrine (1) avoids premature interruption of the administrative process; (2) lets agencies develop the necessary factual background upon which decisions should be based; (3) permits an agency to exercise its discretion or apply its expertise; (4) improves the efficiency of the administrative process; (5) conserves scarce judicial resources; (6) gives the agency a chance to discover and correct its own errors; and (7) may avoid the possibility that "frequent and deliberate flouting of administrative processes could weaken the effectiveness of an agency by encouraging people to ignore its procedures." *Patsy v. Florida Int'l Univ.,* 634 F.2d 900, 903 (5th Cir. Jan. 1981) (en banc) (quoting *McKart,* 395 U.S. at 193-95), *rev'd and remanded on other grounds sub nom., Patsy v. Board of Regents,* 457 U.S. 496 (1982).

A court should only excuse a claimant's failure to exhaust administrative remedies in extraordinary circumstances. *See Central States S.E. & S.W. Areas Pension Fund v. T.I.M.E.DC, Inc.,* 826 F.2d 320, 329 (5th Cir.1987). Traditional circumstances in which courts have excused a claimant's failure to exhaust administrative remedies include situations in which (1) the unexhausted administrative remedy would be plainly inadequate, (2) the claimant has made a constitutional challenge that would remain standing after exhaustion of the administrative remedy, (3) the adequacy of the administrative remedy is essentially coextensive with the merits of the claim (e.g., the claimant contends that the administrative process itself is unlawful), and (4) exhaustion of administrative remedies would be futile because the administrative agency will clearly reject the claim. *See Patsy,* 634 F.2d at 903-04. None of the traditional exceptions to the general rule requiring exhaustion of administrative remedies applies in this case. Therefore, the Court should decline to exercise its discretion to excuse Plaintiff's failure to exhaust administrative remedies.

Failure to file a "proper" FOIA request according to agency regulations, including failure to include, among other things, proof of the requester's identity and a firm commitment to pay search and copy costs, may also result in a determination that the petitioner failed to exhaust his administrative remedies. *Taylor v. U.S. Treasury Dept.,* 127 F.3d 470, 474-75 (5th Cir.1997). Moreover, submission of a properly framed request is a necessary element of a requester's claim for judicial relief under the FOIA. *Id.*

**\*5** A defendant in an FOIA suit is entitled to summary judgment if it establishes that it has fully discharged its obligations under the Act. *Pollack v. U.S. Bureau of Prisons,* 879 F.2d 406, 409 (8th Cir.1989) (citing, *Miller v. U.S. Dep't of State,* 779 F.2d 1378, 1382 (8th Cir.1985). "Summary judgment is commonly used to adjudicate FOIA cases." *See e.g., Miller,* 779 F.2d at 1382. The underlying facts, and the inferences to be drawn from them, are to be construed in the light most favorable to the FOIA requester. *Pollack,* 879 F.2d at 409. As long as there are no material facts at issue and no facts "susceptible to divergent inferences bearing upon an issue critical to disposition of the case," summary judgment is appropriate. *Alyeska Pipeline Serv. Co. v. U.S. EPA,* 856 F.2d 309, 314 (D.C.Cir.1988). A properly supported motion for summary judgment is not defeated simply by a "bare opinion or an unaided claim that a factual controversy persists." *Id.*

A preliminary issue before the Court is whether Defendant conducted a search reasonably calculated to uncover any properly submitted FOIA requests by Plaintiff. "An agency may prove the reasonableness of its search through affidavits from responsible agency officials, as long as such affidavits are relatively detailed, nonconclusory, and submitted in good faith." *Pollack,* 879 F.2d at 409. Wassom's affidavit in this case is thorough and comprehensive. Plaintiff has not given this Court any reason to doubt the veracity of Wassom's declarations.

Ordinarily, the agency has the burden to prove the non-existence of the records sought. However, in this case, Plaintiff has failed to prove the existence of a properly framed request. His letter broadly requested "files" without any proof of his identification or a promise to pay the search costs. The certified mail receipt, signed by an unidentified person named "Horton" does not create a genuine issue of material fact concerning whether Defendant received a properly framed request from Plaintiff. Nor do the facts that (1) Plaintiff's counsel made inquiries and (2) Plaintiff's counsel wrote the agency about Plaintiff's letter request

create genuine issues of material fact. Wassom's thorough and complete search of agency records revealed that no proper FOIA request by either John Harris or Johnny Harris was ever logged into the system.

When Plaintiff received no response to his initial inquiry and no response to his attorney's inquiries, he failed to lodge an appeal. In fact, he did nothing until he filed this suit. To sustain a claim for judicial remedy in his request under the FOIA, a plaintiff must prove that he properly and timely presented his FOIA request to the agency and that he exhausted his administrative remedies prior to seeking judicial review. 5 U.S.C.A. § 552; *Voinche v. F.B.I.,* 999 F.2d 962, 963 (5th Cir.1993).

Plaintiff does not allege that he exhausted his administrative remedies and the record contains no evidence to support even an attempt by Plaintiff to exhaust his administrative remedies. Nevertheless, Plaintiff contends that the agency's failure to respond to his FOIA request should be considered a constructive exhaustion of administrative remedies pursuant to 5 U.S.C. § 552(a)(6)(C). If an agency has not complied within the statutory time limits of an FOIA request, the requester shall be deemed to have exhausted his administrative remedies and may bring suit. *See* 5 U.S.C. § 552(a)(6)(C). However, in an action based on § 552(a)(6)(C), the issue is not whether the requestor should have ultimate access to the records he sought. *Voinche,* 999 F.2d at 963. *See Open America v. Watergate Special Prosecution Force,* 547 F.2d 605, 607 (D.C.Cir.1976). Rather, the issue is under what time constraints a court should compel administrative agencies to act at the behest of a requester. *Id.* at 607-08. Although Plaintiff exhausted his administrative remedies pursuant to § 552(a)(6)(C) in order to challenge the tardiness of Defendant's response, he has not exhausted his administrative remedies for purposes of challenging the adequacy of Defendant's response.

**\*6** Defendant has no record that Plaintiff ever filed a proper FOIA request with the DEA. Plaintiff did not follow the agency's published regulations governing FOIA requests, as required by statute. *See* 5 U.S.C. § 552(a)(3). Where a requester fails "to follow the procedures set forth in the agency regulations, he has failed to make a proper request under the FOIA and therefore has failed to exhaust his administrative remedies." *Kessler v. United States,* 899

F.Supp. 644, 645 (D.D.C.1995). Defendant is entitled to judgment as a matter of law based upon Plaintiff's failure to exhaust his administrative remedies for purposes of challenging Defendant's failure to respond.

### 2. *Six-Year Statute of Limitations*
The terms of 28 U.S.C. § 2401 provide:

**Time for commencing action against United States**

> (a) Except as provided by the Contract Disputes Act of 1978, every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues.

Assuming an agency received a request and failed to respond, a dissatisfied requester has six years to bring his or her FOIA suit in a District Court. *See Spannus v. U.S. Dept. of Justice,* 824 F .2d 52, 55-56 (D.C.Cir.1987). Plaintiff alleges that he filed a FOIA request on September 28, 1999 and did not receive a response to the request within twenty working days. Plaintiff did not appeal. Plaintiff alleges that his counsel followed up on several occasions, including a letter written October 22, 1999. Thus, at the latest, Plaintiff knew twenty days after October 22, 1999, or on November 11, 1999 that the request had gone unanswered. Plaintiff filed suit on January 27, 2006. This date is outside the six-year limitation period. Plaintiff's claim for a judicial remedy under the FOIA is barred by the statute of limitations. 5 U.S.C. § 552. The record contains no evidence that Plaintiff timely filed this suit.

Plaintiff alleges that he is entitled to equitable tolling of the limitation period because the DEA's "acts of threats, intimidation and interference with [his] lawful business activities began in 1999 and continued through the present. (Pet.¶ 11-12.) He claims the acts "served to discourage [him] from pursuing FOIA request to which [he] is entitled for fear of retribution." (*Id.*)

The six-year statute of limitations set forth in § 2401(a) is more than an ordinary statute of limitations; it is a condition on the waiver of sovereign immunity, and Courts are obliged to construe such waivers strictly. Moreover, Plaintiff's

2006 WL 3342598

allegations of harassment are not grounds for equitable tolling. The record contains no evidence of a connection between the agents in the field who allegedly "harassed" Plaintiff and the employees who routinely answer FOIA requests. Additionally, the record contains no support for Plaintiff's conclusory assumption that a FOIA request would cause problems for Plaintiff and his company. As a matter of law, Plaintiff is not entitled to equitable tolling of the statue of limitations. Defendant is entitled to summary judgment because Plaintiff's suit is barred by the six-year statute of limitations. Plaintiff could have filed and still may file a FOIA request that complies with agency regulations.

**D.** *Recommendation*

**\*7** This Court recommends that the District Court sustain Defendant's Objections to Summary Judgment Exhibits and grant Defendant's Motion to Strike Plaintiff's Affidavits and Supplemental Documents, filed July 26, 2006. The Court further recommends that the District Court grant Defendant's Motion for Summary Judgment, filed May 30, 2006 and that the Court deny Plaintiff's Motion for Summary Judgment, filed April 13, 2006.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 3342598

**Harris v. Freedom of Information Unit Drug Enforcement Admin., Not Reported in...**

2006 WL 3342598

---

**End of Document**                                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

2012 WL 12903135
Only the Westlaw citation is currently available.
United States District Court, E.D. Texas, Texarkana Division.

Jorge CABRERA

v.

U.S. DEPARTMENT OF JUSTICE, et al.

CIVIL ACTION NO. 5:12cv108
|
Signed 12/10/2012

**Attorneys and Law Firms**

Jorge Cabrera, Texarkana, TX, pro se.

REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE

CAROLINE M. CRAVEN, UNITED STATES MAGISTRATE JUDGE

**\*1** The Plaintiff Jorge Cabrera, an inmate of the Federal Correctional Institution in Texarkana, Texas proceeding *pro se*, filed this civil action under the Freedom of Information Act, complaining that he has not been provided with certain information which he seeks. The case was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and (3) and the Amended Order for the Adoption of Local Rules for the Assignment of Duties to United States Magistrate Judges.

On October 29, 2012, Cabrera was ordered to pay the filing fee of $350.00 or to submit a properly certified *in forma pauperis* data sheet, as required by 28 U.S.C. § 1915(b). Cabrera received a copy of this order on November 1, 2012, but to date has not complied, nor has he responded in any way.

A district court may dismiss an action for failure of a litigant to prosecute or to comply with any order of the court. McCullough v. Lynaugh, 835 F.2d 1126 (5th Cir. 1988); Rule

41( ), F. R. Civ. P. Cabrera's failure to prosecute his case is demonstrated by his failure to pay the filing fee or to submit a certified *in forma pauperis* data sheet, as required by the Court.[1]

Dismissal with prejudice for failure to prosecute or to obey an order of the Court is an extreme sanction which should be employed only when "the plaintiff's conduct has threatened the integrity of the judicial process [in a way which] leav[es] the Court no choice but to deny that plaintiff its benefit." McNeal v. Papasan, 842 F.2d 787, 790 (5th Cir. 1988), *citing* Rogers v. Kroger Co., 669 F.2d 317, 321 (5th Cir. 1982). A court should consider lesser sanctions, such as fines, costs, damages, conditional dismissals, and dismissals without prejudice, among other lesser measures, prior to dismissing an action with prejudice. McNeal, 842 F.2d at 793.

In this case, Cabrera's failure to pay the filing fee or furnish the data sheet are not actions which threaten the judicial process, and so dismissal with prejudice would not be warranted. The imposition of fines and costs is not appropriate given the status and nature of this case. Records attached to Cabrera's complaint indicate that his attempt to obtain the records was denied on October 3, 2012, giving Cabrera ample time in which to refile his Freedom of Information Act complaint, should he choose to do so. *See* Spannaus v. U.S. Department of Justice, 824 F.2d 52, 55 (C.A.D.C. 1987) (applying six-year statute of limitations to FOIA claims under 28 U.S.C. § 2401(a)). Upon consideration of all relevant factors, the Court has determined that the interests of justice are best served by a dismissal of this case without prejudice.

RECOMMENDATION

It is accordingly recommended that the above-styled civil action be dismissed without prejudice for failure to prosecute or to obey an order of the Court.

A party's failure to file objections to the findings, conclusions, and recommendations contained in this Report within 14 days after service with a copy thereof shall bar that party from *de novo* review by the district judge of those findings, conclusions, and recommendations and, except upon grounds of plain error, from appellate review of the

Cabrera v. U.S. Department of Justice, Not Reported in Fed. Supp. (2012)

unobjected-to proposed factual findings and legal conclusions accepted and adopted by the district court. Douglass v. United Services Automobile Association, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

**All Citations**

Not Reported in Fed. Supp., 2012 WL 12903135

Cabrera v. U.S. Department of Justice, Not Reported in Fed. Supp. (2012)

## Footnotes

| | |
|---|---|
| 1 | Claims brought under the Freedom of Information Act require the standard $350.00 filing fee. *See* Banks v. Department of Justice, 605 F.Supp.2d 131, 138 (D.D.C. 2009). |

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Ades v. United States, Not Reported in Fed. Rptr. (2022)

129 A.F.T.R.2d 2022-1575

2022 WL 1198206

United States Court of Appeals, Fifth Circuit.

Bruce Allan ADES, Plaintiff—Appellant,

v.

UNITED STATES of America, Defendant—Appellee.

No. 22-10044
|
FILED April 22, 2022

Appeal from the United States District Court for the Northern District of Texas, USDC No. 3:21-CV-257, Barbara M. G. Lynn, Chief Judge

**Attorneys and Law Firms**

Bruce Allan Ades, Carrollton, TX, Pro Se.

Thomas M. Herrin, U.S. Department of Justice, Dallas, TX, for Defendant—Appellee.

Before Wiener, Dennis, and Haynes, Circuit Judges.

**Opinion**

Per Curiam:[*]

**\*1** Plaintiff-Appellant Bruce Allen Ades proceeding *pro se* appeals the dismissal of his lawsuit. Ades sued under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551, *et seq.*, alleging that officers and employees of the government committed criminal offenses under 26 U.S.C. § 7214 by "demand[ing] other or greater sums than are authorized by law ... fail[ing] to perform numerous duties of his/her office or employment (including the loss and destruction of pertinent records to the lawsuit ... [and] sign[ing] fraudulent entries in any book." His claims arise from a 2006 closing agreement between the I.R.S., Ades, and his then-wife. ("2006 Agreement") Ades agreed to pay a penalty fee because he underreported federal income taxes by relying on offshore payment cards or financial arrangements.

The government moved to dismiss Ades's lawsuit. The district court granted the motion and dismissed it without prejudice. Pro se litigants are given liberal construction in their briefing, but they are still required to follow the rules of

procedure and to brief relevant points. *Yohey v. Collins*, 985 F.2d 222, 225 (5th Cir. 1993). Ades contends that the district court erred by: (1) dismissing his lawsuit as time-barred and (2) denying his motion for an emergency temporary restraining order ("TRO") and preliminary injunction.

Ades contends that there is not a statute of limitations defined in the APA. However, an "APA challenge is governed by the general statute of limitations provision of 28 U.S.C. § 2401(a), which provides that every civil action against the United States is barred unless brought within six years of accrual." *Dunn-McCampbell Royalty Int., Inc. v. Nat'l Park Serv.*, 112 F.3d 1283, 1286-87 (5th Cir. 1997). Missing the deadline is not without consequences. "[A] 'failure to sue the United States within the limitations period' for a specific cause of action 'is not merely a waivable defense. It operates to deprive federal courts of jurisdiction." *Am. Stewards of Liberty v. Dep't of Interior*, 960 F.3d 223, 229 (5th Cir. 2020) (quoting *Dunn-McCampbell*, 112 F.3d at 1287). Ades's lawsuit is barred by the statute of limitations because his claims stem from the 2006 Agreement.

Ades contends that the government's demand letter in December 2019 "and its complete lack of response for months" placed the final agency action "sometime in the middle part of 2020." Such enforcement actions, however, do not create new legal obligations. *Nat'l Pork Producers Council v. U.S. E.P.A.*, 635 F.3d 738, 756 (5th Cir. 2011) (holding guidance letters issued by the EPA do not constitute final agency actions because they "neither create new legal consequences nor affect their rights or obligations"). Ades's claims stem from the settlement he signed in 2006 so his lawsuit was filed long after the six-year statute of limitations expired.

As for the denial of his TRO, "[t]his court has long held that the denial of an application for a temporary restraining order is not appealable." *In re Lieb*, 915 F.2d 180, 183 (5th Cir. 1990). We do not, therefore, consider his appeal of the TRO denial.

**\*2** We do have jurisdiction to review the denial of a request for preliminary injunction. 28 U.S.C. § 1292(a)(1). "The decision to grant or deny a preliminary injunction lies within the sound discretion of the trial court and may be reversed on

Ades v. United States, Not Reported in Fed. Rptr. (2022)

129 A.F.T.R.2d 2022-1575

appeal only by a showing of abuse of discretion." 🚩 *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989) (quoting 🚩 *Apple Barrel Prods., Inc. v. Beard*, 730 F.2d 384, 386 (5th Cir. 1984)). "A preliminary injunction 'is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion.' " *Id.* (quoting 🚩 *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)). The district court did not abuse its discretion in denying the preliminary injunction because Ades did not show he would prevail on the merits of his underlying claims.

AFFIRMED.

**All Citations**

Not Reported in Fed. Rptr., 2022 WL 1198206, 129 A.F.T.R.2d 2022-1575

**Ades v. United States, Not Reported in Fed. Rptr. (2022)**

129 A.F.T.R.2d 2022-1575

### Footnotes

\*       Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 2705854
Only the Westlaw citation is currently available.
United States District Court, M.D. Louisiana.

Claude PORTER

v.

Tristan L. LEAVITT, et al.

CIVIL ACTION NO. 22-76-BAJ-SDJ
|
Signed March 9, 2023

**Attorneys and Law Firms**

Claude Porter, Sunshine, LA, Pro Se.

Justin Alan Jack, United States Attorney's Office, Baton Rouge, LA, for Tristan L. Leavitt, Robert Kirschman, Jr., Louis DeJoy.

Justin Alan Jack, United States Attorney's Office, Middle District of Lou, Baton Rouge, LA, Amanda Mae Leonard, Dalford Dean Owens, Jr., Contempt, Compliance and Special Litigation Branch, Washington, DC, for Lauren McFerran.

**NOTICE**

SCOTT D. JOHNSON, UNITED STATES MAGISTRATE JUDGE

**\*1** Please take note that the attached Magistrate Judge's Report and Recommendation has been filed with the Clerk of the U.S. District Court for the Middle District of Louisiana.

Under ⚑ 28 U.S.C. § 636(b)(1), you have **14 days** from receipt of this Notice to file written objections to the proposed findings of fact and conclusions of law in the Magistrate Judge's Report and Recommendation. A failure to object will constitute a waiver of your right to attack the factual findings on appeal.

**ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.**

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Before the Court is a Motion to Dismiss (R. Doc. 13) filed by the National Labor Relations Board[1] on June 21, 2022.[2] Plaintiff filed an Opposition (R. Doc. 18), to which the NLRB submitted a Reply Memorandum (R. Doc. 24). The NLRB primarily argues that, because Plaintiff's cause of action is "time-barred by the statute of limitations set forth in 28 U.S.C. 2401(a)," this Court lacks jurisdiction and dismissal is therefore appropriate under Rule 12(b)(1). (R. Doc. 13-1 at 2). Alternatively, the NLRB suggests the Court lacks subject matter jurisdiction "to review prosecutorial decisions of the NLRB's General Counsel refusing to issue an administrative complaint and dismissing unfair-labor-practice charges." (R. Doc. 13-1 at 3).

Because the Court agrees that it lacks subject matter jurisdiction and that Plaintiff's claim must be dismissed pursuant to Rule 12(b)(1), it does not reach the NLRB's remaining bases for dismissal under Rule 12(b)(6). *See* ⚑ *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) ("When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits.").

**I. BACKGROUND**

**\*2** "Over 22 years ago" Plaintiff was allegedly removed from his job with the United States Postal Service for refusing to "work on official relief days which [were] observe[d] as a religious sabbath by [Plaintiff] in violation of the Joint Arbitration Agreement between the Postal Service and the National Rural Letter Carrier Association." (R. Doc. 1 at 5). The Complaint's one and only allegation against the NLRB is that it denied Plaintiff "due process by not adjudicating [his] complaints against the USPS and the NRLCA." (R. Doc. 1 at 15). Nothing more is said of the NLRB throughout the Complaint.

In its Motion to Dismiss, the NLRB clarifies that Plaintiff filed unfair labor practice charges in 1999 against his employer, the United States Postal Service, and his union, the National Rural Letter Carrier Association, following his 1998 termination. (R. Doc. 13-1 at 5).[3] The Regional Director of the NLRB in New Orleans decided (on behalf of the NLRB's General Counsel) not to issue a complaint against either the USPS or the NRLCA and dismissed Plaintiff's charges. (R. Doc. 13-1 at 5); (R. Doc. 18 at 2). Plaintiff appealed, and on February 7, 2000, the NLRB's Office of Appeals denied both appeals on behalf of the NLRB's General Counsel. (R. Doc. 13-1 at 6). The NLRB's summary of events is consistent with the documentation attached to Plaintiff's Opposition (R. Docs. 18-1 to 18-5) (letters received from the NLRB regarding its refusal to issue unfair labor practice complaints).

Despite being removed from his position with USPS in 1998 (R. Doc. 1 at 7), Plaintiff applied for deferred annuity benefits in June of 2019 (R. Doc. 1 at 3). The Office of Personnel Management denied his request for retirement benefits in July of 2019, as Mr. Porter had not been employed by the USPS for more than 2 decades. (R. Doc. 1 at 3). After appealing this denial to the Merit Systems Protection Board and eventually the United States Court of Appeals for the Federal Circuit, Plaintiff filed this lawsuit on February 2, 2022. (R. Doc. 1). In the Complaint, Plaintiff claims that he is still employed by the USPS because his termination was unlawful, and he is therefore entitled to retirement benefits. (R. Doc. 1 at 3, 16). As relief, he asks the Court to reverse OPM's "denial of his eligibility for retirement" and compile his eligibility for retirement benefits to the "present day." (R. Doc. 1 at 16). He does not request any relief specific to the NRLB in his Complaint.

In his Opposition, however, Plaintiff raises additional allegations regarding the NLRB's handling of his charge and claims he is "seeking a Mandamus Review of the prosecutorial discretion" exercised by the General Counsel of the NLRB in refusing to issue complaints against the USPS and the NRLCA. (R. Doc. 18 at 7, 8). To be clear, Plaintiff is not only asserting new factual allegations, but an additional basis for jurisdiction under the Mandamus Act— none of which are found in his lengthy Complaint. But because Plaintiff is proceeding pro se, the Court has nonetheless considered his new allegations and basis for

jurisdiction in connection with the NLRB's Motion to Dismiss.[4]

## II. LEGAL STANDARD

**\*3** The party asserting subject-matter jurisdiction "bears the burden of proof for a motion to dismiss" under Rule 12(b)(1). *Davis v. United States*, 597 F.3d 646, 649 (5th Cir. 2009). "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Smith v. Reg'l Transit Auth.*, 756 F.3d 340, 347 (5th Cir. 2014). The district court is "free to weigh the evidence and resolve factual disputes in order to satisfy itself that it has the power to hear the case." *Smith*, 756 F.3d at 347. "The standard of Rule 12(b)(1), while similar to the standard of Rule 12(b)(6), permits the court to consider a broader range of materials in resolving the motion." *Martin v. Halliburton*, 618 F.3d 476, 481 n.5 (5th Cir. 2010); *see also Clark v. Tarrant County*, 798 F.2d 736, 741 (5th Cir. 1986) (court may consider "(1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts" in resolving Rule 12(b)(1) motion).

## III. DISCUSSION

The Court agrees with the NLRB that it lacks jurisdiction because the conduct at issue — the General Counsel's failure to issue an unfair labor practice complaint — "is an exercise of prosecutorial discretion, which is not subject to judicial review." *Beverly Health & Rehabilitation Servs., Inc. v. Feinstein*, 1996 WL 523729, at \*2 (D.D.C. July 25, 1996). What's more, any claim Plaintiff could conceive of bringing against the NLRB has long prescribed. The Court discusses both bases for dismissal below.[5]

### A. Judicial Review Unavailable

Under the NLRA, the General Counsel of the NLRB has "final authority, on behalf of the Board, in respect of the investigation of charges and issuance of complaints ... and in respect of the prosecution of such complaints before the Board." 29 U.S.C. § 153(d). The Act provides "the

Board's General Counsel [with] unreviewable discretion to refuse to institute an unfair labor practice complaint." *Vaca v. Sipes*, 386 U.S. 171, 182 (1967).

"The words, structure, and history of ... the NLRA clearly ... differentiate between the General Counsel's and the Board's 'final authority' along a prosecutorial versus adjudicatory line." *N.L.R.B. v. United Food & Com. Workers Union, Loc. 23, AFL-CIO*, 484 U.S. 112, 124 (1987). The General Counsel has " 'final authority' regarding the filing, investigation, and 'prosecution' of unfair labor practice complaints." *UFCW*, 484 U.S. at 124 (quoting 29 U.S.C.§ 153(d)). But when the "authority of the Board is discussed ... it is in the context of the adjudication of [unfair labor practice] complaints. Specifically, § 10 of the Act refers to the Board and the procedures it must follow to decide unfair labor practice cases." *Id.* at 124 (citing 29 U.S.C. § 160).

Prosecutorial determinations — e.g., the institution of or refusal to institute an unfair labor practice complaint,[6] or the refusal to withdraw an unfair labor practice charge[7] or complaint[8] — are "made solely by the General Counsel," whereas " 'adjudicatory' decisions" are made by the Board. *UFCW*, 484 U.S. at 129, 130 (emphasis added). "The structure of § 10 of the NLRA emphasizes this distinction" by providing that "final decisions 'of the Board' shall be judicially reviewable,[9] thereby disclosing Congress' decision to authorize review of *adjudications*, not *prosecutions*" of unfair labor practice *complaints. Id.* at 129. Given this distinction, the Supreme Court has explicitly found that the NLRA does not "provide for judicial review of the General Counsel's prosecutorial function." *UFCW*, 484 U.S. at 129, 130.

**\*4** To be clear, the decision not to issue an unfair labor practice complaint based on a charge is a discretionary and prosecutorial function of the General Counsel. *See UFCW*, 484 U.S. at 122 ("General Counsel's approval of a determination not to file an unfair labor practice complaint is not subject to judicial review"); *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 1389 (1975) ("Congress has delegated to the Office of General Counsel on behalf of the Board the unreviewable authority to determine whether a complaint shall be filed."); *Jackman v. NLRB*, 784 F.2d 759, 763 (6th Cir. 1986) ("[N]umerous courts of appeals have routinely concluded that such action by the General

Counsel [— refusal to initiate an unfair labor practice complaint —] ... is merely one of several pretrial discretionary nonreviewable evaluations....").

And because it is prosecutorial, as opposed to adjudicatory, it is not subject to judicial review. *See Vaca v. Sipes*, 386 U.S. 171, 182 (1967) ("the General Counsel has unreviewable discretion to refuse to institute an unfair labor practice complaint."); *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 138 (1975) (General Counsel has "unreviewable authority to determine whether a complaint shall be filed"); *Augusta Bakery Corp. v. N.L.R.B.*, 846 F.2d 445, 447 (7th Cir. 1988) ("A decision by the General Counsel not to issue a complaint is not judicially reviewable."); *Dayton Newspapers, Inc. v. NLRB*, 402 F.3d 651, 668 (6th Cir. 2005) ("The NLRA gives the General Counsel virtually unreviewable rights to decide what charges should be pursued").

In his Opposition, Plaintiff makes it plainly clear that he is "requesting [that] this Court [ ] review" the NLRB's "refus[al] to issue an Unfair Labor Practice [Complaint] against [the USPS] who removed [Plaintiff] from the Postal Service by use of fraudulent, illegal, and invalid step one grievance resolution." (R. Doc. 18 at 2). This prosecutorial decision by the General Counsel of the NLRB is not subject to judicial review. And so, this Court lacks subject matter jurisdiction. Moreover, Plaintiff's conclusory allegations of fraud and the denial of due process do not warrant an exception to this well-established rule.

In his Opposition, Plaintiff points to the narrow and rarely successful exception carved out in *Leedom v. Kyne*, 358 U.S. 184, 189 (1958), as a basis for jurisdiction. *See American Federation of Gov't Employees v. Federal Labor Relations Authority*, 103 F. App'x 802, 805 (5th Cir. 2004) (*Kyne* exception is extremely narrow and "rarely used"); *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) ("a *Leedom v. Kyne* claim is essentially a Hail Mary pass — and in court as in football, the attempt rarely succeeds").

To meet the *Kyne* exception, a plaintiff must "identify a specific provision of the Act which, although it is 'clear and mandatory,' has nevertheless been violated by the Board. That the Board may have made an error of fact or law is

insufficient; the Board must have acted without statutory authority." *Hartz Mountain Corp. v. Dotson*, 727 F.2d 1308, 1312 (D.C. Cir. 1984) (quoting *Kyne*, 358 U.S. at 188).

Here, Plaintiff alleges in conclusory fashion that the NLRB denied him due process and committed fraud when it refused to issue an unfair labor practice complaint. (R. Doc. 1 at 15) (NLRB denied him "due process by not adjudicating [his] complaints against the USPS and the NRLCA."). According to Plaintiff, the General Counsel found his charge was untimely — a finding he believes was not only erroneous, but fraudulent, and resulted in a denial of due process. Neither of these arguments, however, are sufficient to meet the "extraordinarily narrow" exception outlined in *Kyne*. *See Hartz Mountain Corp.*, 727 F.2d at 1312.

**\*5** Fatal to his argument, Plaintiff cannot not identify a single statutory provision that despite being "clear and mandatory" was nonetheless violated. *Kyne*, 358 U.S. at 188. Instead, he summarily claims that the "NLRB has violated a non-discretionary duty to file a complaint against the U.S. Postal Service for unfair labor practices and for not filing a complaint against the NRLCA for letting the Postal Service get away with it." (R. Doc. 18 at 7).

Incorrectly describing the General Counsel's prosecutorial discretion as "non-discretionary" in no way supports Plaintiff's alleged denial of due process, nor does it support the exercise of subject matter jurisdiction under the *Kyne* exception. *See Bokat v. Tidewater Equip. Co.*, 363 F.2d 667, 672 (5th Cir. 1966) ("The fact that the attack is voiced in conclusory language of a denial of due process and like constitutional rights does not warrant stopping the Board in its tracks."); *Bova v. Pipefitters & Plumbers Local 60, AFL–CIO*, 554 F.2d 226, 228-29 (5th Cir. 1977) ("The plaintiff's arguments fail because he has not alleged any specific facts or cited any statutory ... provisions which would show that the General Counsel violated any statutory requirements or [ ] constitutional rights. To invoke the jurisdiction of the federal courts, such allegations must clearly show that jurisdiction is appropriate.").

And while his Opposition, for the first time, claims that the Regional Director of the NLRB "committed fraud by changing [the] filing date" of Plaintiff's charge, there is no support for this in the record. (R. Doc. 18 at 7).[10] Specifically,

Plaintiff claims that Annie Archie, a "Complaint I Specialist for the NLRB," sent Plaintiff a letter in July of 1999, "which documents a filing date of July 2, 1999." (R. Doc. 26 at 2). But a December 30, 1999 letter from "Curtis Wells, Regional Director for NLRB," shows that Mr. Wells "changed Plaintiff's filing date from July 2 to July 21." (R. Doc. 26 at 2-3). Both letters are found in the record, *see* (R. Doc. 18-1) (Archie Letter) *and* (R. Doc. 18-3) (Wells Letter), and neither supports Plaintiff's contention.

To begin, nothing in the letter from Annie Archie states that Plaintiff "fil[ed]" his charge on "July 2, 1999," as Plaintiff claims. (R. Doc. 26 at 2). Instead, it appears that Plaintiff is conflating the date he placed on the letter referenced by Ms. Archie, in which he made the charge against USPS and the NRLCA, with the date on which that charging letter was considered filed by the General Counsel on behalf of the NLRB. (R. Doc. 18-1 at 1) (Archie Letter: "Your letter dated July 2, 1999, received in this office on July 7, 1999."). Once again, Ms. Archie's letter does not say that Plaintiff *filed* his charge on July 2, 1999.

Plaintiff is correct, however, that Curtis Wells' letter indicates a filing date of July 21, 1999. (R. Doc. 18-3) (Wells Letter). Indeed, this is the first time a 'filing date' is indicated. (R. Doc. 18-3). Consistent with Mr. Wells' letter, the record contains 3 additional documents, none of which were authored by Mr. Wells, also indicating a filing date of July 21, 1999. (R. Doc. 18-5 at 1) (February 7, 2000 Letter from Appeals Office/General Counsel stating charge filed on July 21, 1999); (R. Doc. 13-3 at 7) (official NLRB database showing July 21, 1999 as filing date); (R. Doc. 13-3 at 9) (official NLRB database also showing filing date of July 21, 1999).[11]

**\*6** The record, therefore, does not establish fraud, or even falsity, and it certainly does not meet the extremely narrow exception outlined in *Kyne*. *See Boire v. Greyhound Corp.*, 376 U.S. 473, 481–82 (1964) ("The *Kyne* exception is a narrow one, not to be extended to permit plenary district court review ... whenever it can be said that an erroneous assessment of the particular facts before the Board has led it to a conclusion which does not comport with the law."); *Sanderson Farms, Inc. v. National Labor Relations Board*, 651 F. App'x 294, 298 (5th Cir. 2016) ("Simply alleging that the Board engaged in dishonest conduct did not confer"

jurisdiction on the district court under *Kyne*); *American Federation of Gov't Employees, Local 1617 v. Federal Labor Relations Auth.*, 103 F. App'x 802, 805 (5th Cir. 2004) (deciding whether someone met the definition of employee was a factual question and that there was no jurisdiction to review such a decision under *Kyne*). This Court therefore lacks subject matter jurisdiction over Plaintiff's cause of action against the NLRB.

Finally, Plaintiff's Opposition makes another novel claim — that this Court has jurisdiction pursuant to the Mandamus Act (R. Doc. 18 at 7), which gives district courts jurisdiction over any "action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff," 28 U.S.C. § 1361. Specifically, Plaintiff argues that the NLRA "guarantees [him] certain rights, including the right to Due Process as provided by the Constitution." (R. Doc. 18 at 7). And because the NLRB was charged with protecting those rights, it had a "non-discretionary duty to file a complaint against the U.S. Postal Service for unfair labor practice and ... against the NRLCA for letting the Postal Service get away with it." (R. Doc. 18 at 7). Plaintiff is mistaken.

"Mandamus is an extraordinary remedy, available only where government officials clearly have failed to perform nondiscretionary duties" — i.e., a duty to act "devoid of the exercise of judgment or discretion." *Dunn-McCampbell Royalty Int., Inc. v. Nat'l Park Serv.*, 112 F.3d 1283, 1288 (5th Cir. 1997); *see also Heckler v. Ringer*, 466 U.S. 602, 616 (1984) (mandamus provides "a remedy for a plaintiff only if ... the defendant owes him a clear nondiscretionary duty").

The decision whether to issue an unfair labor practice complaint, however, is "plainly discretionary." *Remington Lodging & Hospitality, LLC v. Ahearn*, 749 F. Supp. 2d 951, 956 (D. Alaska 2010) (rejecting nearly identical argument); *see also UFCW*, 484 U.S. at 125-26 ("decisions whether to file a complaint are prosecutorial," and thus, represent an exercise of "unreviewable discretion"). Indeed, it is a decision "integral to the exercise of the prosecutorial function by the General Counsel for which *no* judicial review is available, even under the Mandamus Act." *Paulsen v. All American School Bus Corp.*, 986 F. Supp. 2d 142, 148 (E.D.N.Y. 2013) (rejecting a nearly identical argument). And

so, this Court lacks subject matter jurisdiction over Plaintiff's cause of action against the NLRB and it should be dismissed under Rule 12(b)(1) of the Federal Rules of Civil Procedure.

But even if we assumed, purely for the sake of argument, that an exception did apply that would allow this Court to exercise of jurisdiction over the otherwise unreviewable decision of the General Counsel, Plaintiff's cause of action would still be dismissed as time barred. As explained in the following section, the statute of limitations found in 28 U.S.C. § 2401(a) has long been prescribed.

## B. Untimely

The NLRB argues that any cause of action Plaintiff may have had is barred by section 2401(a)'s statute of limitations and this Court therefore lacks jurisdiction for this additional reason. "[T]he six-year statute of limitations in § 2401(a) applies to suits seeking nonmonetary relief through nonstatutory review of agency action." *Geyen v. Marsh*, 775 F.2d 1303, 1309 (5th Cir. 1985). As recent as 2022, the Fifth Circuit held that § 2401(a)'s limitations period is jurisdictional.[12] *Ades v. United States*, 2022 WL 1198206, at *1 (5th Cir. Apr. 22, 2022) ("It operates to deprive federal courts of jurisdiction."); *General Land Office v. U.S. Dep't of the Interior*, 947 F.3d 309, 318 (5th Cir. 2020). And if a limitations period is jurisdictional, once prescribed, it completely deprives a court of authority to hear the case — it is not subject to waiver or equitable tolling. *Texas v. United States*, 891 F.3d 553, 559 (5th Cir. 2018) ("[J]urisdictional limitations are strong medicine for litigants, attorneys, and judges alike, for with a want of subject matter jurisdiction, the court is deprived of all authority to hear a case: it must dismiss the case irrespective of equitable considerations, and it must do so even when timeliness arguments have been waived."); *Perez v. United States*, 167 F.3d 913, 915 (5th Cir. 1999) ("whether the limitations provisions ... are jurisdictional—in which case equitable tolling could not apply').

**\*7** Here, Plaintiff makes clear in his Opposition that he is seeking judicial "review of the decision NLRB made on December 30, 1999," when the Regional Director in New Orleans refused to file an unfair labor practice complaint upon investigating his charge. (R. Doc. 18 at 4). Plaintiff also readily acknowledges that the conduct "complained of ... did

Porter v. Leavitt, Slip Copy (2023)

occur over 2[0] years ago." (R. Doc. 18 at 4). To be clear, Plaintiff had knowledge of the alleged injury in December of 1999. *See Rushing v. Yazoo Cnty. by & through Bd. of Supervisors of Yazoo Cnty.*, 861 F. App'x 544, 553 (5th Cir. 2021) ("we assess accrual from the moment the plaintiff has sufficient information to know that he has been injured").

But even if the Court assumed a later accrual date in February of 2000 — when the General Counsel denied Plaintiff's appeal and dismissed his Charge on February 7, 2000[13] — Plaintiff's February 2, 2022 Complaint was still nearly 14 years late. Nothing more need be said.[14] Plaintiff's February 2, 2022 cause of action was filed well beyond § 2401(a) statute of limitations, and it must be dismissed.

### C. Dismissal is Appropriate without Amendment

**\*8** To reiterate, it is well-settled that the General Counsel's decision not to issue an unfair labor practice complaint is not subject to judicial review. Moreover, it is plainly clear that any cause of action Plaintiff may had have be time-barred. Because, this Court lacks subject matter jurisdiction, any further amendment would prove futile under the particular circumstances of this case, and Plaintiff's cause of action against the NLRB should be dismissed as recommended above.

What's more, an amendment would also be pointless, as Plaintiff's Opposition seemingly contains the new factual allegations and bases for jurisdiction that Plaintiff would include in any amendment. As such, Plaintiff has alleged his best case, and amendment of the Complaint is not appropriate for this additional reason. *Dark v. Potter*, 293 F. App'x 254, 257–58 (5th Cir. 2008) ("[T]he record does not indicate that Dark amended her complaint, but ... she filed a lengthy response to the USPS's motion to dismiss.... [W]e believe Dark was fully apprised of her complaint's potential insufficiency and given opportunity to correct any insufficiencies.... Thus ... we assume that Dark has alleged her best case."); *Jacquez v. Procunier*, 801 F.2d 789, 792 (5th Cir. 1986) ("Although the plaintiff here has not filed a supplemental complaint, he did file an extensive response to the defendants' motion to dismiss. This pleading responds specifically to the defendants' objection that the complaint" was defective.).

### IV. CONCLUSION
As explained above, this Court is without jurisdiction to hear Plaintiff's cause of action, as prosecutorial decisions of the NLRB's General Counsel are not subject to judicial review. His cause of action against the NLRB should be dismissed without prejudice for lack of subject matter jurisdiction. Beyond that, any cause of action Plaintiff might have had against the NLRB is barred by 28 U.S.C. § 2401(a)'s statute of limitations. Therefore, the Court **RECOMMENDS** that the NLRB's Motion to Dismiss (R. Doc. 13) be **GRANTED** and that Plaintiff's cause of action be **DISMISSED** without prejudice. *Bros. Petroleum, LLC v. United States*, 569 F. Supp. 3d 405, 408 (E.D. La. 2021) ("If a court lacks subject matter jurisdiction, it should dismiss without prejudice.").

**All Citations**

Slip Copy, 2023 WL 2705854

Porter v. Leavitt, Slip Copy (2023)

# Footnotes

[1]    The remaining federal Defendants filed their own Motion to Dismiss (R. Doc. 14), which the Court will consider separately. This Report and Recommendation is limited to the Motion to Dismiss (R. Doc. 13) filed by the NLRB.

[2]    Although Plaintiff named as a Defendant Lauren McFerran, Chairman of the NLRB, she is being sued in her official capacity. Plaintiff does not make a single allegation against Chairman McFerran — her name is only found in the list of "Defendants" at the beginning of the Pro Se Civil Complaint Form. (R. Doc. 1 at 2). Instead, Plaintiff's actual Complaint identifies "Defendant No (4)" as the "National Labor Relation[s] Board" and summarily claims that the "NLRB denied [Plaintiff] due process by not adjudicating [his] complaints against the USPS and the NRLCA." (R. Doc. 1 at 15). And so, Plaintiff has asserted an official-capacity claim against Chairman McFerran, which the Court treats as a suit against the NLRB, the agency she heads. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) ("Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. Official-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent.").

[3]    The fact that Plaintiff simultaneously filed separate charges against the USPS and the NRLCA is not integral to the Court's analysis. Given that, and for simplicity, the Court often refers to Plaintiff's charges as a single charge throughout this Report and Recommendation.

[4]    Just before concluding, the Court below recommends that Plaintiff's cause of action be dismissed without an opportunity to amend his Complaint. The Court's recommendation is largely based on Plaintiff's inability to allege any facts that might cure the jurisdictional and other defects cited by the Court. But also, an amendment would be pointless, as Plaintiff's Opposition seemingly contains the new factual allegations and bases for jurisdiction that Plaintiff would include in any amendment. As such, Plaintiff has alleged his best case, and amendment of the Complaint is not appropriate for this additional reason. *Dark v. Potter*, 293 F. App'x 254, 257–58 (5th Cir. 2008) ("[T]he record does not indicate that Dark amended her complaint, but ... she filed a lengthy response to the USPS's motion to dismiss.... [W]e believe Dark was fully apprised of her complaint's potential insufficiency and given opportunity to correct any insufficiencies.... Thus ... we assume that Dark has alleged her best case."); *Jacquez v. Procunier*, 801 F.2d 789, 792 (5th Cir. 1986) ("Although the plaintiff here has not filed a supplemental complaint, he did file an extensive response to the defendants' motion to dismiss. This pleading responds specifically to the defendants' objection that the complaint" was defective.)

[5]    The NLRB alternatively argues that Plaintiff's cause of action should be dismissed under Rule 12(b)(6) because he has failed to state a claim for relief. But again, because the Court recommends that dismissal is appropriate under Rule 12(b)(1), it need not consider the NLRB's additional argument under Rule 12(b)(6). *See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) ("When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits.").

[6]    *See N.L.R.B. v. United Food & Com. Workers Union, Loc. 23, AFL-CIO*, 484 U.S. 112, 125 (1987) ("decisions whether to file a complaint are prosecutorial"); *Vaca v. Sipes*, 386 U.S. 171, 182 (1967) ("the Board's General Counsel has unreviewable discretion to refuse to institute an unfair labor practice complaint").

[7]    *See Sanderson Farms, Inc. v. NLRB*, 651 F. App'x 294, 297 (5th Cir. 2016) ("decision whether to withdraw a charge"

Porter v. Leavitt, Slip Copy (2023)

is an "exercise of [ ] prosecutorial discretion").

8     *UFCW*, 484 U.S. at 126 ("General Counsel [has] ... unreviewable discretion ... to withdraw the [ULP] complaint before hearing").

9     Even then, final decisions of the Board are subject to review by appellate courts — not district courts. *See Sanderson Farms, Inc. v. NLRB*, 651 F. App'x 294, 297 (5th Cir. 2016) (a final decision of the Board "would be subject to review by a court of appeals, not a district court"). In other words, even if Plaintiff were seeking review of a final adjudicatory decision of the National Labor Relations Board — i.e. a decision subject to judicial review — this Court would still be without subject matter jurisdiction. *See Bokat v. Tidewater Equipment Co.*, 363 F.2d 667, 673 (5th Cir. 1966) ("If on §§ 10(e), (f), review of the unfair labor practice order the scheduling or consolidation of the hearing is demonstrated to have denied due process or statutory rights, the remedy is denial of enforcement of the order or other appropriate relief by the Court of Appeals, not the over-the-shoulder supervision of District Courts....").

10     The Court may properly consider the exhibits found throughout the record because the NLRB's Motion to Dismiss under Rule 12(b)(1) presents a factual attack on the Court's subject matter jurisdiction. *See Coles v. NLRB*, 14 F. Supp. 3d 1031, 1034 n.4 (S.D. Ohio 2014) (considering exhibits found throughout record to resolve Rule 12(b)(1) motion challenging court's jurisdiction to review General Counsel's decision not to file unfair labor practice complaint).

11     These other documents are not mentioned by Plaintiff, even though he had each document before filing his Opposition. (R. Doc. 13-3 at 7, 9) (attached to NLRB's Motion to Dismiss); (R. Doc. 18-5) (attached by Plaintiff to his own Opposition).

12     In 2015, the Supreme Court held that § 2401(b), which contains nearly identical language to § 2401(a), is a non-jurisdictional time-bar and is subject to equitable tolling. *United States v. Kwai Fun Wong*, 575 U.S. 402, 420 (2015). Since the Supreme Court's decision in *Kwai Fun Wong*, several appellate courts have extended its reasoning to § 2401(a), finding its limitations period to be non-jurisdictional. *See Jackson v. Modly*, 949 F.3d 763, 776 (D.C. Cir. 2020) ("[W]e hold today that the Supreme Court's decision in *Kwai Fun Wong* overrules our precedent treating § 2401(a)'s statute of limitations as jurisdictional."); *DeSuze v. Ammon*, 990 F.3d 264, 270 (2d Cir. 2021) ("We therefore conclude that Section 2401(a)'s time bar does not divest us of jurisdiction."); *Herr v. U.S. Forest Serv.*, 803 F.3d 809, 817 (6th Cir. 2015) ("The *Arbaugh* rule together with its application in *Kwai Fun Wong* gives us comfort in siding with the non-jurisdictional side of this [circuit] split. Section 2401(a) does not limit a federal court's subject-matter jurisdiction."); *Matushkina v. Nielsen*, 877 F.3d 289, 292 n.1 (7th Cir. 2017) (§ 2401(a) does not "affect[ ] subject matter jurisdiction"); *North Dakota Retail Ass'n v. Bd. of Governors of the Fed. Rsrv. Sys.*, 55 F.4th 634, 642 (8th Cir. 2022) ("This court has long considered § 2401(a) a jurisdictional bar." However, [b]ased on *Kwai Fun Wong* and the persuasive opinions of the other circuits, this court now holds that § 2401(a) is not a jurisdictional bar."); *Chance v. Zinke*, 898 F.3d 1025, 1033 (10th Cir. 2018) ("we conclude that § 2401(a) isn't jurisdictional"); *see also Cedars–Sinai Medical Center v. Shalala*, 125 F.3d 765, 770 (9th Cir. 1997) ("Because the statute of limitations codified at 28 U.S.C. § 2401(a) makes no mention of jurisdiction but erects only a procedural bar, we hold that § 2401(a)'s six-year statute of limitations is not jurisdictional, but is subject to waiver."). After *Kwai Fun Wong*, the Fifth Circuit, for the most part, has found that § 2401(a)'s statute of limitations is jurisdictional. *See Ades v. United States*, 2022 WL 1198206, at *1 (5th Cir. Apr. 22, 2022) ("[Section 2401(a)] operates to deprive federal courts of jurisdiction."); *State v. Rettig*, 987 F.3d 518, 529 (5th Cir. 2021) ("[U]nlike the ordinary world of statutes of limitations, here the failure to sue the United States within [§ 2401(a)'s] limitations period deprives us of jurisdiction."); *General Land Office v. U.S. Dep't of the Interior*, 947 F.3d 309, 318 (5th Cir. 2020) ("[Section 2401(a)]'s timing requirement is jurisdictional, because it is a condition of the United States' waiver

of sovereign immunity."); *Am. Stewards of Liberty v. Dep't of Interior*, 960 F.3d 223, 229 (5th Cir. 2020) ("[A] failure to sue the United States within the limitations period" found in § 2401(a) "is not merely a waivable defense. It operates to deprive federal courts of jurisdiction.").

The Court must, however, point out that the Fifth Circuit's case law on this issue is conflicting. *See* 🚩*Louisiana v. U.S. Army Corps of Eng'rs*, 834 F.3d 574, 584 (5th Cir. 2016) ("Timeliness [under § 2401(a)] does not raise a jurisdictional issue in this court."); *see also* 🚩*Clymore v. United States*, 217 F.3d 370, 374 (5th Cir. 2000) ("[T]he doctrine of equitable tolling has potential application in suits, like this one, that are governed by the statute of limitations codified at 28 U.S.C. § 2401(a)."). Nevertheless, this Court is bound by Fifth Circuit precedent, the majority and most recent of which finds the relevant limitations period is jurisdictional. But to be sure, the Court would still find the claim time-barred under § 2401(a) and subject to dismissal — jurisdictional or not.

[13] Because Plaintiff's claim is so obviously time-barred, the Court need not determine the exact date of accrual. *See DeSuze v. Ammon*, 990 F.3d 264, 270–71 (2d Cir. 2021) ("We need not decide here the precise moment when the Tenants' APA claims accrued, because they are time-barred under Section 2401(a) whether they accrued when HUD approved Linden Plaza's rental increase application in 2007 or when the Tenants later learned the basis for approval of the HUD Application.").

[14] The government argues that Plaintiff has not provided any reason for his nearly 22-year delay in filing this lawsuit. Therefore, the government suggests, there is "no basis" to equitably toll the statute of limitations. The Court agrees that Plaintiff has indeed offered no excuse for his failure to act in the 21-plus years following the General Counsel's denial of his appeal. And that if the statute of limitations could be equitably tolled, there would be no basis to do so here, and dismissal would still be warranted. But a jurisdictional limitations period is not subject to equitable tolling. *See* 🚩*United States v. Wong*, 575 U.S. 402, 410 (2015) ("Congress must do something special, beyond setting an exception-free deadline, to tag a statute of limitations as jurisdictional and so prohibit a court from tolling it.").

The Court acknowledges that the Fifth Circuit has previously found that § 2401(a)'s jurisdictional limitations period may be subject to equitable tolling. *See* 🚩*Clymore v. U.S.*, 217 F.3d 370, 374 (5th Cir. 2000) ("[T]he doctrine of equitable tolling has potential application in suits, like this one, that are governed by the statute of limitations codified at 28 U.S.C. § 2401(a)."). But the Supreme Court once again made clear in 2015 that if a time-bar is jurisdictional, "a court must enforce the limitation ... even if equitable considerations would support extending the prescribed time period." 🚩*United States v. Kwai Fun Wong*, 575 U.S. 402, 408-09, 420 (2015) ("We held in Irwin that the [ ] rebuttable presumption of equitable tolling ... appl[ies] to suits brought against the United States under a statute waiving sovereign immunity.... A rebuttable presumption, of course, may be rebutted.... One way to [rebut] that [presumption] ... is to show that Congress made the time bar at issue jurisdictional.").

In other words, equitable tolling is not available where a statute of limitations is jurisdictional. *See, e.g., Texas v. United States*, 891 F.3d 553, 559 (5th Cir. 2018) ("[J]urisdictional limitations are strong medicine for litigants, attorneys, and judges alike, for with a want of subject matter jurisdiction, the court is deprived of all authority to hear a case: it must dismiss the case irrespective of equitable considerations, and it must do so even when timeliness arguments have been waived."); *Star v. Sec'y of U.S. Dep't of Homeland Sec.*, 2022 WL 3644188, at *2 (W.D. Tex. June 3, 2022) ("Because the Court considers 28 U.S.C. § 2401(a) to be a jurisdictional statute, equitable tolling is unavailable to Plaintiff."); *Del Angel Cardona v. Mayorkas*, 2021 WL 5242972, at *5 (S.D. Tex. May 27, 2021) ("[E]quitable tolling is unavailable.... [T]he five-year period in § 1503(a) [is] a jurisdictional requirement. When a time bar is jurisdictional, the Court must strictly enforce it, even if equitable considerations would support extending the prescribed time period."); *United States v. Approximately Two Hundred Twenty-Two (222) Firearms & Firearm Accessories*, 2020 WL 8093569, at *3 (N.D. Tex. Dec. 7, 2020) ("When a deadline is jurisdictional, after the deadline has passed, the Court is stripped of all authority to hear the case, and the Court must dismiss the action, regardless of any equitable considerations.").

But again, even if equitable tolling is available, the facts of this case do not warrant any tolling of the limitations

**Porter v. Leavitt, Slip Copy (2023)**

period. Plaintiff does not explain his extraordinary delay in filing this lawsuit. *See* 🚩 *Pacheco v. Rice*, 966 F.2d 904, 906-07 (5th Cir. 1992) ("Equitable tolling is appropriate when, despite all due diligence, a plaintiff is unable to discover essential information bearing on the existence of his claim.").

---

**End of Document**  <span style="float:right">© 2024 Thomson Reuters. No claim to original U.S. Government Works.</span>

---

2022 WL 3644188
Only the Westlaw citation is currently available.
United States District Court, W.D. Texas, Pecos
Division.

John Edos STAR, Plaintiff,

v.

SECRETARY OF U.S. DEPARTMENT OF
HOMELAND SECURITY, Defendant.

No. PE:19-CV-053-DC
|
Signed June 3, 2022

**Attorneys and Law Firms**

John Edos Star, Forest City, AR, Pro Se.

John F. Paniszczyn, Lacy L. McAndrew, U.S. Attorney's
Office, San Antonio, TX, for Defendant.

### AMENDED ORDER DENYING APPLICATION FOR LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL

DAVID COUNTS, UNITED STATES DISTRICT JUDGE

**\*1** BEFORE THE COURT is John Edos Star's ("Star")
Motion to Proceed *In Forma Pauperis* (Doc. 52) to appeal
the Court's Final Judgment (Doc. 48). After due
consideration, Star's Motion to Proceed *In Forma Pauperis*
on appeal shall be **DENIED**. (Doc. 52).

The Court finds that the appeal is not taken in good faith,
*i.e.*, the appeal fails to present a non-frivolous issue. An
action is frivolous where there is no arguable legal or factual
basis for the claim. *Neitzke v. Williams*, 490 U.S. 319, 325
(1989). Under Federal Rule of Appellate Procedure 24, Star
is ineligible for *in forma pauperis* status if the Court certifies
that the appeal is not taken in "good faith." If the district
court finds no "legal points arguable on the merits," then an
appeal is not taken in "good faith." *Howard v. King*, 707 F.2d
215, 220 (5th Cir. 1983), reh'g denied, 719 F.2d 787 (5th Cir.

1983); *see also, Wai Leung Chu v. United States*, 353 F.
App'x 952, 953 (5th Cir. 2009) (per curiam); *Groden v.
Kizzia*, 354 F. App'x 36, 36 (5th Cir. 2009) (per curiam);
*Walton v. Valdez*, 340 F. App'x 954, 955 (5th Cir. 2009) (per
curiam).

Star brings this action against various federal actors involved
in the nation's immigration system, seeking federal court
review of the denial of his naturalization application. The
Magistrate Judge filed his Report and Recommendation on
July 9, 2021 (Doc. 41), recommending that this Court grant
Defendants' Motion to Dismiss for lack of subject matter
jurisdiction, finding that Star has failed to bring suit within
the statute of limitations, and dismiss all of Star's claims in
this cause. On September 23, 2021, the Court overruled
Star's objections, adopted the Report and Recommendation,
and dismissed Star's claims for lack of subject matter
jurisdiction.

The Court explained the "sole authority to naturalize persons
as citizens of the United States is conferred upon the
Attorney General." 8 U.S.C. § 1421(a); § 1421(d) ("A person
may only be naturalized as a citizen of the United States in
the manner and under the conditions prescribed in this
subchapter[.]"). Thus, the Court does not have authority to
grant the relief Star seeks. *INS v. Pangilinan*, 486 U.S.
875, 884–84 (1988) (holding that the federal courts do not
have "the power to make someone a citizen of the United
States").

District courts only have limited jurisdiction regarding the
handling and denials of applications for naturalization. Once
an application for naturalization has been filed with the
Attorney General, the Attorney General has "sole authority
to naturalize persons as citizens of the United States[.]" 8
U.S.C. § 1421(a). "A person whose application for
naturalization under this subchapter is denied, after a hearing
before an immigration officer under section 1447(a) of this
title, may seek review of such denial before the United States
district court for the district in which such person resides." 8
U.S.C. § 1421(c). Under 8 C.F.R. § 336.9(b), "an applicant
must file a petition for review in the United States District
Court having jurisdiction over his or her place of residence ...
within a period of not more than 120 days after the USCIS
final determination."

**\*2** Under 28 U.S.C. § 2401(A), "every civil action" against the United States is barred unless the complaint is filed within six (6) years after the right of action first accrues. Failure to sue the United States within the limitations period for a specific cause of action is not a waivable defense because 28 U.S.C. § 2401(a) is a condition on the government's waiver of sovereign immunity. *Am. Stewards of Liberty v. Dep't of Interior*, 960 F.3d 223, 229 (5th Cir. 2020). Because it is jurisdictional in nature, this statute of limitations cannot be waived by the parties and deprives this Court of jurisdiction. *Gen. Land Office v. U.S. Dep't of the Interior*, 947 F.3d 309, 318 (5th Cir. 2020).

Because the six-year statute of limitations applies to Star's claims under Section 1421(c), this action is time-barred. Plaintiff needed to file his Section 1421(c) litigation no later than May 1, 2015, to avoid triggering the six-year statute of limitations under 28 U.S.C. § 2401(a). He did not. Therefore, Plaintiff has not satisfied the statutory requirements of Section 1421(c) and 28 U.S.C. § 2401(a) for suing the government in federal district court, which leaves the Court without subject matter jurisdiction at law or in equity to hear his challenge at this time. Because the Court considers 28 U.S.C. § 2401(a) to be a jurisdictional statute, equitable tolling is unavailable to Plaintiff. *United States v. Kwai Fun Wong*, 575 U.S. 402 (2015). Accordingly, the Court dismissed Star's Complaint for lack of subject matter jurisdiction. Star now seeks to appeal.

It is this Court's opinion that Star's current Application to Proceed *In Forma Pauperis* simply fails to present either an arguable or a non-frivolous issue for appeal. Pursuant to 28 U.S.C. § 1915(a)(3) and Fed. R. App. P. 24(a)(3), the Court certifies the appeal is not taken in good faith. Accordingly, Star's Motion to Proceed *In Forma Pauperis* is **DENIED**. (Doc. 52).

Although this court has certified that the appeal is not taken in good faith under 28 U.S.C. § 1915(a)(3) and Fed. R. App. P. 24 (a)(3), the applicant may challenge this finding pursuant to *Baugh v. Taylor*, 117 F.3d 197 (5th Cir. 1997), by filing a separate motion to proceed IFP on appeal with the Clerk of Court, U.S. Court of Appeals for the Fifth Circuit, within 30 days of this order. The cost to file a motion to proceed on appeal with the Fifth Circuit is calculated below, and if the appellant moves to proceed on appeal IFP, the prison authorities will be directed to collect the fees as calculated in this order.

John Edos Star is assessed an initial partial fee of $25.00. The agency having custody of the prisoner shall collect this amount from the trust fund account or institutional equivalent, when funds are available, and forward it to the clerk of the district court.

Thereafter, the prisoner shall pay $480.00, the balance of the filing fees, in periodic installments. The appellant is required to make payments of 20% of the preceding month's income credited to the appellant's prison account until the appellant has paid the total filing fees of $505.00. The agency having custody of the prisoner shall collect this amount from the trust fund account or institutional equivalent, when funds are available and when permitted by 28 U.S.C. § 1915(b)(2), and forward it to the clerk of the district court.

If the appellant moves to proceed on appeal IFP, the clerk shall mail a copy of this order to the inmate accounting office or other person(s) or entity with responsibility for collecting and remitting to the district court interim filing payments on behalf of prisoners, as designated by the facility in which the prisoner is currently or subsequently confined.

**\*3** It is so **ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 3644188

Star v. Secretary of U.S. Department of Homeland Security, Not Reported in Fed. Supp....

**End of Document**                                                   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 2072442
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.

Adam BROOK, M.D., Ph.D., Plaintiff,

v.

Catherine TETI, et al., Defendants.

Civil Action No. 15-02022 (TFH)
|
Signed February 17, 2023

**Attorneys and Law Firms**

Adam Brook, Delray Beach, FL, Pro Se.

Daniel Patrick Schaefer, U.S. Attorney's Office for the District of Columbia, Washington, DC, Sam Escher, DOJ-USAO, Civil Division, Washington, DC, for Defendants.

**MEMORANDUM OPINION**

Thomas F. Hogan, Senior United States District Judge

 **\*1** Plaintiff has sued the U.S. Department of Health and Human Services ("HHS" or "the Agency") and three individual HHS employees, alleging violations of the Privacy Act and the Freedom of Information Act ("FOIA") in connection with five requests he submitted to the Health Resources & Services Administration ("HRSA") for records concerning the National Practitioner Data Bank ("NPDB").

Upon consideration of the briefing, the relevant legal authorities, and the entire record herein, and for the reasons stated below, the Court finds that HHS has established that it conducted adequate searches for records responsive to Plaintiff's requests and that it appropriately withheld and redacted certain records. Accordingly, the Court will grant Defendants' Motion for Summary Judgment [ECF No. 32] and will deny Plaintiff's Cross-Motion for Partial Summary Judgment [ECF No. 35].

**I. BACKGROUND**

The National Practitioner Data Bank is a "web-based repository of reports containing information on medical malpractice payments and certain adverse actions related to health care practitioners, providers, and suppliers." NPDB, About Us, https://www.npdb.hrsa.gov/

topNavigation/aboutUs.jsp (last visited Feb. 13, 2023). The NPDB is managed by the HRSA, which is a component agency of HHS, and at issue here are five separate FOIA requests Plaintiff submitted to HRSA for records related to the NPDB. [1] In total, HHS processed 3,057 pages of records in response to Plaintiff's five FOIA requests and released 2,469 pages in full or in part. Flavin Decl. ¶¶ 15, 28, 42, 56 [ECF No. 32-3].

**A. Request No. 1**

Plaintiff's first request, dated August 6, 2012, sought "all documents pertaining to me, Adam Brook, that HRSA has." Compl. ¶ 37; Flavin Decl. ¶ 7. HHS initially released approximately 500 pages of responsive documents to Plaintiff, and after an additional search in response to an administrative appeal filed by Plaintiff, HHS located approximately 200 additional pages of responsive documents. Flavin Decl. ¶¶ 11-13. HHS located 689 pages of documents responsive to FOIA Request No. 1; pursuant to FOIA Exemptions 3, 5, and 6, 41 pages were withheld in full and 22 pages were released in part. Id. ¶¶ 15-20.

**B. Request No. 2**

Plaintiff's second request, dated September 19, 2012, sought various NPDB registration and subscriber documents. Compl. ¶ 38; Flavin Decl. ¶ 22. He requested "blank registration forms, 'the first and two most recent filings of NPDB registration documents for Peconic Bay Medical Center,' screenshots of webpages related to making a NPDB query, and records related to the June 8, 2010 release of Plaintiff's NPDB reports." Flavin Decl. ¶ 22. HHS located 43 pages of documents responsive to FOIA Request No. 2; no pages were withheld in full, and one page was released in part pursuant to FOIA Exemption 3. Id. ¶¶ 28-29.

**C. Request No. 3**

 **\*2** Plaintiff's third request, dated December 18, 2012, sought "all Adverse Action Reports submitted to the National Practitioner Data Bank between December 1, 1989 and the present that were subsequently voided by the Secretary ... as well as any accompanying letters explaining the Secretary's decision." Compl. ¶ 39; Flavin Decl. ¶ 30. HHS

2023 WL 2072442

denied Plaintiff access to the requested records pursuant to FOIA Exemption 3. Flavin Decl. ¶ 31. Plaintiff filed an administrative appeal, and "HHS denied Plaintiff's appeal on the basis that information concerning specific reports and disputes could be utilized to ascertain the identities of other practitioners who had been reported to the NPDB and other protected information." *Id.* ¶¶ 33-34.

### D. Request No. 4

Plaintiff's fourth request, dated January 29, 2013, sought "every e-mail [HRSA Dispute Resolution Manager] Dr. [Anastasia] Timothy has ever sent and every e-mail Dr. Timothy has ever received." Compl. ¶ 41; Flavin Decl. ¶ 35. By letter dated October 9, 2014, Plaintiff agreed to limit the scope of Request No. 4 to all emails dating from June 1, 2010 that contained any of a list of 25 keywords. Compl. ¶ 55; Flavin Decl. ¶ 36. HHS located 364 pages of emails responsive to FOIA Request No. 4; no pages were withheld in full, and 67 pages were released in part pursuant to FOIA Exemptions 3, 5, and 6. Flavin Decl. ¶¶ 42-47.

### E. Request No. 5

Plaintiff's fifth request, dated May 13, 2015, sought all emails sent or received by an HRSA employee dating from June 1, 2010 containing any of a list of 30 keywords. Compl. ¶ 61; Flavin Decl. ¶ 49. HHS located 1,961 pages of documents responsive to FOIA Request No. 5; pursuant to FOIA Exemptions 3, 4, 5, 6, and 7, 547 pages were withheld in full and 304 pages were released in part. Flavin Decl. ¶¶ 56-63.

### II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 mandates that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). With respect to cross-motions for summary judgment, "neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion." *Vaughan v. Amtrak*, 892 F. Supp. 2d 84, 91

(D.D.C. 2012) (quoting *Sherwood v. Washington Post*, 871 F.2d 1144, 1148 n.4 (D.C. Cir. 1989)).

"FOIA cases typically and appropriately are decided on motions for summary judgment." *ViroPharma Inc. v. Dep't of Health & Human Servs.*, 839 F. Supp. 184, 189 (D.D.C. 2012). "The agency is entitled to summary judgment if no material facts are genuinely in dispute and the agency demonstrates that its search for responsive records was adequate, that any exemptions claimed actually apply, and that any reasonably segregable non-exempt parts of records have been disclosed after redaction of exempt information." *Prop. of the People, Inc. v. Off. of Mgmt. & Budget*, 330 F. Supp. 3d 373, 380 (D.D.C. 2018) (citations omitted). An agency can sustain its burden by means of affidavit, and where the affidavit "describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit alone." *Am. Civil Liberties Union v. Dep't of Defense*, 628 F.3d 612, 619 (D.C. Cir. 2011) (citations omitted).

### III. ANALYSIS

### A. Adequacy of Search

**\*3** "An agency fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents." *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (internal citation and quotation marks omitted). "At the summary judgment stage, where the agency has the burden to show that it acted in accordance with the statute, the court may rely on '[a] reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched.'" *Id.* at 326 (quoting *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)). Such affidavits "enjoy a presumption of good faith, which will withstand purely speculative claims about the existence and discoverability of other documents." *Ground Saucer Watch, Inc. v. Cent. Intel. Agency*, 692 F.2d 770, 771 (D.C. Cir. 1981). "The law of this Circuit does not demand that 'the affidavits of the

2023 WL 2072442

responding agency set forth with meticulous documentation the details of an epic search for the requested records. Rather[,] ... affidavits that explain in reasonable detail the scope and method of the search conducted by the agency will suffice to demonstrate compliance.' " *Wolf v. Cent. Intel. Agency*, 569 F. Supp. 2d 1, 7 (D.D.C. 2008) (quoting *Perry v. Block*, 684 F.2d 121, 127 (D.C. Cir. 1982)).

Here, the Court concludes that HHS has met its burden of demonstrating beyond material doubt that its searches for each of the five requests received from Plaintiff were reasonably calculated to uncover all relevant documents. Plaintiff has failed to point to any evidence showing that the Agency's search was not "reasonably calculated to uncover all relevant documents." In support of its summary judgment motion, HHS submitted detailed declarations from HRSA's FOIA Officer, Thomas Flavin [ECF No. 32-3]; HRSA's Deputy Director of the Division of Practitioner Data Banks, Judy Rogers [ECF No. 32-4]; and HRSA's Chief Information Security Officer, Brent Kopp [ECF No. 32-5]. These declarations explain in detail the searches that were performed for documents responsive to Plaintiff's five requests, and establish that "all files likely to contain responsive materials" were searched. Flavin Decl. ¶¶ 8, 23, 37, 50; Rogers Decl. ¶¶ 5-7, 9, 10; Kopp Decl. ¶¶ 5, 8. HHS is entitled to summary judgment with respect to the adequacy of its searches.

### B. Withholdings & Redactions

### 1. FOIA Exemption 3

Exemption 3 incorporates nondisclosure provisions contained in other federal statutes. *See* 5 U.S.C. § 552(b)(3). HHS applied Exemption 3 to withhold certain records containing the identities of other health care practitioners reported to the NPDB and other details of their reports contained in various communications on the basis that the information is exempted from disclosure under the confidentiality provisions of 42 U.S.C. § 11137(b)(1). Flavin Decl. ¶¶ 16, 43, 57. The Court agrees with HHS's conclusion that Section 11137(b)(1) meets the requirements of Exemption 3, which covers records that are "specifically exempted from disclosure by statute ..., if that statute (A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (ii) establishes particular criteria for withholding

or refers to particular types of materials to be withheld." 5 U.S.C. § 552(b)(3). Section 11137(b)(1) states that information reported to the NPDB "is considered confidential and shall not be disclosed" except (1) with respect to professional review activity; (2) as necessary to comply with requests for information from hospitals as required by 42 U.S.C. § 11135; or (3) in accordance with NPDB regulations. Based upon a review of the Mr. Flavin's Declaration and the detailed *Vaughn* Index attached to his declaration, none of the information withheld from disclosure by HHS falls within these exceptions. The Agency's withholding of NPDB reporting information related to other health care providers, as required by section 11137(b)(1), was proper. HHS is entitled to summary judgment on its withholdings under Exemption 3.

### 2. FOIA Exemption 4

**\*4** Exemption 4 protects "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). Here, HHS applied Exemption 4 to withhold a presentation prepared by a government contractor regarding the manner in which the NPDB contractor processes credit card transactions and a financial analysis of the options. Flavin Decl. ¶ 58. As explained by HHS, "[t]his information constitutes commercial or financial information that is confidential in nature." *Id.* Plaintiff does not present any evidence that contradicts HHS's reasoning for withholding this presentation, and HHS is entitled to summary judgment on its withholding under Exemption 4.

### 3. FOIA Exemption 5

Exemption 5 protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). As relevant here, "Exemption 5 incorporates the privileges that the Government may claim when litigating against a private party," including the attorney-client and attorney work-product privileges and the deliberative process privilege. *Abtew v. U.S. Dep't of Homeland Sec.*, 808 F.3d 895, 898 (D.C. Cir. 2015).

Here, HHS withheld internal HHS documents (inter-agency records) and documents "exchanged with contractor who is responsible for assisting in the day-to-day operations of

2023 WL 2072442

the NPDB," Flavin Decl. ¶ 17, which qualify as "intra-agency" records. *McKinley v. Bd. of Governors of Fed. Reserve Sys.*, 647 F.3d 331, 336 (D.C. Cir. 2011) ("Under the 'consultant corollary' to Exemption 5, however, we interpret 'intra-agency' 'to include agency records containing comments solicited from nongovernmental parties.' " (quoting *Nat'l Inst. of Military Justice v. U.S. Dep't of Defense*, 512 F.3d 677, 680, 682 (D.C. Cir. 2008))).

### i. *Deliberative Process Privilege*

To qualify for the deliberative process privilege, a document must be "both predecisional and deliberative." *Machado Amadis v. U.S. Dep't of State*, 971 F.3d 364, 370 (D.C. Cir. 2020). A document is predecisional "if it was generated before the adoption of an agency policy." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). This Circuit recognizes that

> [d]etermining whether a document is deliberative is less straightforward than determining whether it is predecisional in part because of the sheer variety of ways in which a document can be deliberative. As we have explained, the deliberative process privilege is "dependent upon the individual document and the role it plays in the administrative process." *Coastal States*, 617 F.2d at 867. In *Senate of Puerto Rico v. DOJ* our court explained that the agency invoking the deliberative process privilege must show (1) "what deliberative process is involved," and (2) "the role played by the documents in issue in the course of that process." 823 F.2d 574, 585–86 (D.C. Cir. 1987) (quoting *Coastal States*, 617 F.2d at 868). To "assist the court in determining whether th[e] privilege is available," the agency should also explain (3) the "nature of the decisionmaking authority vested in the officer or person issuing the disputed document," and (4) the "relative positions in the agency's chain of command occupied by the document's author and recipient." *Id.* at 586.

*Jud. Watch, Inc. v. U.S. Dep't. of Justice*, 20 F.4th 49, 55 (D.C. Cir. 2021).

Here, HHS has established that the documents it withheld pursuant to the deliberative process privilege under

Exemption 5 were both predecisional and deliberative. As detailed in the Flavin Declaration and the supporting *Vaughn* Index, the documents exchanged with the contractor contained "advice, recommendations, opinions and draft documents. Many of the materials ... were draft documents, suggested language for draft documents, or contained advice about draft documents. The drafts at issue contained the authors' recommendations about what the final documents should say." Flavin Decl. ¶¶ 17, 44, 59; *see also Vaughn* Index. These documents were properly withheld under Exemption 5.

### ii. *Attorney-Client Privilege*

**\*5** The Court likewise finds HHS has demonstrated it properly withheld certain documents on the basis of attorney-client privilege. As explained in Mr. Flavin's declaration, "[t]he redacted materials include communications with agency attorneys regarding draft dispute resolution letters, analysis of the merits of ongoing litigation, litigation strategy, allegations of improper access to the NPDB, and review of agency guidance." Flavin Decl. ¶¶ 18, 45, 60. The *Vaughn* Index confirms that Exemption 5 was properly invoked by HHS to withhold these documents pursuant to the attorney-client privilege.

### iii. *Attorney Work-Product Doctrine*

Similarly, HHS withheld certain records pursuant to the attorney work-product doctrine, including: an agency attorney's advice concerning a draft letter connected to ongoing litigation; an agency attorney's legal analysis of litigation; materials related to a litigation hold; a draft declaration for a litigation, and an agency attorney's advice concerning compilation of an administrative record. Flavin Decl. ¶¶ 19, 46, 61. These documents were properly withheld pursuant to Exemption 5, and HHS is entitled to summary judgment on its withholding under Exemption 5.

### 4. FOIA Exemption 6

Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Here, HHS applied Exemption 6 to redact the identities of cell phone numbers, the identities of practitioners

reported to the NPDB and other details regarding their NPDB reports, and other personal information on the basis that the release would "constitute a clearly unwarranted invasion of personal privacy." Flavin Decl. ¶¶ 20, 47, 62. If the requested information is contained in a personnel, medical, or other similar file, the Court must then "determine whether the information is of such a nature that its disclosure would constitute a clearly unwarranted privacy invasion." 🚩 *Nat'l. Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002) (citing 🚩 *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 598 (1982)). As the D.C. Circuit has further explained,

> [t]o establish that the release of information contained in government files would result in a clearly unwarranted invasion of privacy, the court first asks whether disclosure would compromise a substantial, as opposed to a *de minimis,* privacy interest. If a significant privacy interest is at stake, the court then must weigh that interest against the public interest in the release of the records in order to determine whether, on balance, disclosure would work a clearly unwarranted invasion of personal privacy. The public interest to be weighed against the privacy interest in this balancing test is the extent to which disclosure would serve the core purposes of the FOIA by contributing significantly to public understanding of the operations or activities of the government. Thus, unless a FOIA request advances the citizens' right to be informed about what their government is up to, no relevant public interest is at issue.

*Id.* at 33-34 (internal citations and quotations omitted).

Plaintiff has not identified any documents that he claims were improperly withheld under Exemption 6, and the Court finds that the Agency has established that release of the information at issue would result in an unwarranted invasion of privacy. HHS is entitled to summary judgment on its withholdings under Exemption 6.

### 5. FOIA Exemption 7

Exemption 7(C) protects "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ... (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy." *See* 🚩 *Schrecker v. U.S. Dep't of Justice*, 349 F.3d 657, 661 (D.C. Cir. 2003) ("[O]ur decisions have consistently supported nondisclosure of names or other information identifying individuals appearing in law enforcement records, including investigators, suspects, witnesses, and informants."). HHS applied Exemption 7 to redact the identity of an Office of Inspector General investigator from guidance prepared and sent by the Director of Medicaid Fraud Policy and Oversight Division. Flavin Decl. ¶ 63. The Court agrees that this information was properly redacted to avoid the unwarranted invasion of personal privacy, and HHS is entitled to summary judgment on its withholding under Exemption 7.

### IV. CONCLUSION

**\*6** For the foregoing reasons, the Court finds that the Agency's search was reasonably calculated to uncover all responsive records and that it properly withheld certain information pursuant to FOIA Exemptions 3, 4, 5, 6, and 7. Accordingly, the Court will grant Defendants' Motion for Summary Judgment [ECF No. 32] and will deny Plaintiff's Cross-Motion for Summary Judgment [ECF No. 35]. This case will be dismissed with prejudice. An appropriate Order accompanies this Opinion.

**All Citations**

Slip Copy, 2023 WL 2072442

### Footnotes

1    The genesis of this case is a 2009 report submitted to the NPDB by Plaintiff's former employer. For an account of the complex procedural history and factual background of the related litigation between the parties, *see, e.g., Brook v. Rogers*, Civil Action No. 12-1229 (TFH), 2023 WL 1778792 (D.D.C. Feb. 2, 2023); 🚩*Doe v. Rogers*, 139 F. Supp. 3d 120 (D.D.C. 2015).

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 3470300
Only the Westlaw citation is currently available.
United States District Court, E.D. Texas, Sherman Division.

Allison SLOCUM and Gary Slocum, Plaintiffs,

v.

SEBRING CAPITAL PARTNERS,
LP, et al., Defendants.

CIVIL ACTION NO. 4:18-CV-029-ALM-CAN
|
Signed 06/27/2018

**Attorneys and Law Firms**

Tzvi Aryea Finman, The Finman Law Firm PLLC, Houston, TX, for Plaintiffs.

Robert T. Mowrey, Arthur Elex Anthony, Vincent J. Hess, Locke Lord LLP, Dallas, TX, for Defendants.

**REPORT AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE**

Christine A. Nowak, UNITED STATES MAGISTRATE JUDGE

**\*1** Pending before the Court is Defendants' Renewed Motion to Dismiss [Dkt. 26], and Plaintiffs' Motion to Vacate Foreclosure Sale [Dkt. 33]. Having reviewed the Motions [Dkts. 26, 33], and all other relevant filings, the Court recommends that Defendants' Motion to Dismiss be **GRANTED** and Plaintiffs' Motion to Vacate Foreclosure Sale be **DENIED**.

**BACKGROUND**

Plaintiffs commenced the instant action in state court to prevent foreclosure of the real property located at 18427 Park Grove Lane, Dallas Texas 75287 (the "Property") against each of Defendants Sebring Capital Partners, LP ("Sebring"); Wells Fargo Bank, N.A., d/b/a America's Servicing Company, a Division of Well Fargo Bank, N.A. ("Wells Fargo"); U.S. Bank, N.A. ("U.S. Bank"); DLJ Mortgage Capital, Inc. ("DLJ"); Mortgage Electronic Registration Systems, Inc. ("MERS"); Credit Suisse First Boston Mortgage Securities Corporation ("Credit Suisse"); and Does 1 through 100.

Plaintiffs filed their Original Petition on December 11, 2017, in the 366th District Court, Collin County, Texas, Cause No. 366-05917-2017 (the "State Court Action") [Dkt. 1]. In the state court petition, Plaintiffs allege wrongful foreclosure, unconscionability, breach of contract, breach of fiduciary duty, quiet title, and slander of title [Dkt. 1]. Plaintiffs also seek declaratory relief and attorneys' fees [Dkt. 1 at 17]. Following removal on February 16, 2018, Plaintiffs amended their complaint; Plaintiffs' First Amended Complaint is the live pleading [Dkt. 19].

Plaintiffs allege they purchased the Property in 2005. Specifically, on May 27, 2005, Plaintiffs entered into a note (the "Note") and a deed of trust (the "Deed of Trust") (collectively, the "Loan") in favor of Sebring Capital Partners [1], and held by MERS [Dkt. 19 at 9-10]. Sebring, through its nominee, MERS, subsequently assigned the Deed of Trust to U.S. Bank, as Trustee for Credit Suisse [Dkt 26-3 at 2]. DLJ is the sponsor [2] of the Home Equity Asset Trust 2005-4 [Dkt. 19 at 3]. Wells Fargo services the Loan [Dkt. 26-4]. Plaintiffs do not dispute that they have failed to make all payments required under the Loan, that they are in default, or that they have not tendered the full amount due under the Note [see Dkts. 19 at 10; 27 at 2; 33]. Wells Fargo sold the Property in a foreclosure sale on December 5, 2017 [Dkts. 26 at 5; 26-7].

The Court is quite familiar with the Property at issue, as it has been the subject of two earlier lawsuits here in the Eastern District of Texas. The first suit was filed by Plaintiffs to preclude a scheduled foreclosure sale and was ultimately dismissed without prejudice. *Allison Slocum and Gary Slocum v. U.S. Bank National Association, as Trustee for Credit Suisse First Boston Mortgage Securities Corp., Home Equity Asset Trust 2005-4, Home Equity Pass-Through Certificates, Series 2005-4, et al.*, Civil Action No. 4:16-CV-00453-ALM (ECF No. 10).

**\*2** The second lawsuit: *Allison Slocum and Gary Slocum v. U.S. Bank National Association, as Trustee for Credit Suisse First Boston Mortgage Securities Corp., Home Equity Asset Trust 2005-4, Home Equity Pass-Through Certificates, Series 2005-4, et al.*, Civil Action No. 4:16-CV-00955-RAS-KPJ, 2017 WL 2629147 (E.D. Tex. 2016), was similarly filed by Plaintiffs to preclude a foreclosure sale (the "Second Lawsuit"). Therein, the Court granted U.S. Bank, as Trustee for Credit Suisse, Wells Fargo, America's Servicing Company, and Wells Fargo Home Mortgage's Motion to Dismiss Plaintiffs' claims in the Second Lawsuit

2018 WL 3470300

and dismissed Plaintiffs' claims for breach of contract, failure of condition precedent, common law fraud, and violations of the Real Estate Practices Act ("RESPA") and Texas Debt Collection Act ("TDCA") with prejudice. *Id.* (ECF No. 25 at 11).

In the instant case (which is Plaintiff's third attempt in the Eastern District of Texas to preclude foreclosure), Defendants filed a Notice of Removal, removing the pending State Court Action to the Eastern District of Texas, Sherman Division [Dkt. 1]. On January 23, 2018, Defendants moved to dismiss Plaintiffs' suit [Dkt. 9]. On February 16, 2018, Plaintiffs filed their First Amended Complaint [Dkt. 19]. Defendants filed the instant Renewed Motion to Dismiss on March 8, 2018 [Dkt. 26]. Plaintiffs filed their Response to Defendants' Renewed Motion to Dismiss on March 21, 2018 [Dkt. 27]. Defendants filed their Reply in Support of their Renewed Motion to Dismiss on March 23, 2018 [Dkt. 34]. On March 22, 2018, Plaintiffs also filed a Motion to Vacate Foreclosure Sale [Dkt. 33]. Defendants filed their Response on March 29, 2018 [Dkt. 35]. The Court finds both the Motion to Dismiss and the Motion to Vacate Foreclosure Sale are now ripe for adjudication.

### LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Plaintiffs' First Amended Complaint must include more than labels and conclusions. A formulaic recitation of the elements of a cause of action will not do. (*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ). Instead, the complaint must set forth enough facts to state a claim for relief that is plausible on its face. *Id.* at 570. A claim is facially plausible when the plaintiff pleads facts that allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1940 (2009). The pleading standard does not require "detailed factual allegations," but it must be more than a series of baseless accusations under the standard established in *Iqbal*.

When ruling on a defendant's motion to dismiss, a judge must assume all well-pleaded allegations in the complaint are true. A "well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and

'that recovery is very remote and unlikely.' " *Twombly*, 550 U.S. at 555, 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) ). "Two working principles underlie ... *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 555). "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 1950 (citing *Twombly*, 550 U.S. at 556). "Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

### MOTION TO DISMISS

**\*3** In the Motion to Dismiss, Defendants argue that Plaintiffs' present suit is barred by res judicata, or alternatively that: (1) Plaintiffs have no cause of action based on Defendants' ability to enforce the Deed of Trust; (2) Plaintiffs have no cause of action for wrongful foreclosure; (3) Plaintiffs' claims for unconscionable contract, breach of contract, and breach of fiduciary duty [3] are time-barred; and (4) Plaintiffs' allegations fail to state a claim for quiet title or slander of title [*see* Dkt 26 at 7-25]. Defendants further argue that because Plaintiffs fail to state a cognizable claim, Plaintiffs' requests for declaratory relief and attorneys' fees should likewise be denied [Dkt. 26 at 26].

### Res Judicata

As it is dispositive of each of Plaintiffs' claims, save for Plaintiffs' wrongful foreclosure claim, the Court first addresses Defendants' res judicata argument. Notably, Plaintiffs do not dispute that the elements of res judicata are met in the instant case, arguing instead for other reasons discussed *infra* that the Court should not apply res judicata. Notwithstanding that Plaintiffs do not dispute the elements, the Court briefly analyzes the applicability of the doctrine of res judicata to the instant case.

The Fifth Circuit has explained the doctrine of res judicata as follows:

Slocum v. Sebring Capital Partners, LP, Not Reported in Fed. Supp. (2018)

2018 WL 3470300

The term "res judicata" is often used to describe two discrete preclusive doctrines: res judicata and collateral estoppel. These doctrines relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication. Under the doctrine of res judicata, a final judgment on the merits bars further claims by parties or their privies based on the same cause of action. The bar prevents relitigation of all issues that were or could have been raised in the previous action.

*United States v. Davenport*, 484 F.3d 321, 325-26 (5th Cir. 2007) (internal citations, quotations, and alterations omitted). "[R]es judicata is generally 'an affirmative defense that should not be raised as part of 12(b)(6) motion,' " but dismissal under Rule 12(b)(6) may be appropriate on res judicata grounds where " 'based on the facts pleaded and judicially noticed, a successful affirmative defense appears.' " *Torello v. Mortg. Elec. Registration Sys., Inc.*, No. 3:12–CV–3726–O–BH, 2013 WL 3289526, at *5 (N.D. Tex. June 28, 2013) (quoting *Hall v. Hodgkins*, 305 F. App'x 224, 227–28 (5th Cir. 2008) (per curiam) ); *see also Meador v. Oryx Energy Co.*, 87 F. Supp. 2d 658, 663-67 (E.D. Tex. 2000) (granting 12(b)(6) motion to dismiss because res judicata barred plaintiff's claims); *Cisco Sys., Inc. v. Alcatel USA, Inc.*, 301 F. Supp. 2d 599, 602-06 (granting 12(b)(6) motion to dismiss because res judicata barred counterclaimant's claims).

"Four elements must be met for a claim to be barred by res judicata: '(1) the parties must be identical in the two actions; (2) the prior judgment must have been rendered by a court of competent jurisdiction; (3) there must be a final judgment on the merits; and (4) the same claim or cause of action must be involved in both cases.' " *Sommer v. Wilmington Sav. Fund Soc'y, FSB*, No. 4:17-CV-300-ALM-CAN, 2018 WL 1956466, at *3 (E.D. Tex. Mar. 27, 2018), *report and recommendation adopted*, No. 4:17-CV-300, 2018 WL 1942774 (E.D. Tex. Apr. 25, 2018) (Mazzant, J.) (quoting

*Oreck Direct, LLC v. Dyson, Inc.*, 560 F.3d 398, 401 (5th Cir. 2009) (quoting *In re Ark-La-Tex Timber Co.*, 482 F.3d 319, 330 (5th Cir. 2007) ); citing *JPMorgan Chase Bank, N.A. v. Shatteen*, 4:12-CV-579, 2015 WL 136629, at *3 (E.D. Tex. Jan. 7, 2015) (Mazzant, J.); *Carrasco v. City of Bryan, Tex.*, No. H–11–662, 2012 WL 950079, at *3 (S.D. Tex. March 19, 2012); *Berkman v. City of Keene*, No. 3:10–CV–2378–B, 2011 WL 3268214 (N.D. Tex. 2011); *Hogue v. Royse City, Tex.*, 939 F.2d 1249, 1252–54 (5th Cir. 1991) ). "If these four conditions are satisfied, res judicata prohibits either party from raising any claim or defense in the later action that was or could have been raised in support of or in opposition to the cause of action asserted in the prior action." *Id.* (quoting *Shatteen*, 2015 WL 136629, at *3 (citing *In re Howe*, 913 F.2d 1138, 1144 (5th Cir. 1990) ) ).

### Parties in Privity

**\*4** Privity is a "legal conclusion that the relationship between the one who is a party on the record and the non-party is sufficiently close to afford application of the principle of preclusion." *Meza v. Gen. Battery Corp.*, 908 F.2d 1262, 1266–67 (5th Cir. 1990). The Fifth Circuit maintains that privity may be found only in three narrow situations: "(1) where the non-party is the successor in interest to a party's interest in property; (2) where the non-party controlled the prior litigation; and (3) where the non-party's interests were adequately represented by a party to the original suit." *Id.* Notably, courts acknowledge that privity exists between preceding and succeeding owners of property. *See Taylor*, 553 U.S. at 893. Similarly, assignees and servicing agents of a loan are in privity with an original mortgage company. *See McMahan v. First Union Nat. Bank*, No. C.A.SA–01–782 FB NN, 2003 WL 1606084, at *2 (W.D. Tex. Mar. 7, 2003) (citing *Northern Pac. Ry. Co. v. Slaught*, 205 U.S. 122, 128 (1907) ); *see also Steele v. Quantum Servicing Corp.*, No. 4:12–CV–344, 2012 WL 4162138, at *4 (E.D. Tex. Aug. 24, 2012) (vacated on other grounds) (finding that an assignment between successive defendants is sufficient to create privity).

The Parties in the instant suit and the Second Lawsuit dismissing Plaintiffs' claims with prejudice are the same and/or in privity. Plaintiffs are identical in both cases and U.S. Bank and Wells Fargo were named defendants in the Second Lawsuit. In addition, DLJ, [4] by virtue of the assignment of the Deed of Trust, is in privity with both U.S. Bank and

Slocum v. Sebring Capital Partners, LP, Not Reported in Fed. Supp. (2018)

2018 WL 3470300

Wells Fargo; "it is well accepted that an assignment creates privity" [Dkt. 26-3]. *See Associated Int'l Ins. Co. v. Scottsdale Ins. Co.*, 862 F.3d 508, 511 (5th Cir. 2017); *see also Ernest v. CitiMortgage, Inc.*, No. SA:13-CV-802-DAE, 2014 WL 294544, at *4 (W.D. Tex. Jan. 22, 2014) (finding trust sponsor, depositor, and beneficiary in privity for res judicata purposes. MERS held the Deed of Trust on behalf of Sebring and its successors and assigns, and further assigned the Deed of Trust to US Bank; thus, it is similarly in privity with the Second Lawsuit defendants [Dkt. 26-3]. *See Jackson v. Novastar Mortg., Inc.*, No. CV H-13-1196, 2014 WL 12521697, at *4 (S.D. Tex. Feb. 6, 2014), *aff'd sub nom. Jackson v. Deutsche Bank Tr. Co.*, 583 F. App'x 417 (5th Cir. 2014) ("while Defendants Novastar and Novastar Mortgage Funding Corp. were not named in Plaintiff's 2010 lawsuit, they are in direct privity with Deutsche Bank based on the assignment of the Note and Deed of Trust from Novastar to Deutsche Bank. As for Defendant MERS, it is in privity with Deutsche Bank. The Deed of Trust identifies MERS as nominee for Novastar "and [Novastar's] successors and assigns," which in this instance is Deutsche Bank.") (citing *Maxwell v. U.S. Bank, N.A.*, 544 F. App'x 470, 473 (5th Cir. 2013) (legal relationship between MERS and lender's successor was sufficiently close to find the parties in privity) ). Consequently, the parties in the Second Lawsuit and the instant lawsuit are the same or in privity, and the first element of res judicata is met.

### Prior Final Judgment Rendered on the Merits

The second and third elements are similarly met. The Eastern District of Texas, Sherman Division District Court had jurisdiction over Second Lawsuit. *See Second Lawsuit* (ECF No. 30). Further in the Second Lawsuit, the Court entered a Memorandum Order and Opinion dismissing the case (and Plaintiff's claims for breach of contract, failure of condition precedent, common law fraud, violations of RESPA and TDCA, as well as Plaintiffs' request for injunctive relief and attorney fees) with prejudice, which constitutes a final binding judgment on the merits for res judicata purposes.

*Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 n. 8 (5th Cir. 1993) (noting that a dismissal designated "with prejudice" is an adjudication on the merits for purposes of res judicata).

### Same or Similar Claims

**\*5** The fourth element of res judicata requires similarity among the claims or causes of action in the case. "In determining whether the fourth element [is] satisfied, the

district court [may] app[y] the 'transactional test,' which 'requires that the two actions be based on the same 'nucleus of operative facts.' " *Oreck Direct, LLC*, 560 F.3d at 401–02 (quoting *Ark-La-Tex*, 482 F.3d at 330 (quoting *Eubanks v. FDIC*, 977 F.2d 166, 171 (5th Cir. 1992) ) ). "[A] prior judgment's preclusive effect extends to all rights of the plaintiff 'with respect to all or any part of the transaction, or series of connected transactions, out of which the [original] transaction arose.' " *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 313 (5th Cir. 2004) (quoting *Petro-Hunt, LLC v. United States*, 365 F.3d 385, 395–96 (5th Cir. 2004) ). "What constitutes a 'transaction' or a 'series of transactions' is determined by weighing various factors such as 'whether the facts are related in time, space, origin, or motivation[;] whether they form a convenient trial unit[;] and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.' " *Id.* (quoting *Petro-Hunt*, 365 F.3d at 395–96).

Other than Plaintiffs' current claim for wrongful foreclosure, a comparison of the claims and allegations presented in the Second Lawsuit and those presented in the instant suit demonstrate that Plaintiffs' remaining claims are barred by res judicata as they undoubtedly involve the same nucleus of operative facts; in both cases, Plaintiffs challenge the ability of the named defendants to foreclose under the Deed of Trust on the Property. *See Sommer*, 2018 WL 1956466, at *4 (finding plaintiff's claims were barred because "[a]t its heart, Plaintiff['s complaint] seeks to restrain Defendant from dispossessing him of the Property in both suits.") (citing *Mason v. Wells Fargo Bank, N.A.*, 4:16-CV-00699-ALM-CAN, 2016 WL 7664305, at *4 (E.D. Tex. Dec. 13, 2016) ), *report and recommendation adopted*, 4:16-CV-699, 2017 WL 67943 (E.D. Tex. Jan. 6, 2017) ("[t]he claims derive from the same documents, namely the Conditional Acceptance and Notice of Fault, and the relief sought— restraining Defendant from conducting a foreclosure sale of the Property—is identical but for the foreclosure date."); *see also Millard*, 2013 WL 12120415, at *3 (finding res judicata applied where "[t]he same note and deed of trust [were] at issue"); *Steele v. Quantum Servicing Corp.*, No. 3:12-CV-2897-L, 2012 WL 5987685, at *4–7 (N.D. Tex. Nov. 30, 2012) (same).

More specifically, in the Second Lawsuit, the Court addressed the merits and subsequently dismissed nearly identical

Case 1:23-cv-00379-MAC-ZJH    Document 12-1    Filed 02/20/24    Page 38 of 92 PageID #: 329

Slocum v. Sebring Capital Partners, LP, Not Reported in Fed. Supp. (2018)

2018 WL 3470300

allegations and claims as those currently before the Court; namely, Plaintiffs' allegations that Defendants lacked the ability to enforce the Deed of Trust, and Plaintiffs' claims for breach of contract, and fraud.[5] *See Second Lawsuit* (ECF Nos. 25, 30). As to any present claims not expressly raised in the Second Lawsuit (except Plaintiffs' claim for wrongful foreclosure), the Court finds that such claims arise out of the same common nucleus of operative fact: Plaintiffs' challenge of the ability of the named defendants to foreclose under the Deed of Trust on the Property. Accordingly, the final element of res judicata is also met in this action with regard to all of Plaintiffs' claims, except for wrongful foreclosure because such claims either were or could have been asserted in the Second Lawsuit, and are therefore barred by res judicata.

The preclusive effect of res judicata does not extend to Plaintiffs' wrongful foreclosure claim because such claim arises out of or is premised upon actions taken on December 5, 2017 [Dkt. 26 at 5, 26-71], after the entry of final judgment in the Second Lawsuit on June 16, 2017, namely Defendants' sale of the Property at foreclosure. *Second Lawsuit* (ECF No. 30). Numerous courts considering this issue have found res judicata cannot bar a wrongful foreclosure claim which arose from a subsequent foreclosure on the property. *See Mason v. Bank of Am.*, No. 4:13CV738, 2015 WL 1393235, at *5 (E.D. Tex. Mar. 25, 2015) ("the Court finds that all of Plaintiff's claims, with the exception of those relating to the 2013 foreclosure sale, arise from the same set of operative facts and either were litigated or should have been raised in *Mason I*. They are barred by *res judicata* .... As those are matters arising after the Court's final judgment in *Mason I*—and the Court deduces were actions taken as a result of the Court's disposition of Plaintiff's claims in *Mason I*—they are not barred by *res judicata*."); *Reeves v. Wells Fargo Bank, N.A.*, No. EP-13-CV-318-DCG, 2014 WL 12492038, at *4 (W.D. Tex. Apr. 14, 2014) ("The preclusive effect of *res judicata* does not extend to Plaintiff's claims for intentional infliction of emotional distress or wrongful foreclosure, however, because those claims arise out of actions taken in furtherance of a July 2, 2013, Substitute Trustee's sale of the Property. As such, these claims could not have been brought in Plaintiff's June 28, 2010, suit and are, therefore, not barred by *res judicata*."); *Riley v. Wells Fargo Bank, N.A.*, No. CV H-15-1415, 2016 WL 6905849, at *1, 3 (S.D. Tex. Apr. 27, 2016), *report and recommendation adopted*, No. 4:15-CV-1415, 2016 WL 6916238 (S.D. Tex. June 8, 2016), *aff'd*, 715 F. App'x 413 (5th Cir. 2018) ("The only claim alleged in Plaintiffs' Second Amended Complaint that is not barred by res judicata is the wrongful foreclosure

claim, which arises from the subsequent foreclosure on the property"). Accordingly, because the foreclosure sale took place after the entry of final judgment in the Second Lawsuit, Plaintiffs' claim for wrongful foreclosure could not have been brought in the Second Lawsuit. Therefore, Plaintiffs' wrongful foreclosure claim is not barred by res judicata.

### Effect of Plaintiffs' Failure to Respond to Second Lawsuit's Motion to Dismiss

**\*6** To reiterate, Plaintiffs have not disputed that the elements of res judicata are met in this case [*see* Dkt. 27 at 5]. Rather, Plaintiffs assert, by and through their current counsel, that the doctrine of res judicata should not be applied in the present case because their counsel in the Second Lawsuit failed to file a "response or make any argument in opposition to Defendants [sic] Motion [to Dismiss], robbing Plaintiffs of a fair hearing, and an opportunity to present their arguments" [Dkt. 27 at 5]. Plaintiffs further argue that the Court should find their claims are not barred because their prior counsel's failure to file a response to the case-dispositive motion to dismiss constituted "ineffective assistance of council [sic]" [Dkt. 27 at 5-6]. Plaintiffs provide no authority in support of their position. Defendants argue in response that a claim of ineffective assistance of counsel cannot be used as a defense in this case[6] and that any error which may have occurred in the Second Lawsuit has no bearing on the application of res judicata in the instant case [Dkt. 34 at 2-3].

The Court finds that the failure of Plaintiffs' previous counsel to file a response in the Second Lawsuit does not prevent the application of res judicata in the instant case. *See* 🚩*Matter of Reed*, 861 F.2d 1381, 1383 (5th Cir. 1988) ("Reed asserts that there should be an equitable exception to the doctrine of res judicata because the failure to comply with discovery orders in the first case was due to the incapacitation of one of counsel's associates. This assertion is without merit."); *see also* ❓*Lariscey v. Smith*, 66 F.3d 323, at *4 (5th Cir. 1995) ("Lariscey argues that res judicata is improper because he did not have notice or opportunity to respond to the court's earlier Rule 12(b)(6) dismissal, but Lariscey's failure to keep abreast of his litigation is irrelevant to the application of res judicata."); *Benavides v. U.S. Marshals Serv.*, 990 F.2d 625 (5th Cir. 1993) ("The Supreme Court has stated that it does not recognize a general equitable doctrine, or 'simple justice' exception, applicable to the doctrine of res judicata.") (citing 🚩*Federated Dept. Stores, Inc. v. Moitie*, 452 U.S. 394, 399

Slocum v. Sebring Capital Partners, LP, Not Reported in Fed. Supp. (2018)

2018 WL 3470300

(1981) ). Moreover, the Court did not grant the motion to dismiss in the Second Lawsuit by default, but rather engaged in a lengthy and substantive analysis of each of Plaintiff's claims, the majority of which are merely repeated in the present suit. *See generally the Second Lawsuit* (ECF No. 25). Res judicata "encourages reliance on judicial decisions, bars vexatious litigation, and frees the court to resolve other disputes." *Sommer*, 2018 WL 1956466, at *3 (citing *Millard*, 2013 WL 12120415, at *3.) Allowing Plaintiffs' failure to file a response to the motion to dismiss in the Second Lawsuit, particularly when the Court has already exhaustively considered the merits of Plaintiffs' claims, would frustrate the purpose of res judicata.

**\*7** Having found that Plaintiffs' claims against Defendants, except for wrongful foreclosure (discussed *supra* ), are barred by res judicata, such claims against Defendants should be dismissed.

### Wrongful Foreclosure

To establish a claim for wrongful foreclosure, the plaintiff must demonstrate: "(1) a defect in the foreclosure sale proceedings; (2) a grossly inadequate selling price; and (3) a causal connection between the defect and the grossly inadequate selling price." *Thomas v. Bank of New York Mellon*, No. 3:12-CV-4941-M-BH, 2013 WL 4441568, at *9 (N.D. Tex. Aug. 20, 2013) (quoting *Hurd v. BAC Home Loans Servicing, LP*, 880 F.Supp.2d 747, 766 (N.D. Tex. 2012) (citing *Sauceda v. GMAC Mortg. Corp.*, 268 S.W.3d 135, 139 (Tex. App.—Corpus Christi 2008, no pet.) ) ). A procedural defect may occur when the foreclosing party either "fails to comply with statutory or contractual terms," or "complies with such terms, yet takes affirmative action that detrimentally affects the fairness of the foreclosure proceedings." *Id.* (quoting *Matthews v. JPMorgan Chase Bank, N.A.*, No. 3:11–CV–00972–M, 2011 WL 3347920, at *2 (N.D. Tex. Aug. 1, 2011) ). Apart from their allegation that Defendants lacks authority to foreclose on the Property, Plaintiffs' amended pleading does not state any facts supporting the elements of a wrongful foreclosure action. In addition, Plaintiffs allegedly remain in possession of the Property [Dkts. 19 at 15; 27 at 7-8]. Plaintiffs' possession of the Property is fatal to any wrongful foreclosure claim because recovery for wrongful foreclosure "is based on the mortgagor's [lost] possession." *Thomas*, 2013 WL 4441568, at *9 (quoting *Everhart v. CitiMortgage, Inc.*, No. CIV.A. H–12–1338, 2013 WL 264436, at *7 (S.D. Tex. Jan.

22, 2013) (citing *Petersen v. Black*, 980 S.W.2d 818, 823 (Tex. App.—San Antonio 1998, no pet.) (holding that "[w]here the mortgagor's possession is undisturbed, he has suffered no compensable damage") ); *Medrano v. BAC Home Loans Servicing LP.*, No. 3:10–CV–02565–M(BF), 2012 WL 4174890, at *3 (N.D. Tex. Aug. 10, 2012) ("An attempted wrongful foreclosure is not an action recognized under Texas law.") ) ). Because Plaintiffs are still in possession of the Property, Plaintiffs' claim for wrongful foreclosure should be dismissed. Moreover, in their pleadings, Plaintiffs admit that they were/are in default of the Loan and to date, have not tendered the amount due and owing under the Loan [*see* Dkts. 19 at 10, 27 at 2, 33]. *See Second Lawsuit* (ECF No. 25 at 6) ("Plaintiffs concede that they failed to perform their payment obligations as required under the mortgage.").

In sum, Plaintiffs' claims are barred by res judicata, except for the claim for wrongful foreclosure, which should be dismissed for failure to state a claim. The Court nonetheless further considers Defendants' remaining arguments [Dkt. 19].

### Unconscionable Contract and Breach of Contract

Plaintiffs' claims for unconscionable contract and breach of contract are each barred by the statute of limitations. [7] "Under Texas law, a four-year statute of limitations applies to claims for breach of contract and unconscionable contract." *Bruning v. Nationstar Mortg., L.L.C.*, No. 3:17-CV-0802-M-BK, 2018 WL 1135417, at *2 (N.D. Tex. Feb. 8, 2018), *report and recommendation adopted sub nom. Bruning v. Nationstar Mortg., L.L.C.*, No. 3:17-CV-0802-M, 2018 WL 1083621 (N.D. Tex. Feb. 28, 2018) (citing *Beavers v. Met. Life Ins. Co.*, 566 F.3d 436, 439 (5th Cir. 2009) (breach of contract); *Dumdei v. Certified Fin. Planner Bd. of Standards, Inc.*, No. 3:98-CV-1938-H, 1999 WL 787402, at *4 (N.D. Tex. Oct. 1, 1999) (unconscionable contract) (citing *Williams v. Khalaf*, 802 S.W.2d 651, 658 (Tex. 1990) ) ).

**\*8** "A claim for unconscionable contract accrues at the time the contract is formed." *Id.* (citing *Linder v. Deutsche Bank Nat. Tr. Co.*, No. EP-14-CV-00259-DCG, 2015 WL 12743639, at *5 (W.D. Tex. Jan. 6, 2015) (citing *Wade v. Austin*, 524 S.W.2d 79, 86 (Tex. App.—Texarkana 1975, no writ); Tex. Bus. & Com. Code Ann. § 2.302(a) ) ). Plaintiffs concede that the subject contract: the Note and the Deed of Trust, were entered into in May 2005 [Dkt. 1-3 at 8]. But, Plaintiffs did not file this suit until, December 2017—

Case 1:23-cv-00379-MAC-ZJH    Document 12-1    Filed 02/20/24    Page 40 of 92 PageID #: 331
Slocum v. Sebring Capital Partners, LP, Not Reported in Fed. Supp. (2018)
2018 WL 3470300

more than twelve years later [Dkt. 1]. Accordingly, Plaintiffs' unconscionable contract claim is time-barred.

"The accrual of a claim for breach of contract is governed by the 'legal injury' rule, which states that 'a cause of action accrues when a wrongful act causes some legal injury, even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred.' " *Bruning*, 2018 WL 1135417, at *2 (quoting *Smith Int'l, Inc. v. Egle Grp., L.L.C.*, 490 F.3d 380, 387 (5th Cir. 2007) (quoting *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996) ) ). "Thus, a claim for breach of contract typically accrues when the contract is breached." *Id.* (citation omitted). Plaintiffs argue that Sebring and MERS breached "the terms of the mortgage contract," "when it sold and relinquished its interest in Plaintiffs' [Property]" and subsequently "failed to satisfy, release and reconvey the security instrument" [Dkt. 19 at 17]. The latest in time action Plaintiffs note with respect to such allegation is: "[o]n June 15, 2011, a second Assignment of Deed of Trust was recorded in the Official Records, Collin County," which "was signed by Scott Heurkins as Assistant Secretary of MERS as nominee for SEBRING CAPITAL PARTNERS, LP" [Dkt. 19 at 11]. Plaintiffs' instant suit was filed well over four years later in December 2017. Accordingly, Plaintiffs' claim for breach of contract is similarly time-barred.

Even were it not, the Court finds that Plaintiffs are foreclosed from pursuing any such claim. As the Court in the Second Lawsuit noted, Plaintiffs do not claim to have complied with their payment obligations and do not contest that they were in default under the Loan, triggering the foreclosure remedy [*see* Dkt. 19 at 8]. *See Second Lawsuit* (ECF No. 25 at 6). As a result, the Court finds as the Court in the Second Lawsuit found, "[b]ecause Plaintiffs failed to perform their duties under the contract, Plaintiffs are precluded from maintaining a breach of contract claim." *See id.* (citing *Williams v. Wells Fargo Bank, N.A.*, 560 F. App'x 233, 238 (5th Cir. 2014) (holding that where plaintiffs were delinquent on their loan payments, dismissal of their breach of contract claim was proper) ). [8]

### Defendants' Enforcement of the Deed of Trust

**\*9** As previously alleged in the Second Lawsuit, Plaintiffs' live complaint in the instant suit alleges that Defendants have no standing to foreclose on the Property because Defendants are not the holder or the owner of the Note [Dkt. 19 at 12-15]. [9] Plaintiffs argue that the assignment by Sebring to

MERS was improper because "MERS per its own corporate charter is unauthorized to own, assign, or, [sic] an interest in a Tangible Note debt obligation," and thus, it lacked the authority to assign to future assignees [Dkt. 33 at 3]. However, as the Court previously found in the Second Lawsuit, "Plaintiffs lack standing to challenge the assignment of the Note and the Deed of Trust." *See Second Lawsuit* (ECF No. 25 at 5-6). Plaintiffs lack standing to assert a challenge to the assignment of the Note and the Deed of Trust because Plaintiffs are not parties to the assignment or third-party beneficiaries. *See Reinagel v. Deutsche Bank Nat'l Trust Co.*, 735 F.3d 220, 228 (5th Cir. 2013) ("facially valid assignments cannot be challenged for want of authority" except by the assignor); *Sanchez v. Bank of Am., N.A.*, 2013 WL 3097906, at *3 (E.D. Tex. June 18, 2013). Moreover, as the Court previously found in the Second Lawsuit, even if Plaintiffs had standing to contest the assignment, numerous courts in Texas have consistently recognized that, "under Texas law, a mortgagee or mortgage servicer can foreclose under a deed of trust regardless of whether it is a holder or owner of the note." *See Second Lawsuit* (ECF No. 25 at 4) (citing *Martins v. BAC Home Loans Servicing, LP*, 722 F.3d 249, 253-56 (5th Cir. 2013) ). Indeed, as the Court also noted in the Second Lawsuit, "[t]he Fifth Circuit rejected the 'show-me-the-note' theory and held the original promissory note need not be possessed or produced to foreclose on the property." *See id.* at 5 (citing *Martins*, 722 F.3d at 255; *Casterline v. OneWest Bank, F.S.B.*, 537 F. App'x 314, 317 (5th Cir. 2013) ). Similarly, as the Court formerly pointed out in the Second Lawsuit, "the Fifth Circuit has declared the 'split-the-note' theory—the argument that a note and its security are inseparable—is 'inapplicable' under Texas Law." *See id.* at 5 (citing *Martins*, 722 F.3d at 255). Thus, Plaintiffs' challenge to Defendants' authority to enforce the Deed of Trust should once again be dismissed.

### Quiet Title

A "suit to quiet title is an equitable action intended to remove a cloud on title on property." *Fricks v. Hancock*, 45 S.W.3d 322, 327 (Tex. App.—Corpus Christi 2001, no pet.). In a suit to quiet title action, a plaintiff must show: "(1) an interest in a specific property; (2) title to the property is affected by a claim by the defendant; and (3) the claim, although facially valid, is invalid or unenforceable." *Krishnan v. JP Morgan Chase Bank, N.A.*, No. 4:15-CV-00632-RC-KPJ, 2017 WL 6003105, at *4 (E.D. Tex. Oct. 11, 2017) (Priest-Johnson, J.)

Case 1:23-cv-00379-MAC-ZJH   Document 12-1   Filed 02/20/24   Page 41 of 92 PageID #: 332

Slocum v. Sebring Capital Partners, LP, Not Reported in Fed. Supp. (2018)

2018 WL 3470300

(citing *Wagner v. CitiMortgage, Inc.*, 955 F. Supp. 2d 621, 626 (N.D. Tex. 2014) (citing 🚩 *Vernon v. Perrien*, 390 S.W.3d 47, 61 (Tex. App.—El Paso 2012, pet. denied) ) ). A plaintiff must also prove and recover on the strength of his own title, not the weakness of his adversary's title. *See* 🚩 *Martin v. Amerman*, 133 S.W.3d 262, 265 (Tex. 2004); *Ballard v. Allen*, No. 12-03-00370-CV, 2005 WL 1037514, at *3 (Tex. App.—Tyler May 4, 2005, no pet.); *Warren v. Bank of Am., N.A.*, 566 F. App'x 379, 382 (5th Cir. 2014). Because Plaintiffs rely wholly on Defendants' purportedly weak title and neglect to provide any support for the strength and/or superiority of their own, the Court finds Plaintiffs' quiet title claim must fail. *See Warren*, 566 F. App'x at 382.

Moreover, "Texas courts have made clear that 'a necessary prerequisite to the ... recovery of title ... is tender of whatever amount is owed on the debt.'" *Thomas v. Wells Fargo Bank, N.A.*, No. 4:17-CV-2070, 2018 WL 1898455, at *3 (S.D. Tex. Apr. 20, 2018) (quoting *Cook–Bell v. Mortg. Elec. Registration Sys., Inc.*, 868 F. Supp. 2d 585, 591 (N.D. Tex. 2012) (quoting 🚩 *Fillion v. David Silvers Company*, 709 S.W.2d 240, 246 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.) ) ); *see also Stepan v. PNC Bank, N.A.*, No. 4:14-CV-230, 2015 WL 2156704, at *4 (E.D. Tex. May 7, 2015) (Mazzant, J.) ("Plaintiff's failure to show he offered tender of the amount owed under the Note to PNC is independently sufficient to cause his quiet title claim to fail as a matter of law."); 🚩 *Herrera v. Wells Fargo Bank, N.A.*, No. H-13-68, 2013 WL 961511, at *9 (S.D. Tex. Mar. 12, 2013) (holding a plaintiff failed to state a quiet title claim when he did not deny he fell behind on his mortgage payments). In the instant case, as in *Thomas*, Plaintiffs allege that they have fallen behind on their mortgage payments, but do not allege "any facts to counter the proposition that [Plaintiffs] defaulted on the payment obligations under the note" or allege that they are current in their mortgage payments or that they are "able, or even willing, to tender the balance of their mortgage obligation" [*see* Dkts. 19 at 10, 27 at 2, 33]. *See id.* (dismissing quiet title claim) (citing *Campo v. Bank of Am., N.A.*, No. CV H–15–1091, 2016 WL 1162199, at *5 (S.D. Tex. Mar. 24, 2016), *aff'd*, 678 F. App'x 227 (5th Cir. 2017), *reh'g denied* (Mar. 31, 2017) ("Campo is in default and has not alleged that he has tendered the balance of his loan. His quiet-title claim is legally insufficient for this additional reason and is dismissed."); ⚠️ *Galvan v. Centex Home Equity Co., L.L.C.*, No. 04–06–00820–CV, 2008 WL 441773, *4 (Tex. App.—San Antonio Feb. 20, 2008, no pet.) ("Setting

aside a trustee sale is an equitable remedy which requires the mortgagor to make a valid tender of the amount due to receive equity."); 🚩 *Fillion v. David Silvers Company*, 709 S.W.2d 240, 246 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.) ("Tender of whatever sum is owed on the mortgage debt is a condition precedent to the mortgagor's recovery of title from a mortgagee who is in possession and claims title under a void foreclosure sale.") ). Accordingly, Plaintiffs' quiet title claim should be dismissed.

### Slander of Title

**\*10** To state a slander of title claim under Texas law, Plaintiffs must establish: "(1) the uttering and publishing of disparaging words; (2) that they were false; (3) that they were malicious; (4) that special damages were sustained thereby; (5) that the plaintiff possessed an estate or interest in the property disparaged; and (6) the loss of a specific sale" of the Property due to the uttering and publishing of the allegedly disparaging words. *Emeribe v. Wells Fargo Bank, N.A.*, No. H-12-2545, 2013 WL 140617, at *3 (S.D. Tex. Jan. 10, 2013). Plaintiffs' slander of title claim fails because Plaintiffs fail to plead the elements of such claim and sufficient facts in support thereof. *See id.* (dismissing slander of title claim for failing to plead the elements of a slander of title claim and facts in support of such elements); *Vickery v. Wells Fargo Bank, N.A.*, No. G-11-0243, 2013 WL 321662, at *7 (S.D. Tex. Jan. 28, 2013); *Garcia v. GMAC Mortg.*, No. H-12-2242, 2013 WL 211121, at *6 (S.D. Tex. Jan. 18, 2013); *Nichamoff v. CitiMortgage, Inc.*, No. H-12-1039, 2012 WL 4388344, at *4 (S.D. Tex. Sept. 25, 2012). Specifically, Plaintiffs do not plead the following necessary elements: that the assignment at issue constitutes uttering or publishing disparaging words; that any such disparaging words were false or malicious; that any such disparaging words caused them special damages; or that the alleged slander of title caused them to lose a specific sale of the Property. *See, e.g., Vickery*, 2013 WL 321662, at *7; *Garcia v. GMAC Mortgage*, 2013 WL 211121, at *6; *Nichamoff*, 2012 WL 4388344, at *4 (S.D. Tex. Sept. 25, 2012); *Hines*, 2013 WL 5786473, at *8 (dismissing slander of title claim where plaintiff did not state any facts that defendants made any false or malicious statement regarding their authority to foreclose and where plaintiff did not allege she lost a specific sale of her home). Accordingly, Plaintiffs' slander of title claim should be dismissed. [10]

### DECLARATORY RELIEF/MOTION TO VACATE

Case 1:23-cv-00379-MAC-ZJH    Document 12-1    Filed 02/20/24    Page 42 of 92 PageID #: 333

Slocum v. Sebring Capital Partners, LP, Not Reported in Fed. Supp. (2018)

2018 WL 3470300

In their First Amended Complaint, Plaintiffs ask the Court for declaratory relief, including vacatur of the foreclosure sale [Dkt. 19 at 21-22]. Plaintiffs' Motion to Vacate Foreclosure Sale similarly requests that the Court "overturn the foreclosure sale to provide the Plaintiffs with an equitable remedy" in the form of a return of Property to Plaintiffs [Dkt. 33 at 5]. Because the Motion to Vacate Foreclosure Sale requests the same or similar declaratory relief as Plaintiffs request in their Amended Complaint, the Court considers such requests together.

As an initial matter, Plaintiffs' declaratory judgment claim should be dismissed, because Plaintiffs have failed to state a claim for relief. "Entitlement to declaratory relief is dependent upon the plaintiff first pleading a viable underlying cause of action." *Endsley v. Green Tree Servicing LLC*, No. 5:15CV151-RWS-CMC, 2017 WL 1856281, at *11 (E.D. Tex. Feb. 8, 2017), *report and recommendation adopted*, No. 5:15-CV-151-RWS-CMC, 2017 WL 1862191 (E.D. Tex. May 8, 2017) (citing *Collin County, Tex. v. Homeowners Ass'n for Values Essential to Neighborhoods*, 915 F.2d 167, 170-171 (5th Cir. 1990) (federal declaratory judgment act is remedial only; it is the defendant's underlying cause of action against the plaintiff that is litigated in a suit under the act) ); *see also Abruzzo v. PNC Bank, N.A.*, No. 4:11-CV-735-Y, 2012 WL 3200871, at *3 (N.D. Tex. July 30, 2012) ("Likewise, because Plaintiffs' claims under the Texas declaratory-judgment act are remedial or dependent on their other claims, it is not an independent cause of action."). "Where all the substantive, underlying claims are subject to dismissal, a claim for declaratory relief cannot survive." *Id.* (citing *Walls v. JPMorgan Chase Bank, NA*, No. 4:13-cv-402, 2013 WL 5782999, at *4 (E.D. Tex. Oct. 25, 2013) ). Because all of Plaintiffs' underlying claims fail, Defendants are entitled to judgment as a matter of law on Plaintiffs' declaratory judgment claim.

 *11 Even were this not the case, to the extent Plaintiffs seek injunctive or other relief from this Court to undo the foreclosure sale and/or preclude their later eviction from the Property, federal courts are statutorily prohibited from enjoining state court proceedings under the Anti-Injunction Act, except in very limited circumstances. *Mesa v. Wells Fargo Bank, N.A.*, No. 4:17-CV-532, 2017 WL 3940534, at *1 (E.D. Tex. Sept. 8, 2017) (denying plaintiff's request for injunctive relief related to pending eviction from residence pursuant to the Anti-Injunction Act); *see also* 28 U.S.C. § 2283. Specifically, the Anti-Injunction Act provides that: "[a] court of the United States may not grant an injunction

to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." *Id.* (quoting 28 U.S.C. § 2283). Indeed, numerous cases in the Fifth Circuit have previously rejected attempts by borrowers to seek injunctive relief in federal court in opposition to state court eviction proceedings, on the basis of the Anti-Injunction Act. *See, e.g.*, *Knoles v. Wells Fargo Bank, N.A.*, 513 F. App'x 414 (5th Cir. 2013) (per curiam) (affirming district court's denial of a temporary restraining order seeking to preclude eviction because "[t]he [injunctive] relief sought, in practical effect, would enjoin [the defendant] from enforcing a valid extant judgment of a Texas court. The district court is denied jurisdiction to grant such relief by the Anti-Injunction Act"); *Taylor v. Wells Fargo Bank N.A.*, No. 1:14-cv00084-LY-ML (W.D. Tex. March 4, 2014) (following *Knoles* and holding that the court lacked authority to enjoin the state court judgment awarding possession in forcible detainer action pursuant to the Anti-Injunction Act); *Greene v. Bank of America N.A.*, No. H-13-1092, 2013 WL 2417916, at *2 (S.D. Tex. Jun. 4, 2013) (denying similar request for temporary restraining order seeking to enjoin state court eviction proceeding pursuant to the Anti-Injunction Act). None of the enumerated exceptions to the Anti-Injunction Act are present in this case and importantly Plaintiffs do not allege otherwise.

Moreover, each of Plaintiffs' arguments in support of their request to vacate the foreclosure sale—(1) failure to properly assign, (2) lack of authority to assign, (3) subsequent assignments are defective, (4) no defendant has standing, and (5) no purchaser for value—lack merit. Plaintiffs' request to vacate foreclosure is founded primarily on their already rejected challenges to the enforcement of and/or the assignments of the Deed of Trust.[11] This matter should be dismissed in its entirety.

## CONCLUSION AND RECOMMENDATION

Based on the foregoing, the Court recommends that Defendants' Motion to Dismiss [Dkt. 26] be **GRANTED**. Furthermore, the Court recommends that Plaintiffs' Motion to Vacate Foreclosure Sale [Dkt. 33] be **DENIED**. Plaintiffs' suit should be dismissed with prejudice.

Within fourteen (14) days after service of the magistrate judge's report, any party must serve and file specific written

Case 1:23-cv-00379-MAC-ZJH    Document 12-1    Filed 02/20/24    Page 43 of 92 PageID #: 334
Slocum v. Sebring Capital Partners, LP, Not Reported in Fed. Supp. (2018)

2018 WL 3470300

objections to the findings and recommendations of the magistrate judge. 🚩 28 U.S.C. § 636(b)(1)(C). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *See* 🚩 *Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 🚩 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3470300

## Footnotes

1    Named Defendant Sebring was voluntarily dismissed from this lawsuit on May 15, 2018 [Dkt. 37].

2    The Home Equity Asset Trust 2005-4 owns a pool of residential mortgage loans issuing securities backed by those mortgages. A "sponsor," such as DLJ, sells loans, such as Plaintiffs' mortgage, to the "depositor," here, Credit Suisse, which then creates the trust and conveys the mortgage loans to the trustee, which in the instant case is US Bank [Dkt. 1-3].

3    Plaintiffs' claim for breach of fiduciary duty focuses entirely on Sebring, which has been dismissed from this matter. Even so, the Court finds that this claim would likely be time-barred as the events complained-of allegedly occurred in 2005 and 2008, well over four years prior to the initiation of the instant suit. Under Texas law, breach of fiduciary duty claims have a four-year statute of limitations. TEX. CIV. PRAC. & REM. CODE § 16.004(a)(5) (four-year statute of limitations for breach of fiduciary duty claims); *Taylor v. Deutsche Bank AG*, 3:14-CV-0453-N, 2014 WL 12586180, at *6 (N.D. Tex. Nov. 24, 2014) (applying the four-year statute of limitations to a breach of fiduciary duty claim in the mortgage foreclosure context).

4    Notably, aside from naming DLJ as a party to the instant suit, Plaintiffs have failed to assert any express factual allegations or claims for relief against DLJ [*see* Dkt. 19].

5    Plaintiffs also alleged a claim for wrongful foreclosure in the Second Lawsuit, which the court dismissed because foreclosure proceedings had not yet begun. Here, the Property was foreclosed on prior to the initiation of suit.

6    The Fifth Circuit has made it abundantly clear that "there is no constitutional right to effective counsel in the civil context." *See Price v. Plantation Mgmt. Co.*, 433 F. App'x 264, 265 (5th Cir. 2011); *Wynn v. Dallas Hous. Auth.*, 409 F. App'x 744, 748 (5th Cir. 2011) ("Mitchell's statement that his trial counsel was 'inaccurate' at trial seems to present a claim of ineffective assistance of counsel. As there is no Sixth Amendment right to counsel in a civil trial, the ineffective assistance claim is not an appealable issue."); *Nicholson v. Spring Sand & Clay LP*, 229 F. App'x 304, 305 (5th Cir. 2007) ("In addition, to the extent her brief reflects her disappointment with counsel, the Sixth Amendment right to counsel does not apply to civil proceedings."); 🚩 *F.T.C. v. Assail, Inc.*, 410 F.3d 256, 267 (5th Cir. 2005) (same); *Stiger v. Christus Health ARK-LA-TEX*, 89 F. App'x 447, 448 (5th Cir. 2004) (same); *Olive v. Gonzalez*, 31 F. App'x 152 (5th Cir. 2001) ("Because Olive had no constitutional or statutory right to counsel in this civil rights case, he cannot complain about counsel's allegedly deficient

2018 WL 3470300

performance in this proceeding."). To the extent Plaintiffs intend to assert an ineffective assistance of counsel claim in this civil matter, such allegations fail to state a claim for relief.

7   "While a court generally cannot grant a Rule 12(b)(6) motion premised on a statute of limitations argument, it may do so where, as here, 'it is evident from [Plaintiffs'] pleadings that the action is barred and the pleadings fail to raise some basis for tolling or the like.' " *Bruning v. Nationstar Mortg., L.L.C.,* No. 3:17-CV-0802-M-BK, 2018 WL 1135417, at *3 (N.D. Tex. Feb. 8, 2018), *report and recommendation adopted sub nom. Bruning v. Nationstar Mortg., L.LC.,* No. 3:17-CV-0802-M, 2018 WL 1083621 (N.D. Tex. Feb. 28, 2018) (quoting *Jones v. Alcoa, Inc.,* 339 F.3d 359, 366 (5th Cir. 2003) (citations omitted) ).

8   Insofar as Plaintiffs premise their breach of contract claims on any alleged failure by Defendants to provide the requisite notices under the Loan before foreclosing on the Property, such claim would not be foreclosed by Plaintiffs' default under the Loan. *See Adams v. U.S. Bank, N.A.,* No. 3:17-CV-723-B-BN, 2018 WL 2164520, at *4 (N.D. Tex. Apr. 18, 2018) (Horan, J), *report and recommendation adopted,* No. 3:17-CV-723-B-BN, 2018 WL 2150960 (N.D. Tex. May 10, 2018). In a recent decision, the Fifth Circuit found "that a lender's agreement in a deed of trust to give notice of foreclosure is independent of a borrower's agreement under the note to make monthly payments because the 'obligation to give notice of foreclosure would not even arise unless and until' a borrower defaults." *Thomas,* 2018 WL 1898455, at *3 (quoting *Williams v. Wells Fargo Bank, N.A.,* 884 F.3d 239, 245 (5th Cir. 2018) (the Fifth Circuit reversed trial court's dismissal of the plaintiffs' breach of contract claim based on the plaintiffs' breach of the deed of trust due to their payment default) ).

9   Additionally, Plaintiffs' "Motion to Vacate Foreclosure Sale" is, in reality, an attempt to combine a Motion to Set Aside Foreclosure Sale with a quiet title action as Plaintiffs' prayer for relief requests that the Court "overturn the foreclosure sale to provide the Plaintiffs with an equitable remedy" in the form of a return of the home to Plaintiffs [Dkt. 33 at 5]. The Court considers Plaintiffs' arguments in their Motion to Vacate Foreclosure both in the instant section and the section *infra* analyzing Plaintiffs' quiet title claims.

10   Plaintiffs also list "fraud in the concealment" and "fraud in the inducement" in the title of their live pleading. However, the live complaint does not include an express fraud claim or facts in support of a fraud claim. As the Court in the Second Lawsuit noted, "Plaintiffs fail to meet the heightened pleading standards required under Rule 9(b)," and because "Plaintiffs' allegations of loss pursuant to the fraud claims are directly related to the Loan," Plaintiffs' fraud claim is barred by the economic loss rule." *See Second Lawsuit* (ECF No. 25 at 7). Insofar as Plaintiffs intend to assert a fraud claim, it should be dismissed. *See Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.,* 565 F.3d 200, 206–07 (5th Cir. 2009) ("Rule 9(b) states that 'in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.' This Circuit's precedent interprets Rule 9(b) strictly, requiring the plaintiff to 'specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent.' ") (quoting *Fed. R. Civ. P. 9(b); Williams v. WMX Techs., Inc.,* 112 F.3d 175, 177 (5th Cir. 1997); *Nathenson v. Zonagen, Inc.,* 267 F.3d 400, 412 (5th Cir. 2001) ).

11   As the Court in the Second Lawsuit concluded, "Plaintiffs' request for attorney's fees is barred because Plaintiffs have not pleaded any viable causes of action that would allow for recovery of attorney's fees. *See Second Lawsuit* (ECF No. 25 at 11) (citing *Green Int'l, Inc. v. Solis,* 951 S.W.2d 384, 390 (Tex. 1997) ). "Thus, Plaintiffs' request for attorney's fee[s] should be denied." *See id.*

---

**End of Document**                                                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Fidelis Diagnostics, Inc. v. SafeGuard Services, L.L.C., Not Reported in F.Supp.2d (2011)

2011 WL 5975787
Only the Westlaw citation is currently available.
United States District Court,
E.D. Texas,
Sherman Division.

FIDELIS DIAGNOSTICS, INC.
v.
SAFEGUARD SERVICES, L.L.C., Kathleen Sebelius,
Palmetto GBA, and Donald Berwick, M.D.

No. 4:10–CV–638.
|
Nov. 4, 2011.

**Attorneys and Law Firms**

Patrick D. Souter, Scott B. Aston, Looper Reed & McGraw,
Dallas, TX, for Fidelis Diagnostics, Inc.

Bradley E. Visosky, U.S. Attorney's Office, Plano, TX, for
Safeguard Services, L.L.C., et al.

*REPORT AND RECOMMENDATION OF UNITED
STATES MAGISTRATE JUDGE*

AMOS L. MAZZANT, United States Magistrate Judge.

**\*1** Pending before the Court is Defendants' Motion to
Dismiss Plaintiff's Second Amended Complaint for Lack of
Subject Matter Jurisdiction Under Rule 12(b)(1) and for
Failure to State a Claim Under Rule 12(b)(6) (Dkt.# 40).
Having considered the relevant pleadings, the Court is of the
opinion that Defendants' motion to dismiss should be granted
in part and denied in part.

## I. BACKGROUND[1]

*A. Factual and Procedural Background*

Plaintiff, Fidelis Diagnostics, Inc., is an independent
diagnostic testing facility that performs diagnostic services
for Medicare beneficiaries. Plaintiff's technicians perform
these diagnostic tests after the tests have been ordered by a
medical doctor, doctor of osteopathic medicine, or podiatrist
who is the primary physician of the beneficiary. For each
beneficiary, Plaintiff has in its possession only the
referral/ordering form, patient intake/order form, the nerve
conduction studies form, and the interpretation of the test
results. Plaintiff does not have access to any of the
beneficiaries' medical records.

The Secretary of the U.S. Department of Health and Human
Services ("HHS") operates Medicare through the Centers for
Medicare and Medicaid Services ("CMS"). CMS contracts
with private entities to perform certain administrative
functions on its behalf. One of these administrative functions
is to conduct a post-payment review of the claims that
Medicare paid. Defendant SafeGuard is a Medicare Program
Integrity Contractor. One of SafeGuard's roles is to conduct
the post-payment review to determine whether the services
provided were "medically necessary." If upon its review
SafeGuard determines that Medicare paid for services
provided that were not "medically necessary," it can assess
an overpayment and recover the overpaid amount from the
provider.

Between January 1, 2006, and March 31, 2007, Plaintiff
submitted 1,912 claims for 1,512 beneficiaries in Southern
California. Of these 1,912 claims, Plaintiff was paid a total
of $1,394,892.58. In 2007, SafeGuard elected to conduct a
post-payment review of these claims, and collected a sample
of sixty-five (65) beneficiaries to represent the total amount
of claims. On or about December 6, 2007, SafeGuard
requested from Plaintiff all medical records in its possession
relevant to the claims being reviewed. SafeGuard also
requested medical records regarding the beneficiaries from
the referring physicians. After reviewing the evidence
provided by Plaintiff, SafeGuard determined that Plaintiff
failed to establish the reasonableness and medical necessity
of the diagnostic tests billed for the beneficiaries in the
sample. Based on that failure, SafeGuard concluded that
Medicare overpaid Plaintiff the amount of $1,279,324.37.
This amount was determined by extrapolating from the
sample of sixty-five (65) beneficiaries to the entire
population of 1,512 beneficiaries who received testing.

SafeGuard notified Plaintiff of its findings on July 22, 2010. Upon receipt of the notice letter, Plaintiff began attempting to obtain medical records from the referring physicians, and initiated Freedom of Information Act ("FOIA") requests for the medical records reviewed by SafeGuard from CMS. In addition, SafeGuard considered the additional information provided by Plaintiff regarding the medical necessity of the tests, and changed the overpayment amount to $1,160,420.98. This is SafeGuard's final determination regarding the overpayment.

**\*2** On April 21, 2011, CMS responded to Plaintiff's FOIA request, refusing to produce the beneficiaries' medical records in their entirety. CMS explained that a total of 2310 documents were responsive to the request, and it would release 1079 pages and withhold 1231 pages under applicable FOIA exemptions related to personal privacy. Plaintiff appealed CMS's decision, which was responded to on June 16, 2011. The response asserted that CMS would respond "as expeditiously as possible, consistent with Department of Health and Human Services' FOIA rules." No subsequent communication regarding this appeal was received by Plaintiff at the time of filing their Second Amended Complaint.

On November 17, 2010, Plaintiff filed its original complaint (Dkt.# 1). On May 23, 2011, Plaintiff filed its first amended complaint (Dkt.# 24). On June 6, 2011, Defendants filed a motion to dismiss (Dkt.# 26). In response, on July 19, 2011, Plaintiff filed a motion for leave to file a second amended complaint (Dkt.# 33). The Court granted leave to amend (Dkt.# 35), and Plaintiff's second amended complaint was filed on July 19, 2011 (Dkt.# 34). On September 7, 2011, Plaintiff filed a motion for leave to file its third amended complaint (Dkt. # 45); however, this motion was denied by the Court on September 29, 2011 (Dkt. # 56).

After withdrawing their previous motion to dismiss based on the filing of the second amended complaint, Defendants filed this motion to dismiss for lack of jurisdiction on August 8, 2011 (Dkt.# 40). On September 7, 2011, Plaintiff filed its response to the motion to dismiss (Dkt.# 48). On September 19, 2011, Defendants filed their reply to Plaintiff's response (Dkt.# 51). On September 26, 2011, Plaintiff filed its sur-reply (Dkt.# 54).

### B. Plaintiff's Claims

Plaintiff argues that in this case, SafeGuard violated federal law during its post-payment review by reopening forty-seven (47) claims more than one year old without evidence of good cause or fraud. Further, Plaintiff asserts that SafeGuard is required to provide an explanation of its findings to the provider, including findings for each individual claim, which Plaintiff never received. Plaintiff contends there were several problems with the sample population selected by SafeGuard, including the fact that SafeGuard included five claims determined in Plaintiff's favor during the Medicare appeals process, and one claim for which Plaintiff never received full payment. Plaintiff asserts that the credentials of the medical consultant are inadequate for an appropriate post-payment review.[2] Plaintiff also asserts that SafeGuard has not disclosed the methodology used to extrapolate the final overpayment amount from the sample of sixty-five (65) beneficiaries in a meaningful way.

Plaintiff additionally alleges various problems with the notice letter provided by SafeGuard, including the following: the notice failed to give a full review and explanation of findings; failed to contain a narrative description of the overpayment; failed to recommend corrective actions the provider should consider taking; failed to contain the findings for each claim in the sample, including a specific explanation of why services were not covered; failed to contain an explanation of Plaintiff's right to submit a rebuttal statement prior to recoupment of overpayment; and failed to contain an explanation of the procedures for recovery of overpayments. Plaintiff contends that it is without fault and could not have reasonably been expected to know that payment would not be made for Plaintiff's services when the physicians certified that such services were medically necessary. Plaintiff argues that federal law requires payment for such services to be made when the provider is without fault.

**\*3** Plaintiff alleges that it has initiated FOIA requests for the medical records of the beneficiaries to SafeGuard after experiencing difficulty obtaining the records from the beneficiaries' physicians. Plaintiff asserts that SafeGuard has refused to release the requested information despite two instructions from CMS to release the records. In addition,

Plaintiff argues that SafeGuard was required to respond to its FOIA request within 20 working days, but failed to do so.

In summary, Plaintiff asserts claims for the following: (1) a violation of 42 U.S.C. § 1395DDD, 42 C.F.R. § 405.373, and the Program Integrity Manual; (2) a violation of the Administrative Procedure Act, arguing that SafeGuard's actions are arbitrary and capricious; (3) a violation of due process; (4) a violation of the Freedom of Information Act; (5) a request for mandamus; and (6) a request for declaratory relief. Defendants move for dismissal of Plaintiff's complaint based on a lack of subject matter jurisdiction and failure to state a claim upon which relief may be granted.

*C. The Administrative Appeals Process for Medicare Claims*
Medicare has a multi-step appeals process for a provider to follow if it is dissatisfied with an overpayment determination made by a Medicare contractor. 42 C.F.R. § 405.904(a)(2). First, the Medicare contractor makes an initial determination on the amount of overpayment. A provider may ask the contractor for a redetermination of the initial determination if the provider is dissatisfied. *Id.* If the provider is still not satisfied, the provider may request that a qualified independent contractor perform a reconsideration of the claim. *Id.* Following the reconsideration, a provider may request a hearing before an administrative law judge. *Id.* If the provider is dissatisfied with the findings of the administrative law judge, the provider can appeal the decision to the Medicare Appeals Council. *Id.* The decision of the Medicare Appeals Council is considered the final decision of the Secretary. 42 U.S.C. § 1395ff(b). The Medicare Act allows "any individual, after any final decision of the [HHS Secretary], made after a hearing to which he was a party, irrespective of the amount in controversy, [to] obtain a review of such decision by a civil action." 42 U.S.C. § 405(g). Therefore, if the Medicare Appeals Council reviews the case and issues a decision, and the provider is dissatisfied with the decision, the provider may file suit in Federal district court. *Id.*

## II. STANDARDS

"When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States,* 281 F.3d 158, 161 (5th Cir.2001).

*A. Motion to Dismiss for Lack of Subject Matter Jurisdiction*
Defendants move to dismiss based on Federal Rules of Civil Procedure 12(b)(1). The Court has subject matter jurisdiction over those cases arising under federal law. U.S. Const. Art. III § 2, cl. 1; 28 U.S.C. § 1331. A case arises under federal law if the complaint establishes that federal law creates the cause of action or the plaintiff's right to relief necessarily depends on the resolution of a substantial question of federal law. *Empire Healthchoice Assur., Inc. v. McVeigh,* 547 U.S. 677, 689–90, 126 S.Ct. 2121, 165 L.Ed.2d 131 (2006).

**\*4** A motion under Federal Rule of Civil Procedure 12(b)(1) should be granted only if it appears beyond doubt that Plaintiff cannot prove a plausible set of facts in support of its claim. *Lane v. Halliburton,* 529 F.3d 548, 557 (5th Cir.2008) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556–57, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The Court may find a plausible set of facts by considering: "(1) the complaint alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Lane,* 529 F.3d at 557 (quoting *Barrera–Montenegro v. United States,* 74 F.3d 657, 659 (5th Cir.1996)). The Court will accept all well-pleaded allegations in the complaint as true, and construe those allegations in a light most favorable to Plaintiff. *Truman v. United States,* 26 F.3d 592, 594 (5th Cir.1994). The party asserting jurisdiction bears the burden of proof for a 12(b)(1) motion to dismiss. *Ramming,* 281 F.3d at 161. "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *CleanCOALition v. TXU Power,* 536 F.3d 469, 473 (5th Cir.2008) (quoting *Home Builders Ass'n of Miss., Inc. v. City of Madison,* 143 F.3d 1006, 1010 (5th Cir.1998)).

*B. Motion to Dismiss for Failure to State a Claim*

Defendants also move for dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, which authorizes certain defenses to be presented via pretrial motions. A Rule 12(b)(6) motion to dismiss argues that, irrespective of jurisdiction, the complaint fails to assert facts that give rise to legal liability of the defendant. The Federal Rules of Civil Procedure require that each claim in a complaint include "a short and plain statement ... showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The claims must include enough factual allegations "to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting Twombly, 550 U.S. at 570).

Rule 12(b)(6) provides that a party may move for dismissal of an action for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The Court must accept as true all well-pleaded facts contained in the plaintiff's complaint and view them in the light most favorable to the plaintiff. Baker v. Putnal, 75 F.3d 190, 196 (5th Cir.1996). In deciding a Rule 12(b)(6) motion, "[f]actual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555; Gonzalez v. Kay, 577 F.3d 600, 603 (5th Cir.2009). "The Supreme Court recently expounded upon the Twombly standard, explaining that '[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.' " Gonzalez, 577 F.3d at 603 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "It follows, that 'where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'shown'-'that the pleader is entitled to relief.' " Id.

*5 In Iqbal, the Supreme Court established a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion. First, the Court identifies conclusory allegations and proceeds to disregard them, for they are "not entitled to the assumption of truth." Iqbal, 129 S.Ct. at 1951. Second, the Court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief." Id. "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary claims or elements." Morgan v. Hubert, 335 F. App'x 466, 470 (5th Cir.2009). This evaluation will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 129 S.Ct. at 1950.

In determining whether to grant a motion to dismiss, a district court may generally not "go outside the complaint." Scanlan v. Tex. A & M Univ., 343 F.3d 533, 536 (5th Cir.2003). However, a district court may consider documents attached to a motion to dismiss if they are referred to in the plaintiff's complaint and are central to the plaintiff's claim. Scanlan, 343 F.3d at 536.

## III. ANALYSIS

### A. Subject–Matter Jurisdiction

The Court's preliminary inquiry must be whether or not it has subject matter jurisdiction over the claims presented in Plaintiff's second amended complaint. Defendants assert that all of Plaintiff's claims, excluding the FOIA and mandamus claims, arise under the Medicare Act, which precludes review by this Court until a final decision has been made on the claims after exhausting the administrative remedies in the Medicare appeals process. Defendants argue that since Plaintiff has not yet exhausted its available administrative remedies, this lawsuit is premature and should be dismissed.

Plaintiff does not dispute Defendants' arguments that its claims for violating various provisions of the Medicare Act, violating the Administrative Procedure Act, violating Plaintiff's due process rights, and declaratory judgment all arise under the Medicare Act. However, Plaintiff asserts that it is not required to exhaust its administrative remedies under the circumstances of this case. Plaintiff asserts that its claims are a procedural challenge to the administrative appeals process that is wholly collateral to its claim for benefits, and

that its injury cannot be remedied by the retroactive payment of benefits after the exhaustion of administrative remedies.

Providers are ordinarily required to exhaust their remedies before seeking judicial review. 42 U.S.C. § 405(g). However, where a plaintiff asserts a procedural challenge to the administrative appeals process that is "wholly collateral" to its claim for benefits, and the plaintiff makes a colorable showing that any injury could not be remedied by the retroactive payment of benefits, then the plaintiff is not required to exhaust its administrative remedies. *Heckler v. Ringer,* 466 U.S. 602, 618, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984); *Foley v. Southwest Texas HMO, Inc.,* 226 F.Supp.2d 886, 904 (E.D.Tex.2002). To decide whether waiver of exhaustion is appropriate, some courts consider whether: (1) the claim is "wholly collateral" to a claim for benefits; (2) the claimant would be irreparably harmed by exhausting its remedies; and (3) exhaustion would be futile. *Ringer,* 466 U.S. at 618; *Abbey v. Sullivan,* 978 F.2d 37, 44 (2d Cir.1992). "Courts should also keep in mind that '[e]xhaustion is the rule, waiver the exception ... because of a variety of prudential and separation-of-powers concerns.' " *Janacek v. Leavitt,* No. 3:07–CV–1996–G, 2008 WL 4107549, at *7 (N.D.Tex. Aug.27, 2008) (citing *Abbey,* 978 F.2d at 44).

**\*6** Plaintiff argues that its claims are "wholly collateral" to a claim for benefits, since it is not seeking the benefits themselves as damages. In the words of Plaintiff, "Fidelis' claims are not 'inextricably intertwined' with claims for benefits because Fidelis will not be entitled to receive benefits if it prevails on its claims, but only to receive the procedure it should have been accorded in the first place." Response at 14.

"The inquiry in determining whether § 405(h) bars federal-question jurisdiction must be whether the claim 'arises under' the Act, not whether it lends itself to a 'substantive' rather than 'procedural' label." *Ringer,* 466 U.S. at 615. Those claims that attempt to challenge the constitutional validity of the administrative procedures are wholly collateral to a claim for benefits. *See Mathews v. Eldridge,* 424 U.S. 319, 330, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). However, Plaintiff does not challenge the constitutional validity of any of these claims, but rather asks the Court to uphold the administrative procedures. Instead,

Plaintiff attacks the *application* of the procedures to its particular situation.

One of the purposes of requiring exhaustion is "preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors." *Abbey,* 978 F.2d at 44 (quoting *Weinberger v. Salfi,* 422 U.S. 749, 765, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975)). "The policies favoring exhaustion are most strongly implicated by actions (like this one) challenging the application of concededly valid regulations." *Abbey,* 978 F.2d at 44; see also *Bowen v. City of New York,* 476 U.S. 467, 484–85, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986) (agency's "mere deviation from the applicable regulations ... [is] fully correctable upon subsequent administrative review since the claimant on appeal will alert the agency to the alleged deviation"). All of Plaintiff's procedural claims can be addressed by the agency during the administrative appeals process.

Further, Plaintiff asks the Court to throw out or recalculate the overpayment determined by SafeGuard, and to declare that Defendants cannot recover any amount from Plaintiff. These are clearly claims for the payment of benefits, and cannot be construed as "wholly collateral" to a claim for benefits. Plaintiff also asks the Court to declare that Defendants cannot recover any benefits. While Plaintiff does assert an additional claim for damages as a result of the insufficient notice letter, it is unclear what damages Plaintiff could have suffered that could not now be remedied by the administrative process. The Court finds that Plaintiff's claims arising under the Medicare Act are not "wholly collateral" to a claim for benefits.

Turning now to the second consideration, the Court must determine whether Plaintiff will be irreparably harmed by the exhaustion of its administrative remedies. Plaintiff argues that after it exhausts the next two levels of the Medicare appeals process it will lack the resources to seek judicial review. Plaintiff submits the affidavit of W. Flynn Wilson, CEO of Fidelis Diagnostics, Inc., asserting that recoupment of the alleged overpayment amount prior to Plaintiff's exhaustion of its administrative remedies "would substantially interfere with Fidelis' operations and irreparably harm Fidelis to such an extent that Fidelis would have to lay off its work force, cease operations and file for

Fidelis Diagnostics, Inc. v. SafeGuard Services, L.L.C., Not Reported in F.Supp.2d (2011)

bankruptcy, or cease business operations all together." Response, Exhibit I at 3.

**\*7** The Court is certainly sympathetic to the serious consequences faced by Plaintiff during the process of exhausting its remedies through the Medicare appeals process. However, Congress's decision to channel all claims arising under the Medicare Act "comes at a price, namely, occasional individual, delay-related hardship." *Shalala v. Illinois Council,* 529 U.S. 1, 13, 120 S.Ct. 1084, 146 L.Ed.2d 1 (2000). The question is not whether on an individual basis the party is injured by the requirement to exhaust its remedies under the Medicare Act, but rather, whether the requirement is a complete preclusion of judicial review. *Id.* at 22–23. "This language suggests that a plaintiff must show a systemic deprivation of review-not an individual hardship based on delay." *Triad at Jeffersonville I, LLC v. Leavitt,* 563 F.Supp.2d 1, 14 (D.D.C.2008). Plaintiff has not made such a showing.

Further, the injuries claimed by Plaintiff are not irreparable. "Concerning [Plaintiff's] claim that he would be forced to shut down his facility, such injury is 'not necessarily irreparable,' considering the risk known to the health care provider when it enters the Medicare program." *Janacek,* 2008 WL 4107549, at \*9 (citing *Manakee Professional Medical Transfer Service, Inc. v. Shalala,* 71 F.3d 574, 581 (6th Cir.1995)). Therefore, Plaintiff has failed to show it will be irreparably injured if required to exhaust its administrative appeals.

Finally, the Court must consider whether requiring Plaintiff to exhaust its administrative remedies would be futile. Plaintiff argues that Defendants are biased and have unfairly predetermined the issues that must be decided during the appeal. However, the Court finds that this is not the case. There is simply no evidence that Plaintiff will not get fair administrative procedures during the appeals process. Defendants have provided Plaintiff with some of the information requested by Plaintiff. Further, upon receiving additional information from Plaintiff regarding the claims, Defendants modified the original overpayment amount based on the evidence provided. Therefore, the Court finds that exhaustion of administrative remedies is not futile.

The Court finds Plaintiff has failed to establish entitlement to a judicial waiver of § 405(g)'s exhaustion requirement, and Plaintiff's claims arising under the Medicare Act should be dismissed without prejudice.[3]

### B. Plaintiff's Due Process Claims

Plaintiff asserts that dismissal of this action will violate its due process rights. Plaintiff alleges that the Medicare appeals process cannot protect its due process rights because Defendants refuse to produce the private beneficiary medical records, and have advised Plaintiff that they intend to begin recoupment before the Medicare appeals process will be completed. In addition, Plaintiff argues that requiring it to incur the time and expense of engaging in the Medicare appeals process violates its due process because it is without fault. Finally, Plaintiff states that Defendants' reopening forty-seven (47) claims that are more than a year old, without good cause, violates its due process rights.

**\*8** A fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews,* 424 U.S. at 333. As discussed above, these claims arise under the Medicare Act. Therefore, Plaintiff's due process claims are also barred by § 405(h), since they are merely claims arising under the Medicare Act "cloaked in constitutional terms." *Marsaw v. Trailblazer Health Enterprises, LLC,* 192 F.Supp.2d 737, 746 (S.D.Tex.2002) (holding court lacked subject matter jurisdiction and claimant was still required to exhaust administrative remedies prior to obtaining judicial review); *see also Affiliated Prof'l Home Health Care Agency v. Shalala,* 164 F.3d 282, 286 (5th Cir.1999) (even though claims were presented as constitutional claims, they were inextricably intertwined with a claim of entitlement to benefits and therefore subject to § 405(g)'s exhaustion requirement). Here, Plaintiff's constitutional claims are merely those claims under the Medicare Act restated in constitutional terms. In addition, Plaintiff will be afforded a meaningful right to be heard through the Medicare appeals process, and can later challenge due process issues arising during the appeal. Therefore, the Court finds these claims should also be dismissed without prejudice for lack of subject matter jurisdiction.

Fidelis Diagnostics, Inc. v. SafeGuard Services, L.L.C., Not Reported in F.Supp.2d (2011)

*C. Plaintiff's Freedom of Information Act Claims*

Defendants argue that Plaintiff's FOIA claim should be dismissed because Plaintiff incorrectly sued Kathleen Sebelius, the HHS Secretary, and Donald Berwick, the CMS administrator. Defendants argue that the only proper party to a FOIA action is a federal agency. Plaintiffs contend that a suit against a government official in their official capacity is the same as suit against the entity itself. Therefore, Plaintiff asserts that both parties to the lawsuit are proper.

In 🏴 *Petrus v. Bowen,* 833 F.2d 581, 582 (5th Cir.1987), the Fifth Circuit held that the FOIA does not create a cause of action for a suit against an individual employee of a federal agency. The court determined that the plain language of the statute allowed only for suits against agencies. *Id.* However, Plaintiff has requested leave to amend, and "the court should freely give leave when justice so requires." Fed.R.Civ.P. Rule 15. Therefore, the Court finds that Plaintiff should be given leave to amend its complaint to name the proper Defendant in its FOIA claim, should it choose to do so.

*D. Request for Mandamus*

Plaintiff asks the Court to grant a writ of mandamus ordering the following: (1) Defendants provide to Plaintiff all medical records and other information, including the calculation of the alleged overpayment; (2) Defendants exclude from the post-payment review and overpayment calculation any consideration of the claim on which payment was not made; (3) Defendants exclude from the post-payment review and overpayment calculation any consideration of the forty-seven (47) claims Defendants reopened more than a year after the date of their initial determination without good cause or reliable evidence of fraud; and (4) Defendants honor Defendants' payment obligation, and cease recoupment efforts with respect to all claims in the post-payment review because Plaintiff is without fault. Response at 24.

**\*9** In 🏴 *Wolcott v. Sebelius,* 635 F.3d 757 (5th Cir.2011), the Fifth Circuit addressed the issue of whether the 🏴 § 405(h) bar to jurisdiction prohibits federal courts from exercising judicial review of the Secretary's decisions under the Medicare Act. The Fifth Circuit stated, "We join the near unanimity of all other circuits holding 🏴 § 405(h) does not preclude mandamus jurisdiction to review otherwise unreviewable procedural issues." *Wolcott,* 635 F.3d at

764. However, the Fifth Circuit also held that the second sentence of 🏴 § 405(h) applied to bar judicial review "where a judicial decision favorable to the plaintiff would affect the merits of whether the plaintiff is entitled to the benefits." *Id.* In addition, the language of the statute only grants jurisdiction to consider a mandamus action, which is an action that "commands the performance of a particular duty that rests on the defendant ... by operation or law or because of official status." *Id.* at 766. Jurisdiction is not permitted for other types of actions, such as those for declaratory or injunctive relief. *Id.*

As an initial matter, the Court lacks subject matter jurisdiction for the second, third, and fourth mandamus requests of Plaintiff. The relief that Plaintiff seeks in these three requests is not mandamus, but injunctive relief. An injunction "is a remedy to restrain the doing of injurious acts" or to require "the undoing of injurious acts and the restoration of the status quo." *Id.* Plaintiff asks this Court to order Defendants to exclude from their calculations a claim on which payment was not made and forty-seven (47) claims that were reopened more than a year after the date of their initial determination, without good cause. In addition, Plaintiff asks the Court to order Defendants to honor their payment obligations and cease recoupment efforts. These requests ask the Court restrain Defendants from doing injurious acts or require Defendants to undo injurious acts, rather than compel the Defendants "to affirmatively perform a presently existing duty under the law." *Id.* at 767. Therefore, there is no jurisdiction for these claims for mandamus, and these claims should be dismissed.

When mandamus jurisdiction exists, the Court must then determine whether plaintiff has stated a claim for mandamus relief. "Mandamus may only issue when (1) the plaintiff has a clear right to relief, (2) the defendant a clear duty to act, and (3) no other adequate remedy exists." *Id.* at 768 (citing 🏴 *Jones v. Alexander,* 609 F.2d 778, 781 (5th Cir.1980); 🏴 *Green v. Heckler,* 742 F.2d 237, 241 (5th Cir.1984)). "In short, mandamus does not create or expand duties, but merely enforces clear, non-discretionary duties already in existence." *Id.* "Mandamus is an extraordinary remedy that should be granted only in the clearest and most compelling cases." 🏴 *In re Willy,* 831 F.2d 545, 549 (5th Cir.1987).

Plaintiff first asks the Court to order Defendants to provide Plaintiff with all medical records and other information, including the calculation of the alleged overpayment, not less than thirty days before issuing a final determination on the post-payment review. Response at 25. Plaintiff asserts that FOIA gives Plaintiff a clear right to these documents, and Defendants a clear duty to produce them. Plaintiff states that there is no other adequate remedy, because it has exhausted its remedies under FOIA and still has not received the documents from Defendants.

**\*10** First, Defendants have already disclosed to Plaintiff their method of calculation of the alleged overpayment. This claim is now moot. As to Plaintiff's claim for medical records and other information, an adequate remedy still exists. While it is true that Plaintiff has exhausted its administrative remedies under FOIA, its FOIA appeal is now pending before this Court. Plaintiff will be permitted to amend its complaint regarding its FOIA claim to add the correct agency to the lawsuit, and it will have an adequate remedy consisting of judicial review of its claim. Therefore, the Court finds that this claim should be dismissed.

Plaintiff next asks the Court to exclude from post-payment review and overpayment calculation any consideration of the one claim on which payment was not made in full.[4] The Court finds that in addition to a lack of subject matter jurisdiction over this claim, as discussed above, this request is also moot. Defendants demonstrated that they did not include this claim in their final overpayment calculation amount. Therefore, this request is moot and should be dismissed.

Plaintiff next requests that the Court order Defendants to exclude from the post-payment review and overpayment calculation any consideration of the forty-seven (47) claims Defendants reopened more than a year after the date of their initial determination, without good cause or reliable evidence of fraud. Plaintiff asserts that it has a clear right to relief, and this is a wholly unreviewable procedural issue appropriate for mandamus. However, a judicial decision in Plaintiff's favor would require the readjustment of the overpayment amount and would directly affect the merits of Plaintiff's claim for benefits. This is prohibited by 🚩42 U.S.C. § 405(h), discussed above, and therefore, the Court lacks

subject matter jurisdiction over this claim for this reason as well.

Further, the Medicare contractor's decision on whether to reopen claims based on good cause is plainly a discretionary duty. Mandamus only enforces clear, non-discretionary duties already in existence. 🚩*Wolcott,* 635 F.3d at 768. Since this duty is one that is discretionary, and dependant on the facts of each individual case, the Court finds that this claim should be dismissed for this reason as well.

Finally, Plaintiff asks the Court to order Defendants to honor their payment obligation and cease recoupment efforts with respect to all claims in the post-payment review, because Plaintiff is without fault. This claim also goes to the merits of the overpayment calculation. Defendants have determined that Plaintiff is at fault; and Plaintiff disagrees with Defendants' determination. A judicial decision in favor of Plaintiff would directly affect the merits, which is prohibited by 🚩42 U.S.C. § 405(h).

Further, the Medicare contractor's decision on whether to find Plaintiff at fault or without fault is plainly a discretionary duty. Mandamus only enforces clear, non-discretionary duties already in existence. 🚩*Wolcott,* 635 F.3d at 768. Since this duty is one that is discretionary, and dependant on the facts of each individual case, the Court finds that this claim should be dismissed for this reason as well.

## IV. RECOMMENDATION

**\*11** Based upon the foregoing, the Court recommends Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint for Lack of Subject Matter Jurisdiction Under Rule 12(b)(1) and for Failure to State a Claim Under Rule 12(b)(6) (Dkt.# 40) be **GRANTED** in part and **DENIED** in part.

Plaintiff's claims for violating the Medicare Act, violating the Administrative Procedure Act, violating Plaintiff's due process rights, declaratory judgment, and mandamus should be dismissed without prejudice. Plaintiff may refile its

Fidelis Diagnostics, Inc. v. SafeGuard Services, L.L.C., Not Reported in F.Supp.2d (2011)

claims, if it chooses to do so, following exhaustion of its administrative remedies under the Medicare Act.

Rather than dismiss Plaintiff's claims under the Freedom of Information Act, Plaintiff should be given an opportunity to replead its allegations and name the appropriate party, if it chooses to do so, within fourteen (14) days of this order.

Within fourteen (14) days after service of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 🚩 28 U.S.C. § 636(b)(1)(C).

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. 🚩 *Thomas v. Arn,* 474 U.S. 140, 148, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); 🚩⚠️ *Rodriguez v. Bowen,* 857 F.2d 275, 276–77 (5th Cir.1988).

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 5975787

## Footnotes

[1]    Because the Court is considering a motion to dismiss under Federal Rule of Civil Procedure 12(b), the facts are as alleged by Plaintiff and are taken from Plaintiff's Second Amended Complaint (Dkt. # 34) and Plaintiff's Response to Defendants' Motion to Dismiss (Dkt.# 48, # 49).

[2]    In its second amended complaint, Plaintiff alleged that SafeGuard refused to provide it with the credentials of the medical consultant who conducted the post-payment review. However, upon receiving the curriculum vitae of the medical consultant, Plaintiff now alleges that the credentials are insufficient.

[3]    Defendants argue that two of Plaintiff's claims are now moot because they are no longer a live action or controversy between the parties. First, Defendants argue that they corrected any claims based on their initial notice letter. Defendants recalculated the amount of overpayment based on information submitted by Plaintiff, and Defendants contend that Plaintiff made no arguments against the final-overpayment notice letter. Thus, Defendants assert this claim is now moot. Next, Defendants contend that Plaintiff's allegation that Defendants erroneously included five (5) claims decided in Plaintiff's favor in the sample overpayment population is also moot. Defendants subsequently modified the overpayment determination to exclude those five claims. The Court agrees that these two claims are now moot and should also be dismissed for this reason.

[4]    Although the Court found above that no subject matter jurisdiction existed for the following three claims based on the type of relief requested, the Court will also consider them under the 12(b)(6) standard for failure to state a claim, since both parties address this issue in detail.

---

**End of Document** <span style="float:right">© 2024 Thomson Reuters. No claim to original U.S. Government Works.</span>

**FILED**

NOV 1 7 2015

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

# IN THE UNITED STATES DISTRICT COURT FOR THE

# DISTRICT OF COLUMBIA

ADAM BROOK, M.D., PH.D.,
350 Central Park West Apt. 12H,
New York, NY 10025;

*Plaintiff* pro se

*vs.*

CATHERINE TETI, as Deputy
Agency Chief FOIA Officer,
Office of the Assistant Secretary
for Public Affairs, Health
Resources and Services
Administration, 200
Independence Ave. SW Rm
621.E3, Washington, DC  20201,
(202) 205-3592,
Catherine.Teti@hhs.gov;

TOM FLAVIN, as Freedom of
Information Officer, FOIA
Office, HRSA, 5600 Fishers Ln.
Rm. 6C-18, Rockville, MD
20857, (301) 443-9425;

KAREN SHAW, FOIA Office,
HRSA, 5600 Fishers Ln. Rm. 6C-
18, Rockville, MD  20857,
(301) 443-2865;

DEPARTMENT OF HEALTH &
HUMAN SERVICES;

*Defendants.*

Case: 1:15-cv-02022
Assigned To : Howell, Beryl A.
Assign. Date : 11/17/2015
Description: FOIA/PRIVACY ACT

**COMPLAINT**



RECEIVED
Mail Room

NOV 1 7 2015

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

## COMPLAINT

Plaintiff Adam Brook, M.D., Ph.D. alleges as follows:

This is an action under the Privacy Act, 5 U.S.C. § 552a, and the Freedom of Information Act, 5 U.S.C. § 552, for injunctive and other appropriate relief, including seeking disclosure and release of agency records improperly withheld from plaintiff by the United States Department of Health and Human Services ("HHS") and its components the Health Resources and Services Administration ("HRSA"), the Division of Practitioner Data Banks ("DPDB") and the National Practitioner Data Bank ("NPDB").

## JURISDICTION AND VENUE

1. Jurisdiction in this Court is based on 5 U.S.C. § 552a, the Privacy Act of 1974; 5 U.S.C. § 552, the Freedom of Information Act; and 28 U.S.C. § 1331, federal question, in that this Complaint seeks review of United States agency action, and inaction, made reviewable by statute for which there is no other adequate remedy in any court of competent jurisdiction.

2. Venue is appropriate in this Court under 5 U.S.C. § 552(a)(4)(B), which says: "On complaint, the district court of the United States ... in the District of Columbia[] has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant."

1

**PARTIES**

3. I, the plaintiff *pro se*, Adam Brook, M.D., Ph.D., am a physician licensed to practice medicine in the State of New York and other states, and am a citizen of the United States. I received the A.B. degree from Harvard College, the M.D. degree from Harvard Medical School and the Ph.D. degree in genetics from the Harvard Graduate School of Arts and Sciences. I am a Diplomate in Surgery of the American Board of Surgery and a Diplomate in Cardiothoracic Surgery of the American Board of Thoracic Surgery. I have served as Specialist Registrar in Cardiothoracic Surgery at Barts and the London NHS Trust. I currently reside in New York.

4. Defendant Catherine Teti is Deputy Agency Chief Freedom of Information Act ("FOIA") Officer for the HRSA. Her office is in Washington, DC.

5. Defendant Tom Flavin is an FOIA Officer for HRSA. His office is in Rockville, MD.

6. Defendant Karen Shaw is an FOIA Officer for HRSA. Her office is in Rockville, MD.

7. Defendant HHS is the federal agency designated under the Health Care Quality Improvement Act of 1986 ("HCQIA"), 42 U.S.C. §§ 11101 *et seq.*, to administer the NPDB. HHS does so through one of its sub-agencies, the HRSA. HRSA agency records are the subject of this Privacy Act and FOIA suit.

**BACKGROUND**

8. As explained by law professor Katherine van Tassel:

> The United States has a growing number of government
> created blacklists, including those for convicted sexual
> predators, suspected gang members and suspected
> terrorists. The latest surprise entry in this trend is the
> federally created databank of 'bad physicians' called the
> National Practitioner Data Bank ("NPDB"). The NPDB is
> the first time the federal government has engaged in
> blacklisting since the McCarthy era. Physicians are
> blacklisted after being 'found' to have provided poor
> quality of care through a highly subjective, and oft-times
> summary, peer review process conducted by private
> hospitals.
>
> Physician blacklisting by the NPDB has become a
> pressing national issue as it has serious legal and social
> consequences. First, the physician blacklisting process
> has a high risk of error as it is both over inclusive,
> unfairly destroying the careers of many competent
> physicians, and under inclusive as it ignores many
> incompetent physicians. Second, the NPDB reporting
> system encourages the perpetuation of custom-based
> practices undermining efforts to improve the quality and
> cost of healthcare through the practice of evidence-based
> treatment choices. Third, the NPDB system is being used

3

to silence physician whistleblowers which also negatively impacts quality of care. Finally, last year the NPDB expanded its scope to take on blacklisting of all licensed healthcare practitioners in the United States, including dentists, nurses, physician's assistants and social workers, extending its reach to over six million people. This expansion magnifies the NPDB's negative effects exponentially as it begins to affect the practice habits of all healthcare professionals.

Van Tassel, Katharine A. "Blacklisted: The Constitutionality of the Federal System for Publishing Reports of 'Bad Doctors' in the National Practitioner Data Bank." *Cardozo Law Review* 33 (2012): 2032-2033. Internal citations omitted.

9. In actual practice, the Data Bank is wildly over-inclusive and wildly under-inclusive.

10. Hospital administrators have reported some physicians to the Data Bank, thereby destroying their careers, for minor clinical offenses.

4

11. The American College of Emergency Physicians explains:

> Some hospitals have learned that if they simply appear to follow the HCQIA "procedural cookbook," they can eliminate virtually any physician in the absence of any meaningful substantive due process.

> "Information on Sham Peer Review." *American College of Emergency Physicians* (2011), at 3-4.

12. According to health-care attorney Greg R. Piche:

> In hospital settings power historically has been focused on big admitters, in hospital based physicians, and in long time officers of the medical staff who pass critical roles of chief of staff or members of the Medical Executive Committee back and forth among a favored few. Those who are typically victims of the inappropriate exercise of institutional power tend to be new members of the medical staff, women, minorities and foreign born physicians who do not assimilate as easily into the social structure and organization of the hospital institution. There is a hospital in Texas that had a shelf in the medical staff office referred to by most of the medical staff as the "sand bunny" shelf for doctors from India, Pakistan and the Middle East, for ease of access during peer review proceedings.

5

Piche, Gregory. "Sham peer review: power aphrodisiac"
*Singularity Health Law Blog* (2011).

13. These observations are supported by the history of NPDB cases.[1]

---

[1] 1. In *Kaplan v. Blue Hill Memorial Hospital*, No. 1: 14-cv-00276-DBH (D. Me. Nov. 28, 2014): A physician was married to a physician assistant, who worked in the emergency room. The physician assistant documented in patient charts and reported between 200 and 300 EMTALA violations committed by the Hospital. Allegedly in retaliation, the hospital revoked the hospital privileges of the physician (the husband of the physician assistant who reported all those EMTALA violations) and reported the physician to the Data Bank for 4 cases where he purportedly was found to be incompetent.

2. In *Langenberg v. Warren General Hospital*, No. 1: 12-cv-175-NBF (W.D. Pa. Nov. 22, 2013): A competent vascular surgeon was critical of substandard care at the hospital; his employment contract was terminated because he "often lacked civility and was demeaning to Hospital staff," which had a "disruptive and detrimental effect on the Hospital's working environment". The hospital subsequently reported him to the Data Bank without a hearing; in fact, during the course of his employment he had never been disciplined for any misconduct.

3. In *Chudacoff v. University Medical Center of Southern Nevada*, No. 2: 08-cv-00863-RCJ-GWF (D. Nev. Nov. 1, 2013): "At UMC, Plaintiff observed deficiencies in the skills of the residents he observed at UMC as compared with the residents he had observed in Texas, which resulted in surgical complications in patients that Plaintiff assisted in correcting. (*Id.* ¶¶ 28-29). On April 16, 2008, Plaintiff wrote a long email to Dr. Paul Stumpf, Professor and Chair of Obstetricians and Gynecologists at UMC to memorialize conversations he had had with Dr. Stumpf regarding these issues and recommending some improvements. (*Id.* ¶ 30). ... On June 16, 2008, Defendants filed a report (the "Report") with the

6

National Practitioner Data Bank ("NPDB") stating that Plaintiff's staff privileges had been suspended for "substandard or inadequate care" and "substandard or inadequate skill level." (*Id.* ¶ 38). In the Report, Defendants cited four cases where Plaintiff has allegedly caused "serious operative complications during gynecological surgery," once incident of failure to respond to a medical emergency, and several complaints of disruptive physician behavior. (*Id.* ¶ 39). Plaintiff was unaware of any such alleged misconduct before learning of the Report."

4. In *Osuagwu v. Gila Regional Medical Center*, 850 F. Supp. 2d 1216 (D.N.M. 2012): A physician's hospital privileges were revoked for allegedly causing a bowel perforation during surgery, and the physician was reported to the Data Bank for that act, rendering him unemployable; in fact, he was not the one who caused the bowel perforation, it was caused by the chairman of the hospital's obstetrics and gynecology department.

5. In *Mazzoccoli v. Merit Mountainside LLC*, Civil Action No. 12-2168 (D.N.Y. Dec. 20, 2012): A physician was accused by the Chief Medical Officer of "grabbing, fondling and/or kneading" a nurse's aides breasts in public and was reported to the Data Bank for "sexual misconduct"; the Chief Medical Officer who did the investigation just happened to be the lover of the physician's main rival at the hospital.

6. In *Salamon v. Our Lady of Victory Hosp.*, 867 F. Supp. 2d 344 (W.D.N.Y. 2012): A young female gastroenterologist complained to the hospital administration about inappropriate sexual advances by a senior male gastroenterologist; instead of investigating the senior gastroenterologist, the hospital administration conducted an exhaustive review of all of the junior gastroenterologist's cases, imposed a reeducation plan on her, and reported her to the Data Bank for incompetence.

7. In *Kandel v. Nebraska Medical Center*, No. A-09-1241 (Neb. Ct. App. Oct. 12, 2010): A urologist was reported to the Data Bank for surrender of clinical

14. The flip side of all this is that hospitals have found it all too easy
**_not_** to report a physician to the Data Bank when the physician has

---

privileges while under investigation for "refus[ing] to allow another physician
to use a laser for a procedure for fear that the usage would delay his own usage
of the laser".

8. In *Smith v. Selma Community Hospital*, 188 Cal. App. 4th 1 (Ct. App. 2010): In
March 2002 physician and hospital agreed to physician selling his practice to
hospital for 8 million dollars; in June 2002 hospital demanded the physician
accept a lower price, and the physician refused; the hospital then reported the
physician to the Data Bank for a January 2000 case.

9. In *Williams v. University Medical Ctr. of Southern NV*, 688 F. Supp. 2d 1111 (D.
Nev. 2010): A patient had a cardiac arrest after a transplant operation, and the
hospital suspended the anesthesiologist for failure to manage the patient's
airway (without taking action against the surgeon for not creating a surgical
airway) and accused the anesthesiologist of substance abuse without any
evidence that the anesthesiologist used drugs.

10. In *Straznicky v. Desert Springs Hosp.*, 642 F. Supp. 2d 1238, 1240 (D. Nev.
2009): An anesthesiologist was reported to the Data Bank, and had his career
and life destroyed, apparently for borrowing a lead radiation shield from the
operating room of a powerful orthopedic surgeon, even though the surgeon
was not using the shield.

11. In *Clark v. Columbia/HCA Info. Servs.*, 25 P.3d 215, 218, 117 Nev. 468 (2001): A
psychiatrist was reported to the Data Bank, and had his career and life
destroyed, for reporting substandard care at his hospital to the state medical
board; the hospital deemed this report "disruptive behavior", and revoked his
privileges and reported him to the Data Bank on that basis.

8

been profitable to the hospital, even when the physician has engaged in the grossest incompetence and misconduct bordering on criminality.[2]

_____

[2] 1. Thus, Dr. Chae Hyun Moon and Dr. Fidel Realyvasquez were **not** reported to the Data Bank by the hospital at which they had privileges, Redding Medical Center, despite the fact that "hundreds of patients underwent unnecessary bypass and valve surgery from which some suffered debilitating injuries and others died." Rogan, G. N., and F. Sebat. "Grady." *How peer review failed at Redding Medical Center, why it is failing across the country and what can be done about it. Disaster Analysis Redding Medical Center Congressional Report* (2008), at 4.

2. Dr. Andrew Cubria was **not** reported to the Data Bank by the hospital at which he had privileges, Edgewater Medical Center, despite the fact that he "admitted performing unnecessary angioplasties and angiograms on more than 750 patients, two of whom died as a result of these unnecessary procedures." *Id.*, at 5.

3. Dr. Mark Midei was **not** reported to the Data Bank by the hospital at which he performed cardiac catheterizations. Dr. Midei practiced at that hospital until his medical license was revoked by the Maryland Board of Physicians in 2011, and he has been subject to approximately 250 lawsuits (Anderson, Jessica. "Midei breached medical care standard with stents, jury finds." *Baltimore Sun* (Oct. 23, 2013)).

4. Orthopedic surgeon Dr. Spyros Panos was **not** reported to the Data Bank by the hospital at which he had privileges, and where it has been alleged that not only did he perform sham operations, he did so many of them so quickly it appears to an outside observer that the hospital turned a blind eye. Dr. Panos has pled guilty to felony health care fraud in Federal Court and is the subject of 261 lawsuits (Bradshaw, Sarah. "Spyros Panos penalty: Who else might pay in billing scheme?" *Poughkeepsie Journal* (Nov. 10, 2013)).

9

15. What is so troubling about the NPDB is that it gives hospital administrations "complete and unfettered discretion", see van Tassel, *supra*, at 2076, to preserve, or to destroy, the career of any physician by refusing to list, or listing, the physician with the NPDB.

16. For, legal fiction aside, the reality of 21st Century medicine is that complications are frequent, and complications due to human error are also frequent. Several large studies have estimated that as

---

5. Dr. Christian Schlicht, an anesthesiologist, performed spinal surgery that was reportedly "a gross and flagrant violation of acceptable medical practice" resulting in 80 malpractice claims and more than 33 million dollars in settlements (Heild, Colleen. "'Untouchable' doc at center of malpractice storm." *Albuquerque Journal* (July 29, 2012).) **Neither** the hospital **nor** its insurance company reported Dr. Schlicht to the Data Bank. See *In re Otero County Hospital Association, Inc.*, No. 11-11-13686 JL, Consolidated Misc (Bankr. D.N.M Mar. 18, 2015) ("Molina changed its administrative policy to require that "all physicians requesting credentialing for minimally invasive spine surgery must have completed a residency in either neurosurgery or orthopedics." *Id.* As a result of this categorical policy change, Dr. Schlicht was no longer credentialed to perform minimally invasive spine surgery on Molina's insured patients. *Id.* Molina considered Dr. Schlicht's credentials for pain management unchanged. *Id.* This resolution meant that the incident did not require reporting to the National Practitioner Data Bank.") Incidentally, in my opinion, spinal surgery should only be performed by spine surgeons, and should not be performed by anesthesiologists.

**The HCQIA and the Data Bank did *nothing* to prevent these abuses.**

10

many as 98,000 Americans die a year in hospitals due to human error.[3]

17. In a study of 1363 general surgery patients, Healey *et al.* calculated that the total complication rate was 30.3%.[4] Moreover, Healey *et al.* found that 14.2% of general surgery cases had an avoidable complication *i.e.* a complication due to human error. That's 1 in 7 cases.

18. Which, for those of us who practice surgery, reflects the reality that we all know: that all surgeons have complications, and all surgeons from time to time have complications due to our errors. Sometimes during the course of surgery we need to do maneuvers that can injure our patients.

19. If 1 in 3 surgical cases results in a complication, and 1 in 7 surgical cases has a complication due to human error, clearly the mere fact that a surgeon has had a complication, or even has made an error that caused a complication, should not be the basis of a career-destroying NPDB Report. Were that the case, there would quickly be no surgeons left.

---

[3] Kohn, Linda T., Janet M. Corrigan, and Molla S. Donaldson, eds. *To err is human: building a Safer Health System.* Vol. 6. National Academies Press, 2000, at 1.

[4] Healey, Mark A., Steven R. Shackford, Turner M. Osler, Frederick B. Rogers, and Elizabeth Burns. "Complications in surgical patients." *Archives of Surgery* 137, no. 5 (2002): 611-618.

20. One of the problems with the NPDB then, is that it only takes a single complication (never mind a complication due to error) for a hospital Chief Medical Officer to file an NPDB report and end a surgeon's career. If a Chief Medical Officer wants to destroy a surgeon, all he has to do is wait for the surgeon to have a complication. The Chief Medical Officer can then use that complication as a pretext to brand the surgeon incompetent and file an NPDB report against him.

21. Another problem with the NPDB is that not all physicians are aware of it; this is particularly true of young physicians fresh out of training.

22. The mechanism by which the NPDB blacklist works is that once the physician's name is listed in the Data Bank, every time the physician attempts to obtain employment or hospital privileges, the hospital to which the physician has applied for employment "queries" the Data Bank.

23. By action of law, 42 U.S.C. § 11135(a) requires hospitals to query the Data Bank prior to granting employment or hospital privileges:

> (a) **In general**

> It is the duty of each hospital to request from the Secretary (or the agency designated under section 11134 (b) of this title), on and after the date information is first required to be reported under section 11134 (a) of this title)—

12

(1) at the time a physician or licensed health care practitioner applies to be on the medical staff (courtesy or otherwise) of, or for clinical privileges at, the hospital, information reported under this subchapter concerning the physician or practitioner, and

(2) once every 2 years information reported under this subchapter concerning any physician or such practitioner who is on the medical staff (courtesy or otherwise) of, or has been granted clinical privileges at, the hospital.

A hospital may request such information at other times.

24. Hospitals almost never grant privileges to a physician with an NPDB Report. Law professor van Tassel says:

As explained by Dr. Edward Dench, Jr., former President of the Pennsylvania Medical Society, a data bank report "can essentially make you unemployable, and it can be the difference between getting insurance and not getting insurance." This opinion is confirmed by an extensive study commissioned by the State of California into the reasons for the low and declining level of reporting of negative peer review actions to the NPDB:

physicians who have been the subject of an [negative peer review] report that it is difficult or impossible to find a new position, their professional lives are ruined,

13

other entities will not grant privileges even if they have fulfilled the terms of the discipline, and they spend years and hundreds of thousands of dollars in court trying to clear their professional names and reputations. *** Physicians who had experienced [having a negative peer review report state that it] ... was a "career ender."

Take the case of Dr. John Ulrich, Jr. He protested the layoffs of two staff positions at the county-owned Laguna Honda Hospital and then joined several others in sending a letter of protest as the layoffs would harm patient care. In less than two weeks, Dr. Ulrich was informed that he was being investigated for clinical incompetence, charges that were later determined by the state board of medial licensure to be unfounded. When Dr. Ulrich heard of the charges, he resigned his staff privileges, not realizing that the charges and his resignation would be reported to the NPDB. The report that hospital sent to California Medical Board and the NPDB stated:

Dr. Ulrich resigned from the Medical Staff, and relinquished his privileges, following receipt of a letter announcing the commencement of a formal investigation into his practice and professional conduct as a member of the Medical Staff and while caring for patients at the Hospital. That investigation was

14

prompted as a result of concerns regarding apparent deficiencies in his practice and conduct spanning the full range of Hospital care, including incomplete diagnoses, inappropriate diagnostic and therapeutic orders, failures to accept appropriate responsibility for the course of patient treatment, and an overall absence of clear, effective management of hospitalizations. Dr. Dr. [sic] Ulrich submitted his resignation before this investigation had progressed to any findings or recommendations.

When he learned of the NPDB report, Dr. Ulrich tried to rescind his resignation. The hospital refused, so Dr. Ullrich sued. The NPDB refused to remove the report in spite of the California Medical Board's findings that the charges were unfounded. At the trial, the presidents of two California medical associations told the court that "it will be virtually impossible" for Dr. Ulrich to find work at any U.S. hospital with that report in the data bank.

The federal district court held that, once the hospital accepted Dr. Ulrich's resignation, the hospital had no obligation to rescind the report that it made to the NPDB. Thus, the fact that there was a report by the hospital that detailed the charges against Dr. Ullrich, and the fact that he resigned his privileges in the face of

15

those charges, was an accurate reflection of the facts.
Ultimately, the Ninth Circuit Court of Appeals held that
Dr. Ulrich could pursue his argument that he had been
retaliated against for exercising his free speech rights. As
of 2003, five years after the report was made to the
NPDB, Dr. Ulrich was still fighting to have the report
removed.

An analysis of the National Practitioner Data Bank
Public Use File for 1990 to 2009 found that, of 10,672
physicians who had been sanctioned by either a
restriction or termination of their clinical privileges,
3,218 lost their privileges permanently and 389 lost their
privileges for more than a year. The bottom line for
these 3,218 physicians is that their ability to practice
medicine by admitting their patients into hospitals for
treatment has either been seriously curtailed or
completely eliminated. This inability to treat their
patients results in severe contraction of the scope of
their license to practice medicine granted by the state.
For some, this limitation on the scope of the ability to
practice medicine, or the effective extinguishment of the
license to practice, will further the public's interest in
protecting patients from harm. But others will have
suffered from a grave injustice.

25. Congress did not intend for the Data Bank to be misused.

26. During discussion of H.R. 5540 (the bill enacted into law as the
HCQIA) on the House floor, Rep. Henry Waxman, the floor
manager of H.R. 5540, explained:

> I want to make it clear, however, that we fully agree that
> we cannot tolerate abuses of the peer review system, and
> that H.R. 5540 was never intended to protect such
> abuses. To reiterate: nothing in H.R. 5540, as currently
> drafted, would protect the type of abuses that I have
> referred to.

> H.R. 99th Cong., 2d Sess., Hearings Before the
> Subcommittee on Health and the Environment of the
> House Comm. on Energy and Commerce, (Jul. 15, 1986).

27. This concern for fairness to physicians is present in the
legislative history of the HCQIA:

> In any case, it is the Committee's intent that physicians
> receive fair and unbiased review to protect their
> reputations and medical practices.

> 1986 U.S.C.C.A., HR No. 90, 6384 at 6393; 1986 WL
> 31972 (1986).

28. Because of this concern that physicians be treated fairly by
hospital peer-review processes prior to reporting to the NPDB,
Congress included in the HCQIA 42 U.S.C. § 11136:

> With respect to the information reported to the
> Secretary (or the agency designated under section 11134
> (b) of this title) under this subchapter respecting a
> physician or other licensed health care practitioner, the
> Secretary shall, by regulation, provide for—
>
> (2) procedures in the case of disputed accuracy of the
> information.

29. Yet the bureaucrats at HHS, for their own administrative convenience, have chosen essentially almost never to void an NPDB Report, even in the most egregious of cases of abuse of the Data Bank system.

30. For example, according to the *2012 National Practitioner Data Bank Annual Report*[5], for the 6-year period from 2007 through 2012, *for the entire United States*, the Secretary voided only 4 reports (out of 363 Requests for Secretarial Reviews).

31. These data raise serious concerns about whether HRSA is doing its job in evaluating NPDB Reports, or whether they are just rubberstamping approval of Data Bank reports without meaningful review. Sunlight, as they say, is the best disinfectant, particularly at exposing agency misconduct and incompetence.

---

[5] What does one say about an agency that publishes their 2012 Annual Report in 2015? It's 2015, and the 2013 and 2014 Annual Reports are still not available.

18

32. Given the Orwellian nature of the Data Bank, and the draconian consequences to physicians who are blacklisted in the Data Bank, scrutiny as to how the Data Bank is functioning in actual practice is needed.

33. For by ending their careers as physicians, the Data Bank is depriving physicians of their fundamental right to free choice of occupation.

34. James Madison says:

> That is not a just government, nor is property secure under it, where arbitrary restrictions, exemptions, and monopolies deny to part of its citizens that free use of their faculties, and free choice of their occupations, which not only constitute their property in the general sense of the word; but are the means of acquiring property strictly so called.

> Madison, James. "Essay on "Property"." *Nat'l Gazette* (1792).

35. This country was founded by a Revolution against an oppressive British colonial government. How ironic that the Government founded by that Revolution should 200 years later devolve into repeating the very oppressions that were the reasons for its foundation.

**PROCEDURAL HISTORY**

36. Although the FOIA statute provides several exemptions which an agency may list as reasons for denying an FOIA request, see 5 U.S.C. §§ 552(b)(1)-(9), an agency's desire to cover-up official misconduct and incompetence is not listed in the statute as a reason for denying or delaying indefinitely an FOIA request. "[The Freedom of Information Act] seeks to permit access to official information long shielded unnecessarily from public view and attempts to create a judicially enforceable public right to secure such information from possibly unwilling official hands." *EPA v. Mink*, 410 U.S. 73, 80, 93 S. Ct. 827, 35 L. Ed. 2d 119 (1973).

37. On August 13, 2012 (**"Request #1"**), I sent Mr. Tom Flavin a letter making a Privacy Act request for "all documents pertaining to me, Adam Brook, that HRSA has." In that letter I indicated that that request "encompasses all documents including without limitation all records, communications, e-mails, letters, and intra-agency memoranda." I noted that "5 U.S.C. § 552a (as well as other statutes and regulations) entitles me to these documents and information."

38. I followed this, on September 19, 2012 (**"Request #2"**), with a 4-part FOIA request. I requested: 1. a blank Entity Registration form, a blank Certifying Official Registration form, and a blank Data Bank Administrator Registration document form; 2. copies of all NPDB registration documents for Peconic Bay Medical Center ("PBMC") from January 1, 2000 to the present, including all Entity Registration Documents, Certifying Official Registration

20

Documents, and Data Bank Administrator Registration Documents; 3. screenshots of the webpages that any administrator must pass through in order to query the NPDB on any physician; and 4. "the NPDB records of [PBMC Medical Staff Coordinator] Ms. [Lisa] Squicciarini's agreeing on June 8, 2010 (by checking the checkboxes corresponding to the "Rules of Behavior" and the "Subscriber Agreement") to comply with the rules and regulations of the NPDB and federal civil and criminal law."

39. Then, on December 18, 2012 **("Request #3")**, I submitted an FOIA request for "all Adverse Action Reports submitted to the National Practitioner Data Bank between December 1, 1989 and the present that were subsequently voided by the Secretary of the U.S. Department of Health and Human Services." I requested that I be sent "for each and every one of these Adverse Action Reports, the Secretary's decision, as well as any accompanying letters explaining the Secretary's decision."

40. On or about December 27, 2012, someone with an illegible signature in the HRSA FOIA office sent me a letter, attached as exhibit 1, "acknowledg[ing] receipt of [my] Freedom of Information Act (FOIA) request received by this office on December 26, 2012. Your request has been assigned a case number (F356) based on its receipt in this office and is being processed as expeditiously as possible." "You may contact this office 20 working days from the date of this letter to find out the status of your request" the letter noted.

21

41. On January 29, 2013 **("Request #4")**, I submitted an FOIA request asking to be sent "every e-mail [HRSA Dispute Resolution Manager] Dr. [Anastasia] Timothy has ever sent and every e-mail Dr. Timothy has ever received."

42. On or about February 5, 2013, someone with an illegible signature in the HRSA FOIA office sent me a letter, attached as exhibit 2, "acknowledg[ing] receipt of [my] Freedom of Information Act (FOIA) request received by this office on February 4, 2013. Your request has been assigned a case number (13F030) based on its receipt in this office and is being processed as expeditiously as possible."

43. By letter dated September 3, 2013, attached as exhibit 3, Mr. Tom Flavin denied my December 18, 2012 request **(Request #3)**, case number 12F356, for "all Adverse Action Reports submitted to the National Practitioner Data Bank between December 1, 1989 and the present that were subsequently voided by the Secretary of the U.S. Department of Health and Human Services."

44. Mr. Flavin asserted: "The Health Care Quality Improvement Act of 1986 (the Act), 42 U.S.C. § 11127(b), as amended, Section 427(b), limits access to the information maintained in the NPDB to affected healthcare practitioners and organizations engaged in professional review activities such as boards of medical examiners, state licensing boards, and health care entities which have or may be entering into employment or affiliation agreement with the health care practitioner. Since you do not fall within the previously

22

mentioned categories permitted access under the Health Care Quality Improvement Act, your request is denied pursuant to FOIA Exemption 5 U.S.C § 552 (b)(3)."

45. In Mr. Flavin's letter dated September 3, 2013, Mr. Flavin noted that I had "the right to appeal this decision to neither confirm nor deny the existence of the record" to the "Assistant Secretary for Public Affairs (Media), U.S. Department of Health and Human Services".

46. On September 14, 2013 **("Appeal of Denial of Request #3")**, exhibit 4, I did so appeal to the Assistant Secretary for Public Affairs (Media).

47. In my appeal I noted that Mr. Flavin's letter dated September 3, 2013 cited 42 U.S.C. § 11137 as the basis for denying my request.

48. In fact, as I noted in my September 14, 2013 letter, 42 U.S.C. § 11137(b)(1) provides, emphasis added:

> Information reported under this subchapter is considered confidential and shall not be disclosed (other than to the physician or practitioner involved) except with respect to professional review activity, as necessary to carry out subsections (b) and (c) of section 11135 of this title (as specified in regulations by the Secretary), or in accordance with regulations of the Secretary promulgated pursuant to subsection (a) of this section. Nothing in this subsection shall prevent the disclosure of

23

such information by a party which is otherwise authorized, under applicable State law, to make such disclosure. **Information reported under this subchapter that is in a form that does not permit the identification of any particular health care entity, physician, other health care practitioner, or patient shall not be considered confidential. The Secretary (or the agency designated under section 11134 (b) of this title), on application by any person, shall prepare such information in such form and shall disclose such information in such form.**

49. As I explained in my September 14, 2013 letter:

I did not expect the Department of Health and Human Services to divulge the names of individual physicians who have been reported to the NPDB but subsequently had those reports voided. What I did expect, as the plain language of the statute provides, was that the Secretary or one of her employees would "prepare" this information "in a form that does not permit the identification of any particular health care entity, physician, other health care practitioner, or patient." This could be done simply by redacting the names of all health care facilities, physicians, other health care practitioners and patients in those Adverse Action Reports that have been voided.

24

"As the FOIA statute mandates, all reasonably segregable, non-exempt portions of any agency records must, after deletion of the exempt material, be disclosed to a requester, 5 U.S.C. § 552(b) (last sentence)." *Wightman v. Bureau of Alcohol, Tobacco & Firearms*, 755 F.2d 979, 982 (1st Cir. 1985). ... Simply put, the agency must redact the minimum required by 42 USC § 11137(b)(1) and may not redact more than that.

Since the Secretary has voided so few Adverse Action Reports (in the last 4 reported years, for the entire United States, only a single Adverse Action Report has been voided, see *2011 National Practitioner Data Bank Annual Report*, at 79), this FOIA request should be a simple matter and should not take much time to perform.

The information revealed by this FOIA request may well be of great interest to physicians. For example, if it turns out that certain Adverse Action Reports are voided for specific reasons, but then physicians with Adverse Action Reports that have not been voided come forward and indicate, despite identical reasons, their Adverse Action Reports have not been voided, this would indicate that the Agency is handling Secretarial Reviews in an arbitrary and capricious manner.

Also of interest to physicians will be the nature of the reasons why the very few Adverse Action Reports that

25

have been voided were voided. For example, if the only reason reports are voided are for clerical errors (*e.g.* a report erroneously reporting Dr. John Smith of Paris, France instead of Dr. John Smith of Paris, Texas), and it turns out that Reports are <u>never</u> voided for substantive reasons, this would call into question the fairness of the entire Secretarial Review process. This is particularly true because physicians with Adverse Action Reports are frequently unable to get hospital privileges ever again at any hospital in the United States, implicating a physician's fundamental right to follow a lawful profession. See *Dent v. West Virginia*, 129 U.S. 114, 121-122, 9 S. Ct. 231, 32 L. Ed. 623 (1889) ("It is undoubtedly the right of every citizen of the United States to follow any lawful calling, business, or profession he may choose, subject only to such restrictions as are imposed upon all persons of like age, sex and condition. This right may in many respects be considered as a distinguishing feature of our republican institutions. Here all vocations are open to every one on like conditions. All may be pursued as sources of livelihood, some requiring years of study and great learning for their successful prosecution. The interest, or, as it is sometimes termed, the estate acquired in them, that is, the right to continue their prosecution, is often of great value to the possessors, and cannot be arbitrarily taken from them, any more than their real or personal property can be thus taken.").

26

Finally, the U.S. Government spends millions of dollars on the National Practitioner Data Bank and the Secretarial Review process. As a member of the public, I am entitled to know if this money is being well spent.

50. I then received a letter dated September 18, 2013, attached as exhibit 5, "acknowledg[ing] receipt of [my] administrative appeal by this office on the date above. Your appeal has been assigned the above-stated case number [PSC-13-0569-AA.]" This letter was signed by "X".

51. I don't know why the signatory of this letter omitted his usual name and used the pseudonym "X". Perhaps that individual chose to use the pseudonym "X" because of the frequent involvement of HRSA with national security matters.

52. The letter dated September 18, 2013 further states: "The case number of the original request was not provided to us."

53. On September 25, 2013 (**Response to September 18, 2013 Letter Regarding Appeal of Denial of Request #3**), I responded to Mr. X's letter dated September 18, 2013, see my attached September 25, 2013 letter, exhibit 6.

54. I noted that in the letter dated September 18, 2013, Mr. X "state[d] that '[t]he case number of the original request was not provided to us.'" I further noted that 1. right above the appellation "Dear Sir" in my September 14, 2013 letter appears the line "Re: Case Number 12F356"; 2. on page 9, the final sentence of the letter

is: "This constitutes my appeal of the denial of my FOIA request, case number 12F356."; and 3. I had enclosed with my September 14 letter Mr. Flavin's letter dated September 3 in which Mr. Flavin wrote "RE: Freedom of Information Act (FOIA) Case Number 12F356" above the appellation "Dear Dr. Brook".

55. I wrote to Mr. Flavin again on October 9, 2014 **(Narrowing of Request #4)**, see letter attached as exhibit 7. In that letter I narrowed my January 29, 2013 FOIA request for every e-mail ever sent or received by Anastasia Timothy, an employee of the Department of HHS. Specifically, I requested that my request be narrowed to the "time period from June 1, 2010 to the present."

56. I also requested that that request be further narrowed by limiting it to a list of keywords. See exhibit 7.

57. On December 23, 2014, I unearthed a remarkable notice in the *Federal Register*. A large number of Federal agencies were planning a massive destruction of records. See *Federal Register* volume 79, number 246 (December 23, 2014), at 77039-77040. Item 11 provides:

> Department of Health and Human Services, Agency-wide (DAA-0512-2014-006, 4 items, 3 temporary items). Records of the National Practitioner Data Bank, including query transactions, compliance and research files, and dispute resolution case files. Proposed for permanent retention are reports providing a

comprehensive history of actions taken against health care practitioners, suppliers, and providers.

58. What this means is that the NPDB was planning to destroy all of its records except for Adverse Action Reports against physicians and other practitioners.

59. On December 29, 2014, I wrote a letter **("Letter Objecting to Record Destruction")** to Mr. Flavin which I also addressed to Margaret Hawkins, Director of Records Management Services of the National Archives and Records Administration. See December 29, 2014 letter attached as exhibit 8. In that letter I insisted that HRSA not destroy any records, nor permit the destruction of any records, prior to complete resolution of all outstanding FOIA requests, including all appeals.

60. I also called upon Mr. Flavin in that letter "to expeditiously comply with my various FOIA requests."

61. On May 13, 2015, I sent Mr. Flavin a letter **("Request #5")**, attached as exhibit 9, requesting "[a]ny and all correspondence (*i.e.* email), between June 1, 2010 and the present, to or from Ms. Judy Rodgers" that contain any of a list of keywords (see attached letter).

62. I then received a letter dated May 21, 2015 from Ms. Shaw acknowledging receipt of my FOIA request and stating that my request had "been assigned a case number (15F293)". This May 21, 2015 letter is attached as exhibit 10.

63. I then received a letter dated June 22, 2015 from a Ms. Catherine Teti, Executive Officer and Deputy Agency Chief FOIA Officer of the Office of the Assistant Secretary for Public Affairs. This letter denied my December 18, 2012 FOIA Request (Request #3) for "all Adverse Action Reports submitted to the National Practitioner Data Bank between December 1, 1989 and the present that were subsequently voided by the Secretary of the U.S. Department of Health and Human Services."

64. In her June 22, 2015 letter, Ms. Teti said:

> Exemption 3 of the FOIA allows withholding of certain records that are otherwise protected from disclosure under another federal statute. Three significant laws govern NPDB: 42 U.S.C. § 11101-11152 (the Act); 42 U.S.C. § 1396r-2 (section 1921 of the Social Security Act (SSA); hereinafter "section 1921"); and 42 U.S.C. § 1320a-7e (section 1128E of the SSA; hereinafter "section 1128E"). Regulations implementing these laws are codified in 45 C.F.R. part 60. These provisions provide that information from the NPDB is not subject to disclosure under FOIA.

> Specifically, section 11137(b)(1) of the Act prohibits disclosure, other than to the physician or practitioner involved; except with respect to professional review activity. This statute limits access to individually identifiable information maintained in the NPDB to

30

affected health practitioners and organizations engaged
in professional review activities such as boards of
medical examiners, state licensing boards, and health
care entities which have or may be entering into
employment or affiliation agreements with practitioners.
The NPDB information is not available to the general
public. This information can only be released to the
specific people or institutions listed in statute and
regulations cited above.

65. However, the agency completely failed to address in the June 22,
2015 letter the point that I had raised in in my September 14, 2013
letter, namely that 42 U.S.C. § 11137(b)(1) provides, emphasis added:

> **Information reported under this subchapter that is
> in a form that does not permit the identification of
> any particular health care entity, physician, other
> health care practitioner, or patient shall not be
> considered confidential. The Secretary (or the
> agency designated under section 11134 (b) of this
> title), on application by any person, shall prepare
> such information in such form and shall disclose
> such information in such form.**

66. As I explained in my September 14, 2013 letter, emphasis added:

> I did not expect the Department of Health and Human
> Services to divulge the names of individual physicians

31

who have been reported to the NPDB but subsequently
had those reports voided. What I did expect, as the plain
language of the statute provides, was that the Secretary
or one of her employees would "prepare" this
information "in a form that does not permit the
identification of any particular health care entity,
physician, other health care practitioner, or patient."
**This could be done simply by redacting the names of
all health care facilities, physicians, other health
care practitioners and patients in those Adverse
Action Reports that have been voided.**

"As the FOIA statute mandates, all reasonably segregable,
non-exempt portions of any agency records must, after
deletion of the exempt material, be disclosed to a
requester, 5 U.S.C. § 552(b) (last sentence)." *Wightman v.
Bureau of Alcohol, Tobacco & Firearms*, 755 F.2d 979, 982 (1st
Cir. 1985). ... Simply put, the agency must redact the
minimum required by 42 USC § 11137(b)(1) and may not
redact more than that.

67. The agency in the June 22, 2015 letter also did not offer a
rationale for why it was not complying with the request in my
September 14, 2013 that the agency prepare the information by
redacting the names of all health care facilities, physicians, other
health care practitioners and patients in those Adverse Action

32

Reports that have been voided, which in any event is what the plain language of 42 U.S.C. § 11137(b)(1) says.

68. Needless to say, the agency is not violating the law for the purpose of protecting those physicians whose Adverse Action Reports have subsequently been voided. The agency could care less about the fate of those physicians.

69. I do not at this juncture know the reason why the agency is refusing to provide the information in redacted form as the statute requires. It is conceivable that the agency has been sued by physicians, and prior to any published decision, has decided to void Adverse Action Reports in occasional cases where the agency sensed they were going to lose in court.

70. Again, without seeing the results of this FOIA request, I do not know the exact reason for the agency's recalcitrance. But the whole thing reeks of a desire to cover-up agency misconduct and incompetence.

71. It may also be that release of information regarding the agency's specific decisions (redacted with respect to physician and hospital information), and the way the agency is making those decisions, could lead to physician dissatisfaction with the agency. Physicians, once informed on how, specifically, the agency is acting arbitrarily, capriciously, and with utter disregard for fairness and physicians' Constitutional rights, might become politically motivated; and this might lead to changes with regard to either the how the agency

33

administers the HCQIA or the HCQIA statute itself. That, in turn, could convert a very easy job, wherein agency bureaucrats simply rubberstamp approval of all NPDB Reports, into a job where the bureaucrats would actually have to work for their high salaries.

72. In addition, the "FOIA requires an agency to issue a final determination resolving an information request within 20 business days from the date of its receipt. 5 U.S.C. § 552(a)(6)(A)(i)." *Sierra Club v. United States Environmental Protection Agency*, No. 11-cv-00846-MEJ f. 1 (N.D. Cal. Dec. 8, 2014). Yet as of the June 29, 2015 date of this complaint we are over 700 business days from the August 13, 2012 date of Request #1.

73. That we are now over 700 business days makes me concerned that HRSA is seeking to avoid responding to most of my FOIA requests by delaying indefinitely.

74. In sum, with regard to Request #3, I have exhausted all administrative remedies available to me, and no further right of agency review or appeal is available to me before HHS.

75. With regard to Requests #1, #2, #4 and #5, to date HRSA has not provided the records I requested in my Privacy Act and FOIA Requests, notwithstanding the FOIA's requirement of an agency response within 20 working days. Request #1 is well over 700 working days late at this point.

**REQUESTED RELIEF**

WHEREFORE, plaintiff prays that this Court:

1. order defendants to disclose the requested records in their entireties and make copies available to plaintiff;

2. provide for expeditious proceedings in this action;

3. award plaintiff the costs that plaintiff has incurred in this action;

4. grant such other relief as the Court may deem just and proper.


June 29, 2015                                Respectfully submitted,


Adam Brook, M.D., Ph.D.
350 Central Park West Apt. 12H
New York, NY 10025
(415) 516-0787

*Plaintiff* pro se

SIGNED AGAIN

11/14/15

35

**CIVIL COVER SHEET**

*1 5 2022*
*15 2022*
*BAH*

JS-44 (Rev. 7/13 DC)

**I. (a) PLAINTIFFS**

ADAM BROOK

**DEFENDANTS**

CATHERINE TETI ; TOM FLAVIN;
KAREN SHAW ;
DEPARTMENT OF HEALTH & HUMAN
SERVICES

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF NEW YORK
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT D.C.
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

PRO SE
350 CENTRAL PARK W APT 12H
NEW YORK, NY 10025
(415) 516 - 0787

Case: 1:15-cv-02022
Assigned To : Howell, Beryl A.
Assign. Date : 11/17/2015
Description: FOIA/PRIVACY ACT

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

- ◉ 1 U S Government Plaintiff
- ○ 3 Federal Question (U S Government Not a Party)
- ☒ 2 U S Government Defendant
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
(Place an X in one category, A-N, that best represents your Cause of Action and one in a corresponding Nature of Suit)

○ **A.** *Antitrust*

- ☐ 410 Antitrust

○ **B.** *Personal Injury/Malpractice*

- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Product Liability

○ **C.** *Administrative Agency Review*

- ☐ 151 Medicare Act

Social Security
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

Other Statutes
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D.** *Temporary Restraining Order/Preliminary Injunction*

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

RECEIVED
Mail Room

NOV - 9 2015

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

○ **E.** *General Civil (Other)* **OR** ○ **F.** *Pro Se General Civil*

Real Property
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

Personal Property
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

Bankruptcy
- ☐ 422 Appeal 27 USC 158
- ☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Conditions
- ☐ 560 Civil Detainee – Conditions of Confinement

Property Rights
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

Federal Tax Suits
- ☐ 870 Taxes (US plaintiff or defendant)
- ☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

Other Statutes
- ☐ 375 False Claims Act
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions
- ☐ 470 Racketeer Influenced and Corrupt Organization

- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 850 Securities/Commodities/Exchange
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act)

RECEIVED
Mail Room

OCT 26 2015

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

RECEIVED
Mail Room
NOV 17 2015
Angela D. Caesar, Clerk

| O **G. Habeas Corpus/ 2255** | O **H. Employment Discrimination** | ☒ **I. FOIA/Privacy Act** | O **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus – General | ☐ 442 Civil Rights – Employment (criteria: race, gender/sex, national origin, discrimination, disability, age, religion, retaliation) | ☒ 895 Freedom of Information Act ☒ 890 Other Statutory Actions (if Privacy Act) | ☐ 152 Recovery of Defaulted Student Loan (excluding veterans) |
| ☐ 510 Motion/Vacate Sentence | | | |
| ☐ 463 Habeas Corpus – Alien Detainee | | | |
| | *(If pro se, select this deck)* | *(If pro se, select this deck)* | |

| O **K. Labor/ERISA (non-employment)** | O **L. Other Civil Rights (non-employment)** | O **M. Contract** | O **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act | ☐ 441 Voting (if not Voting Rights Act) | ☐ 110 Insurance | ☐ 441 Civil Rights – Voting (if Voting Rights Act) |
| ☐ 720 Labor/Mgmt. Relations | ☐ 443 Housing/Accommodations | ☐ 120 Marine | |
| ☐ 740 Labor Railway Act | ☐ 440 Other Civil Rights | ☐ 130 Miller Act | |
| ☐ 751 Family and Medical Leave Act | ☐ 445 Americans w/Disabilities – Employment | ☐ 140 Negotiable Instrument | |
| ☐ 790 Other Labor Litigation | ☐ 446 Americans w/Disabilities – Other | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | |
| ☐ 791 Empl. Ret. Inc. Security Act | ☐ 448 Education | ☐ 153 Recovery of Overpayment of Veteran's Benefits | |
| | | ☐ 160 Stockholder's Suits | |
| | | ☐ 190 Other Contracts | |
| | | ☐ 195 Contract Product Liability | |
| | | ☐ 196 Franchise | |

**V. ORIGIN**

☒ 1 Original Proceeding   O 2 Removed from State Court   O 3 Remanded from Appellate Court   O 4 Reinstated or Reopened   O 5 Transferred from another district (specify)   O 6 Multi-district Litigation   O 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

5 USC 552; 5 USC 552a; 42 USC 11101 ET SEQ.

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** JURY DEMAND: | Check YES only if demanded in complaint YES ☐   NO ☒ |
|---|---|---|---|

| **VIII. RELATED CASE(S) IF ANY** | (See instruction) | YES ☐   NO ☒ | If yes, please complete related case form |
|---|---|---|---|

DATE: 10/23/15   SIGNATURE OF ATTORNEY OF RECORD _____ MO

NOV 11 19 15 /DK

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
**Authority for Civil Cover Sheet**

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and services of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the cover sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence. Use 11001 to indicate plaintiff if resident of Washington, DC, 88888 if plaintiff is resident of United States but not Washington, DC, and 99999 if plaintiff is outside the United States

III.   CITIZENSHIP OF PRINCIPAL PARTIES This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II

IV.   CASE ASSIGNMENT AND NATURE OF SUIT The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of the case

VI.   CAUSE OF ACTION Cite the U.S. Civil Statute under which you are filing and write a brief statement of the primary cause

VIII.   RELATED CASE(S), IF ANY If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form

